

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARLEY MULLION & CO. LIMITED,
ERNST RUSS (UK) LTD
SCANDINAVIAN SHIPPING

                                    Plaintiffs,

            - against -

CAVERTON MARINE LIMITED,

                                    Defendant,

Case No. 08 CV 5435 (BSJ)

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE

## ATTACHMENT PURSUANT TO F.R.CIV.P RULE E(4)(F)

### AND FOR ATTORNEY'S FEES

*Submitted By:*
Watson, Farley & Williams (New York) LLP
Attorneys for Defendant Caverton Marine Ltd.
Christopher P. Belisle (CPB-0119)
Neil A. Quartaro (NAQ-9640)
100 Park Avenue, 31st Floor
New York, NY 10017

## INTRODUCTION

Plaintiffs HARLEY MULLION & CO. LIMITED, ERNST RUSS (UK) LTD, and SCANDINAVIAN SHIPPING (collectively "Plaintiffs") filed and obtained an Order for Maritime Attachment Pursuant to the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims, Rule B ("Rule B") on June 16, 2008. As of the date hereof, Plaintiffs have attached over $180,000 in electronic funds transfers ("EFTs") coming from or going to Defendant, Caverton Marine Limited ("Caverton" or "Defendant"). As a basis for these attachments, Plaintiffs allege maritime jurisdiction stemming from an implied contract for ship brokerage services with Caverton related to the liquefied petroleum gas carrier BW SAGA.

Plaintiffs' sole basis for attachment is an incorrect assertion that, under both U.S. and English law, ship brokers have a maritime cause of action for alleged brokers' fees. The attachment was wrongful. Defendant believes that Plaintiffs have misled this Court in order to obtain *ex parte* relief consisting of the wrongful attachment of money and other assets belonging to Defendant, and therefore request that Plaintiffs be sanctioned by, at the very least, Defendant's attorney's fees related to vacating this wrongful attachment.

## FACTS

In January, 2007, Caverton began looking to charter a refrigerated liquefied petroleum gas carrier ocean-going vessel. Plaintiff Harley Mullion & Co. (UK) ("Mullion") assisted with this search, but was unsuccessful in finding such a vessel. No arrangement was memorialized between Caverton and Mullion. At a subsequent date, Caverton fixed BW SAGA on a time charter. During the time between Mullion's unsuccessful search and the fixture of BW SAGA, the individual at Mullion who had handled the file, Mr. Richard France, moved to Plaintiff Ernst Russ (UK) Ltd. (also a broker), apparently taking this claim with

19100046 v1

him.  Mr. France also involved Plaintiff Scandinavian Shipping (another broker) in attempting to fix a suitable vessel.  A dispute has now arisen between the Plaintiffs and Caverton regarding the calculation and payment of commissions.

Plaintiffs allege that the claim is subject to arbitration in London, (Complaint ¶17)[1] and do not place the merits of the dispute before this Court. (Complaint ¶21).  Also, Plaintiffs do not allege that any arbitration has been commenced.  Instead, Plaintiffs seek only security in New York for the alleged arbitration in London.  (Complaint ¶24).  In order to obtain security, Plaintiffs filed an *ex parte* Rule B action, seeking to attach, *inter alia*, electronic funds transfers to or from Caverton.  (Complaint ¶22).  Because Rule B requires a maritime cause of action, Plaintiffs simply employ a misleading defined term, "MARITIME CONTRACT", (Complaint ¶8, emphasis in the original), in a failed attempt to shoehorn the facts into a colorable maritime claim.

**LEGAL ARGUMENT**
**POINT I**
**THERE IS NO MARITIME JURISDICTION IN THIS MATTER**

Despite Plaintiffs' allegations to the contrary, a contract for the provision of ship brokerage services does not give rise to a maritime cause of action and maritime jurisdiction is therefore lacking in this matter.  As noted by the Second Circuit in *Winter Storm v. TPI*, "[m]aritime attachment is available whenever the plaintiff has an *in personam* claim against the defendant which is cognizable in admiralty." 310 F.3d 263, 268 (2d. Cir. 2002) *citing* 28 U.S.C. § 1333.  Plaintiffs proffer two legal arguments in support of their contention that their claim against Caverton sounds in admiralty:  (1) under U.S. law, "the exchange of emails between the parties is a maritime contract because charter party brokerage has a significant

---

[1]  The Verified Complaint contains a paragraph numbering error, whereby the paragraph numbers end after Paragraph 8 and renew immediately thereafter with Paragraph number 5.  In the interest of clarity, Defendant refers to the paragraph numbers as provided by the Verified Complaint and does not renumber them here.

19100046 v1

impact on maritime commerce . . ." (Complaint ¶8); and (2) under English law, the alleged ship brokerage agreement has reference to a maritime contract subject to English law and arbitration and to which Plaintiffs may claim third party beneficiary status. (Complaint ¶9). Both of these statements alleging maritime jurisdiction are wrong.

**A.     There is No Maritime Jurisdiction Under U.S. Law**

Plaintiffs' allegation of maritime jurisdiction over Caverton is misleading and incorrect. The doctrine in the Second Circuit for well over a century is that disputes arising out of preliminary services contracts for navigation do not give rise to maritime jurisdiction. *See, e.g., The Thames*, 10 F. 848 (D.C.N.Y. 1881) ("The distinction between preliminary services leading to a maritime contract and such contracts themselves ha[s] been affirmed in this country from the first. . . . ") *cited by Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 1998 AMC 1578 (2d Cir. 1998) ("*Drakos*"). This principle has been consistently applied to brokerage agreements ever since *The Thames. See, e.g. The Harvey and Henry*, 86 F. 656, 657 (2d Cir. 1881) (Denying admiralty jurisdiction to cargo brokerage claim); *Aktieselskabet Fido v. The Lloyd Braziliero*, 283 F.2d 62 (2d Cir.) *cert. denied*, 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922) (Declining to exercise maritime jurisdiction over charterer's cargo sale contract); *Christman v. Maristella Compania Naviera*, 349 F.Supp. 845, 848 (S.D.N.Y.) (Noting that Court did not have maritime jurisdiction over shipowner's claim against broker for breach of contract), *aff'd*, 468 F.2d 620 (2d Cir. 1972); *Boyd, Weir & Sewell, Inc. v. Fritzen-Halcyon Lijn, Inc.* 709 F.Supp. 77, (S.D.N.Y. 1989) ("[A]cting as a chartering broker is a preliminary matter and as such may not support admiralty jurisdiction"). In the instant matter, Plaintiffs obtained preliminary relief under an *ex parte* application in which they alleged maritime jurisdiction over a claim for services allegedly provided under an alleged ship brokerage agreement (Complaint ¶¶6-8), notwithstanding longstanding and

19100046 v1

applicable case law in the Second Circuit that holds exactly the opposite. Plaintiffs' *ex parte* Rule B application papers do not identify any of these cases to the Court, and offer no rationale why this case law should be overturned.

Taken in the light most favorable to Plaintiffs, the only possible good faith basis for the instant action is the decision in *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). The narrow holding in *Exxon* overrules the *per se* exclusion of agency agreements from maritime jurisdiction previously established by *Minturn v. Maynard*, 17 How. (58 U.S) 477, 15 L.Ed. 235 (1854). *Id.* *Exxon* holds that an agency contract can be a basis for maritime jurisdiction "if the nature of the transaction was maritime." *Id.* at 611, 111 S.Ct. 2076 (this has been called the "*Exxon* analysis"). However, the *Exxon* decision explicitly states that the Court was not ruling on the preliminary contract doctrine. *See id.* at 613 n. 7, 111 S.Ct. at 2077 n. 7 ("This Court has never ruled on the validity of the preliminary contract doctrine, nor do we reach that question here").

The Second Circuit, in the *Drakos* case, had occasion to address the question of whether or not *Exxon* overruled the preliminary contract doctrine and found that it did not:

> Although *Exxon* instructs that the *per se* agency contract exception no longer applies, it does not necessarily require a similar fate to the preliminary contract doctrine.

140 F.3d at 133.

The *Drakos* Court found that the chartering brokerage contract before it was not maritime under both the preliminary contract doctrine and the *Exxon* analysis. *Id.* at 133-34. Thus to the extent that Plaintiffs argue that *Exxon* requires a different result, the plain language of *Exxon* and of *Drakos* shows that it does not, and we are unaware of any reported case in which a United States Court has extended admiralty jurisdiction in such circumstances.

19100046 v1

However, even if this Court were to apply Plaintiffs' reasoning to the instant Rule B action, the attachment still fails for want of maritime jurisdiction (see Point II, *infra*).

**B.    There is No Maritime Jurisdiction Under English Law**

Plaintiffs represent to this Court that they have a maritime claim under English law because the alleged agreement:

> is based upon two maritime charter party contracts which are governed by English law, and, under English law brokers can enforce their rights in admiralty, even though they are not a party to a maritime charter party, by relying on the provisions of the Contract (Rights of Third Parties) Act because a maritime charter party confers a benefit on brokers.

(Complaint ¶10).

This transparent attempt to coat Plaintiffs' decidedly land-based claim with a patina of English maritime law should be rejected out of hand by this Court, but in any event English law has absolutely no bearing on whether or not Defendant is subject to maritime jurisdiction in the Southern District of New York. However, Plaintiffs' unsupported allegation that the Contracts (Rights of Third Parties) Act somehow confers maritime jurisdiction to a shipbroker's claim for commissions simply because a charter party (in which the brokers are not named and the alleged commission is not referenced) confers a benefit on brokers misstates English law and is incorrect.

The underlying Charters make no reference to either brokers' commissions for arranging the hire of BW SAGA or to the brokers themselves. (*See*, Quartaro Aff. Exs. 1-2; Hutcheon Aff. ¶5). Under the Contracts (Rights of Third Parties) Act, a third party must be identified in the contract or have a right conferred on it by that contract in order to be a third party beneficiary. (Hutcheon Aff. ¶4). In the instant matter, the absence of such references in the underlying agreements makes the Contracts (Rights of Third Parties) Act inapplicable and the cited authority provides no support for Plaintiffs' position. (Hutcheon Aff. ¶5).

19100046 v1

Furthermore, a review of applicable English case law has revealed no reported decision in which admiralty jurisdiction was extended to a claim for a charter party brokerage commission.  (Hutcheon Aff. ¶6).  Plaintiffs' misleading statement on the effect of foreign law, made in support of *ex parte* relief, should not go unnoticed by the Court.

**POINT II**
**IN ANY EVENT, PLAINTIFFS FAIL TO MAKE ANY AFFIRMATIVE SHOWING**
**THAT THE ALLEGED CONTRACT IS MARITIME IN NATURE**

Even if the preliminary contract doctrine did not preclude the instant claim, there is compelling precedent that the alleged brokerage agreement in this case is not sufficiently maritime in nature to come within maritime jurisdiction using the *Exxon* analysis.  The instant case is precisely on point with *Drakos,* where the Second Circuit affirmed the District Court's dismissal of a ship broker's complaint for lack of maritime jurisdiction, even taking as true the broker's unsupported allegation that it had a written contract with the defendant charterers. 130 F. 3d at 134.  In upholding the dismissal of the complaint, the Second Circuit found that the alleged ship brokerage contract was not sufficiently "maritime in nature" even if the *Exxon* analysis were applied.  *Id.*  In that case, the plaintiff claimed for breach of contract based on a lost brokerage commission but was unable to produce a written contract with the defendant.  *Id.*  The facts in *Drakos* mirror the unsupported allegation presently before this Court.  Accordingly, even if the Court applies the only possible legal basis for Plaintiffs' assertion that maritime jurisdiction exists over a broker's claim for lost commissions, the ineluctable conclusion is that maritime jurisdiction is clearly lacking.

Such a decision would fall squarely in line with the jurisprudence post-*Exxon*.  Even applying the *Exxon* analysis, Courts have uniformly found ship brokerage and similar types of

agreements to be non-maritime in nature. *Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS*, 78 F.Supp.2d 162 (S.D.N.Y. 1999) (J. Scheindlin) (Analyzing brokerage agreement similar to that at issue in *Drakos* and finding that an agreement to procure contract for oil rigs was too far removed from navigation or maritime commerce to justify the exercise of federal maritime jurisdiction); *Tankship Intern., LLC v. El Paso Merchant Energy-Petroleum Co.*, 428 F.Supp.2d 93 (D.Conn. 2006) (J. Arterton) (Dismissing for lack of maritime jurisdiction broker's breach of contract claim for failure to pay commission because alleged contract was not maritime); *Masherah v. Dettloff*, 968 F.Supp. 336 (E.D.Mi. 1997) (Holding that, applying the *Exxon* analysis, contract between seafarer's union and doctor, pursuant to which doctor conducted annual physical examinations of seaman, was not maritime contract within admiralty jurisdiction). Courts that have found maritime jurisdiction over a service contract have done so where there are many factors not present here. *Compania Tauben S.A. v. Stolt Tankers, Inc.*, 179 Misc.2d 933, 686 N.Y.S.2d 916 (N.Y. Sup. Ct. 1998) (Finding maritime jurisdiction over five year contract for the provision of services including: (1) negotiating duration of cargo contracts; (2) setting annual cargo volumes; (2) setting freight rates for cargo; (3) establishing discharge port requirements and selecting of ports; (4) negotiating demurrage and bunker rates; (5) handling nomination of ports and cargo declarations; and (6) negotiating payment of demurrage invoices).

## POINT III
## THIS ATTACHMENT IS SO FRIVILOUS AS TO WARRANT THE AWARD OF ATTORNEY'S FEES

Plaintiffs' misleading statements of law, and lack of legal support for their position, justify the award of attorney's fees in this instance. Defendant is cognizant of the "American Rule" that the prevailing party in a United States federal court litigation generally cannot

19100046 v1

recover attorneys' fees. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Notwithstanding the American Rule, this Court does have the power to award attorneys' fees to Caverton if the Court finds that the instant action was commenced "in bad faith, vexatiously, wantonly, or for oppressive reasons."[2] *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (footnote omitted); *Weinberger v. Kendrick,* 698 F.2d 61, 80 (2d Cir. 1982). Because of the potential to deter those with colorable claims, the award of attorney's fees under the bad-faith exception requires both " 'clear evidence' that the challenged actions 'are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes,' " *Weinberger v. Kendrick,* 698 F.2d at 80 (citation omitted), and "a high degree of specificity in the factual findings of [the] lower courts." *Weinberger v. Kendrick,* 698 F.2d at 80. Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of "whether a reasonable attorney could have concluded that facts supporting the claim <u>might be established</u>, not whether such facts actually <u>had been established</u>." *Nemeroff v. Abelson,* 620 F.2d at 348 (emphasis in original).

Plaintiffs' misleading statements as to the applicable law, made in support of an *ex parte* Rule B attachment application against a foreign defendant satisfies the bad faith exception to the American Rule. There is 'clear evidence' that the challenged attachment was made entirely without color, as there is compelling, on-point precedent that a simple breach of claim for lost brokerage commissions does not confer maritime jurisdiction. There is no

---

[2]  In the alternative, this Court may impose sanctions absent a finding of bad faith given the Court's inherent power "'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123 (1991) (holding that Court may asses sanction for conduct which interferes with the court's power to manage its calendar and the courtroom without a finding of bad faith).

19100046 v1

reasonable basis to conclude that this claim was maritime under the preliminary contract doctrine, and the *Exxon* analysis similarly leads to the conclusion that maritime jurisdiction is lacking here.  To the extent that the Plaintiff seeks to use *Exxon* as a shield, *Drakos* involves nearly identical facts as are before the Court here, and finds that there is no maritime jurisdiction if the *Exxon* analysis is employed.  That the attachment of over $180,000 in electronic funds transfer from or to Defendant was harassing is self-evident, as Defendant was forced to obtain New York counsel and suffered a disruption to its business by having its assets seized.

## CONCLUSION

All of Plaintiffs' attachments in the S.D.N.Y. should be vacated because Defendant is not subject to maritime jurisdiction here.  Moreover, Plaintiffs' misleading statements to this Court regarding the legal basis for the exercise of maritime jurisdiction are so egregious as to warrant the imposition of sanctions for Defendant's costs in vacating the Rule B attachments.

Dated: New York, New York
      July 11, 2008

                    WATSON, FARLEY & WILLIAMS (NEW YORK) LLP

By: _____
              Christopher P. Belisle (CPB-0119)
              Neil A. Quartaro (NAQ-9640)
              100 Park Avenue, 31st Floor
              New York, NY 10017
              Tel: (212) 922-2200
              Fax: (212) 922-1512

TO:    Chalos, O'Connor & Duffy, LLP
          Attorneys for Plaintiffs
          366 Main Street
          Port Washington, NY 11050
          Attn.:  Owen F. Duffy, Esq.
                  George E. Murray, Esq.

19100046 v1

## CERTIFICATE OF SERVICE

Neil A. Quartaro declares and states that:

I am not a party to these actions, am over 18 years of age and work in New York, New York. I am an employee with Watson, Farley & Williams (New York) L.L.P. attorneys for Plaintiffs with offices at 100 Park Avenue, 31st Floor, New York, NY 10018.

On July 11, 2008, I served true copies of the attached Defendant Caverton Marine Limited's Affidavit of Neil A. Quartaro and Memorandum of Law in Support of Motion to Vacate Attachment and in Support of Attorney's Fees:

> Chalos, O'Connor & Duffy, LLP
> Attorneys for Plaintiffs
> 366 Main Street
> Port Washington, NY 11050
> Attn.: Owen F. Duffy, Esq.
>          George E. Murray, Esq.

by furnishing delivering the same to an overnight courier with instructions to deliver them to Plaintiffs' counsel above.

I declare and state under penalty of perjury that the foregoing is true and correct.

Executed on: July 11, 2008

_____
Neil A. Quartaro

12                                          19100046 v1