

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARLEY MULLION & CO. LIMITED,
ERNST RUSS (UK) LTD
SCANDINAVIAN SHIPPING

        Plaintiffs,

   - against -

CAVERTON MARINE LIMITED,

        Defendant,

Case No. 08 CV 5435 (BSJ)

**AFFIDAVIT OF NEIL A.
QUARTARO IN SUPPORT
OF DEFENDANT'S
MOTION TO VACATE
ATTACHMENT AND FOR
THE AWARD OF
ATTORNEY'S FEES**

STATE OF NEW YORK )
        ) ss:
COUNTY OF NEW YORK )

  I, NEIL A. QUARTARO, being duly sworn, deposes and says pursuant to the penalties of perjury under the laws of the United States of America

  1.  I am an attorney with the law firm of Watson, Farley & Williams (New York) LLP, counsel for defendant Caverton Marine Limited ("Caverton") and make this affidavit based upon my knowledge and documents provided to me by Caverton.

  2.  I make this Affidavit in support of Caverton's Motion to Vacate Attachment Pursuant to Federal Rule of Civil Procedure Rule E(4)(f) and for Attorney's Fees.

  3.  According to the instant Verified Complaint ("Complaint") and accompanying Order for Maritime Attachment Pursuant to Federal Rule of Civil Procedure Rule B ("Rule B"), filed June 16, 2008, Plaintiffs seek payment of certain commissions they allege are owed by Caverton for ship brokerage services related to two charters for the vessel BW SAGA.

  4.  The Complaint identifies two charters at issue: "from Bergesen to Caverton Marine and from Caverton Marine to Nlng [Nigerian LNG]". Attached hereto as Exhibit 1 is

19100047 v1

a true and correct copy of the executed and initialed charter between Bergesen (also known as "BW Green Carriers") and Caverton, provided to us by Caverton.

5.    Attached hereto as Exhibit 2 is a true and correct copy of the executed and initialed charter from Caverton to Nigeria LNG Limited, provided to us by Caverton.

6.    Plaintiffs allege that this Court has maritime jurisdiction under U.S. law over Plaintiff's claim "because charter party brokerage has a significant impact on maritime commerce". (Complaint ¶ 8).  However, Plaintiffs do not identify to the Court the substantial body of jurisprudence in the Second Circuit holding that charter party brokerage is not a maritime contract, but rather is a contract preliminary to navigation.

7.    Even if the Court applies the nature and subject analysis used for other alleged maritime contracts, there is on-point Second Circuit precedent holding that Plaintiff's claims for a lost brokerage fee is not maritime in nature and thus cannot support maritime jurisdiction over Caverton.

8.    In the alternative, Plaintiffs allege that this Court has maritime jurisdiction under English law because the alleged agreement to pay brokers' fees:

> is based upon two maritime charter party contracts which are governed by English law, and, under English law brokers can enforce their rights in admiralty, even though they are not a party to a maritime charter party, by relying on the provisions of the Contract (Rights of Third Parties) Act because a maritime charter party confers a benefit on brokers.

Complaint ¶ 9

Plaintiff's statement as to English law is offered without explanation as to why it might apply in New York and is devoid of support by counsel admitted to practice by the Law Society England & Wales.

19100047 v1

9.    In fact, Plaintiff's representation as to English law with respect to third parties

is incorrect, as is demonstrated by the Declaration of Andrew Hutcheon, Esq., a solicitor

admitted to practice by the Law Society England & Wales and experienced in maritime law.


Dated: New York, New York
       July 11, 2008

Neil A. Quartaro

                    Subscribed and sworn to before me this 11th Day of June,
                    2008

                    Notary Public

                    Clark Gregory Chase
                    No. 02CH6123022
                    Qualified in New York County
                    Certificate Filed in New York County
                    Commission Expires February 28, 2009

19100047 v1

EXHIBIT 1

IT IS THIS DAY AGREED between BW Green Carriers AS of Drammensveien 145, Oslo, Norway (hereinafter referred to as "Owners"), being disponent owners of the fully refrigerated LPG vessel called *BW Sapa* (hereinafter referred to as "the Vessel") described as per Clause 1 hereof,

AND

Caverton Marine Limited of 1, Prince Kayode Akingbade Close, Victoria Island Lagos, Nigeria (hereinafter referred to as "Charterers"):

## 1. Description and Condition of Vessel

At the date of delivery of the Vessel under this charter and throughout the charter period:

(a) she shall be classed by a classification Society, which is a member of the International Association of Classification Societies;

(b) she shall be in every way fit to load, carry, discharge and measure normal commercial quality and quantity of Liquefied Petroleum Gas (LPG);

(c) she shall be tight, staunch, strong in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;

(d) her tanks, valves and pipelines and appurtenances pertaining to the LPG cargo shall be gas-tight and fully functional;

(e) she shall be in every way fitted for burning at sea – fueloil with a maximum viscosity of Centistokes at 50 degrees Centigrade/any commercial grade of fueloil for main propulsion, marine diesel oil for auxiliaries, in port – marine diesel oil for auxiliaries See Clause30;

(f) she shall have all her cargo measuring equipment and instrumentation calibrated and certified, and this shall be verified (if required by Charterers);

(g) she shall comply with the regulations in force so as to enable her to pass through the Suez Canal by day and night without delay;

(h) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her perform the charter service without delay;

(i) she shall comply with the description in Form C appended hereto, provided however that if there is any conflict between the provisions of Form C and any other provision, including this Clause 1, of this charter such other provision shall govern.



1

2. Shipboard Personnel and their Duties

(a)  At the date of delivery of the Vessel under this charter and throughout the charter period:

    (i)  she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the Vessel and her equipment competently and safely;

    (ii)  all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state and shall be trained in accordance with the relevant provisions of the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, 1978;

    (iii)  there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently;

    (iv)  the terms of employment of the Vessel's staff and crew will always remain acceptable to The International Transport Worker's Federation (ITF)

    (v)  Owners and/or any person engaged by Owners as managers or operators of the Vessel shall comply with any national or international law or regulation applicable in respect of the management or operation of the Vessel.

(b)  Owners shall exercise due diligence that throughout the charter service the master shall with the Vessel's officers and crew, unless otherwise ordered by Charterers:
    (i)  prosecute all voyages with the utmost despatch;
    (ii)  render all customary assistance; and
    (iii)  load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

(c)  It is agreed that the Owner will employ Nigerian crew as agreed with the relevant Authorities in compliance with the Nigerian Cabotage Act, 2004. The number and seniority level of such Nigerian ratings will be agreed but it is understood that (in the Owners sole discretion) if suitable crew cannot be found then the Owner shall employ such crew as required but will double up with non Nigerian staff until the Nigerian staff are trained and in the reasonable opinion of the master acceptable for the position they are to fill.

All extra costs (including doubling up of ships staff, if any) arising out of employing such Nigerian ship staff including training costs shall be for Charterers account and will be paid promptly on invoice from Owner.  It is understood that the Owner may not employ such

2



Nigerian staff directly but will use the services of a reputable Nigerian manning agency or other reputable company. The employment of Nigerian staff will always comply with ITF regulations or agreements acceptable to the ITF

It is also understood and agreed that such Nigerian manning may only be qualified for Nigerian coastwise trade and that should the Owner agree to trade the Vessel outside Nigeria for a limited time on the instruction of Charterer, then any and all extra costs (including but not limited to travel and severance payments if necessary) incurred in changing the Nigerian manning of the vessel to permit such trade shall be for Charterer's account and shall be paid promptly on receipt of Owner's invoice.

Charterers will allow the vessel to deviate to a nearby convenient place outside Nigeria to change crew whilst on hire provided such deviation does not seriously disrupt the discharge programme of the cargo.

(d)    At certain ports it is usual and necessary for ship's crew to connect and disconnect cargo hoses and/or chicksan arm from vessel's manifold and such work to be done free of expenses to the Charterers under the shore terminal's guidance and at the shore terminal's responsibility.

## 3. Duty to Maintain

(a)    Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 28 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the Vessel.

(b)    If at any time whilst the Vessel is on hire under this charter the Vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 25.

(c)    If Owners are in breach of their obligation under Clause 3(a) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the Vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d)    Furthermore, at any time while the Vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in



3



such notice. This sub-Clause (d) is without prejudice to any rights of the Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).

(e)    Owners do not give any warranties as to the vessels approvals by all oil company but the ship will be maintained in a condition acceptable to Shell subject to Shell not amending their vetting requirements with regard to the age of the vessel.

Owners shall advise Charterers immediately, in writing, should the Vessel fail an inspection by, but not limited to a governmental and/or port state authority, and/or terminal and/or major charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects, which have caused the failure of such inspection.

(f)    Where Owners fail to remedy the defect under Clause 3(e) above within a period of 10 (ten) days and such failure prevents normal commercial operations then Charterers have the option to place the Vessel off-hire from the date and time that the Vessel fails such inspection and becomes commercially inoperable, until the date and time that the Vessel passes a re-inspection by the same organisation, or becomes commercially operable, which shall be in a position no less favourable to Charterers than at which she went off-hire.

(g)    i)    During the currency of this Charter, the Owners shall procure that both the vessel and the "Company" (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter, loss, damages, expense or delay caused by failure on the part of the Owners or the "Company" to comply with the ISM Code and/or failure to respond (or delay in responding) to Charterers' request for the foregoing documents and certificates shall be for the Owners' account. Owners undertake that the vessel will have on board a certificate valid for the full duration of this Charter, warranting that the company operating the vessel and the vessel comply with the ISM Code.

ii)    Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements in the format reasonably agreed and appended hereto as Appendix B;

iii)   Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners;



4



Limits and Safe Places

ree to let and Charterers agree to hire the vessel for a period of One year,
ng from the date of delivery of the Vessel. Charterers have the option to extend
id year and a third year. The final declared period shall be plus or minus 30
arterers' option. Charterer's option to extend for the second and third year is to
I no later than 9 months after the commencement of the initial period or the first
clared.

I shall be used for the purpose of carrying all lawful merchandise (subject
Clause 29) including in particular 1 or 2 grades fully refrigerated normal
I quality Liquefied Petroleum Gas (LPG) and if 2 grades, always within Vessel's
regations for trading between safe ports or places within Nigerian waters of
geria as Charterers shall direct. Vessel not to carry incompatible products at the

will trade Nigerian coastwise but, in exceptional circumstances Charterers may
ners to trade the vessel outside the agreed limitations. The Vessel shall not be
y trade that could result in detention/arrest or restraint by any or authorities
ntal or otherwise). Charterers agree that should Owners incur any delays, costs
s as a result of Charterers request to trade outside Nigeria including but not
nanging or dismissing any officers or crew, the cost of obtaining COFR for USA
n such costs and expenses shall be for Charterers account and delays to the
ny shall be on-hire. However Owners shall endeavour to minimise such delays

will not be ordered to areas where there is danger from ice.

shall use due diligence to ensure that the Vessel is only employed between and
ces (which expression when used in this charter shall include ports, berths,
ocks, anchorages, submarine lines, alongside vessels or lighters, and other
ncluding locations at sea) where she can safely lie always afloat,
iding anything contained in this or any other clause of this charter, Charterers
ant the safety of any place to which they order the Vessel and shall be under
n respect thereof except for loss or damage caused by their failure to exercise
ce as aforesaid. Subject as above, the Vessel shall be loaded and discharged
ces as Charterers may direct, provided that Charterers shall exercise due
ensure that any ship-to-ship transfer operations shall conform with Clause 22



5 

5. Delivery, Redelivery

(a)    The Vessel shall be delivered by Owners on arrival off Bonny River, Nigeria at Owners'
       option and redelivered to Owners dropping outbound pilot at, or off a port or at a safe
       anchorage, Nigeria at Charterers' option.

(b)    The Vessel shall not be delivered to Charterers before 15 August 2007 and Charterers
       shall have the option of cancelling this charter if the Vessel is not ready and at their
       disposal on or before 31st August 2007.

(c)    On delivery and redelivery the Vessel to present under vapours and heel normal
       commercial quality LPG, with last 3 cargoes LPG.


6. Owners to Provide

(a)    Owners undertake to provide and to pay for all provisions, wages and shipping and
       discharging fees and all other expenses of the master, officers and crew; also, for all
       insurance on the vessel, for all deck, cabin and engine-room stores, for all drydocking,
       overhaul, maintenance and repairs to the vessel and for all fumigation expenses and de-rat
       certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or
       import duties arising at any time during the performance of this charter in relation to the
       personal effects of the master, officers and crew, and relation to the stores, provisions and
       other matters aforesaid which Owners are to provide and pay for and Owners shall refund to
       Charterers any sums Charterers or their agents may have paid or been compelled to pay in
       respect of any such liability. Any amounts allowable in general average for wages and
       provisions and stores shall be credited to Charterers insofar as such amounts are in respect
       of a period when the vessel is on-hire.


(b)    Overtime pay of the master, officers and crew in accordance with ship's articles shall be for
       Owners' account when incurred, as a result of complying with the request of Charterers or
       their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning.


7. Charterers to Provide

(a)    Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage
       and pilotage and shall pay all agency fees, port charges, commissions, expenses of loading
       and unloading cargoes, canal dues and all charges other than those payable by Owners in
       accordance with Clause 6 hereof, provided that all charges for the said items shall be for
       Owners' account when such items are consumed, employed or incurred for Owners'
       purposes or while the vessel is off-hire (unless such items reasonably relate to any service
       given or distance-made-good-and-taken into account under Clause 21 or 23); and provided



6

further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

(b) It is agreed that Charterers shall promptly re-imburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably paid for by the Owners as a consequence of the Vessel's trade.

(c) Due to the unclear safety situation in Nigeria should the master be concerned about the safety of the Vessel, officers and crew he shall, in his sole discretion and upon informing the Charterers, be permitted to move the Vessel off shore, further to sea or other safe place until in the master's opinion it is safe to return. Such movement, bunkers consumed shall be on hire and any additional substantiated (original vouchers and invoices) reasonable costs incurred shall be for Charterers account.

(d) Charterers shall arrange for the provision of suitable and sufficient Nigerian Navy guards on board the Vessel as the master requires.

(e) The Vessel shall be used off the Nigerian coast and as such shall require an exemption from the Nigerian Authorities. Charterers shall arrange any and all exemptions (at their cost and time) to permit the Vessel to trade on the Nigerian coast. Charterers shall provide Owners with written documentary evidence that all exemption have been obtained.

(f) Charterers confirm that they will ensure that the Vessel is acceptable to national, regional and local and governmental authorities and other Nigerian bodies having authority over the trade, manning and operation of the Vessel and further Charterers will ensure that the Vessel will be physically acceptable to the terminals and loading places utilized by the Vessel.

(g) All permits required to enable the Vessel to trade and serve as a floating storage unit in Nigeria throughout the period of the Charter, including importation and exportation of the Vessel her equipment and spare parts, will be arranged by the Charterer for its account. Owners will ensure that the vessel, master, officers, crew, and support staff in Nigeria and entering Nigeria will receive all permits in connection with the Vessel and its manning. The cost of these permits to be for the Owner's account.

(h) Charterers shall provide and pay for all potable water required by the vessel as and when requested by the master.

(i) Charterers shall provide and pay for the provision of facilities to remove all waste, garbage and sludge from the vessel as and when requested by the master.

(j) If after the date on which this charter is agreed there are changes in the laws and regulations of Nigeria making the use of the Vessel as floating storage more expensive then Charterers shall re-imburse Owners promptly for any corresponding extra costs incurred by Owners by increasing the hire rate of by lump sum payments, so that the Owner is in no worse financial position than if such a change had not occurred



7

(k)    The Charterers agree that their agents will undertake without charges normal ship's
husbandry as Owners agents. This shall not include any extraordinary business such as but
not limited to crew member deserting or being left in hospital, when Owners shall appoint
their own agents or pay Charterers agents in accordance with locally recognised tariff.

## 8. Rate of Hire

Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate
of U.S $ 26,500 per day, and pro rata for any part of a day, from the time and date of her
delivery (local time) until the time and date of her redelivery (local time) to Owners.

## 9. Payment of Hire

Subject to Clause 3(c) and 3(f), payment of hire shall be made in immediately available funds to *BW
Green Carriers AS account at*
    *Bank: DnB NOR*
    *BIC/SWIFT : DNBANOKKXXX*
    *Account for international payments: NO59 7037 0443 090*
    *Cover through: IRVTUS3N*
    *Beneficiary: BW Green Carriers AS*

per calendar month in advance, less:

(i)     any hire paid which Charterers reasonable estimate to relate to off-hire periods, and;

(ii)    any amounts disbursed on Owners' behalf, any advances and commissions thereon,
and charges which are for Owners' account pursuant to any provision hereof, and;

(iii)   any amounts due or reasonably estimated to become due to Charterers under this
charter,

any such adjustments to be made at the due date for the next monthly payment after
the facts have been ascertained. Charterers shall not be responsible for any delay
or error by Owners' bank in crediting Owners' account provided that Charterers have
made proper and timely payment.

In default of such proper and timely payment:

(a)    Owners shall notify Charterers of such default and Charterers shall within
seven days of receipt of such notice pay to Owners the amount due
including interest, failing which Owners may withdraw the vessel from the
service of Charterers without prejudice to any other rights Owners may
have under this charter or otherwise; and

8



Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made at the rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

## 10. Space Available to Charterers

The whole reach, burthen and decks of the Vessel and any passenger accommodation shall be at Charterers' disposal, reserving only proper and sufficient space for the Vessel's master, officers, crew, extra personnel, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 500 tonnes at any time during the charter period.

## 11. Instructions and Logs

All oral and written instructions between Charterers and the master of the Vessel shall be in English Language. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required.  The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require.  Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

## 12. Bill of Lading

(a)  The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the Vessel, agency and other arrangements, and subject to Clause 12(c) below shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise:

   (i)  from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 12(b)) from the master otherwise complying with Charterers' or their agents' orders;

9



(ii) from any irregularities in papers supplied by Charterers or their agents.

(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo:

(i) at any place other than that shown on the bill of lading and/or

(ii) without presentation of an original bill of lading,

unless they have received from both written confirmation of such orders and an indemnity(ies) in a form acceptable to Owners

(c) For cargo destined for domestic Nigerian waters trading the Vessel shall not produce valid bills of lading but will issue 'Mates receipts' for all cargo loaded and discharged. Should it be agreed that the Vessel trades outside Nigeria then the Vessel will produce bills of lading for the cargo on board prior to sailing from Nigeria. If bills of lading are produced and should Charterers require the Vessel to discharge without presenting original bill(s) of lading at the discharge port and/or wish discharge at a port different to that named on the bill of lading(s) then Owners may discharge cargo as requested provided Charterers arrange for an indemnity, in a form acceptable to Owners, to be provided to the Owners and master. Such indemnity shall be countersigned by a first class bank or a company acceptable to Owners and the indemnity and countersignature to be provided to Owners at their Oslo office in sufficient time not to delay vessel.

(d) The master of the Vessel will, if requested by cargo owners, and approved by Charterers draft bills of lading (in originals and copies as specifically instructed by cargo owners) for the transhipment vessel for each cargo loaded off the Vessel. Such Bills of Lading shall be issued by and for and on behalf of the transhipment vessel. Save for wilful neglect on the part of the master, Charterers and cargo owners hereby indemnify Owners against consequences and or liabilities that may arise.

(i) from drafting such bills of lading according to Charterers directions;

(ii) from irregularities in papers supplied to transhipment vessel in compliance with Charterers directions.

(iii) from the handling of the Bills of lading once issued by the transhipment vessel on behalf of Cargo Owners;

## 13. Conduct of Vessel

If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall

10

immediately investigate the complaint. If the complaint proves to be well founded, Owner shall discuss the results of their investigations with Charterer and if so required by Charterer effect a change in the appointment as soon as possible.

## 14. Bunkers at Delivery and Redelivery

The Vessel will deliver with full bunkers less that used to ballast the Vessel to the delivery position. With regard to the trade Owners will utilise Fuel Oil Bunker tank(s) for Gas Oil thus reducing the fuel oil capacity. On redelivery the vessel should have sufficient bunkers with bunkers of each grade for 8 sea days full speed steaming with normal safety reserves. Bunker prices shall be as per last paid prior delivery and redelivery respectively. However, bunkering for delivery and redelivery shall be done after consultation with the other party with regard to the trading intentions. Bunkering for delivery and redelivery shall not be done for the purposes of making a profit.

## 15. Stevedores, Pilots and Tugs

Stevedores and or cargo surveyors when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboats personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that:

(i)    the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and;

(ii)   Charterers shall be liable for any damage to the Vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

## 17. Supernumeraries

Charterers may send representatives in the Vessel's available accommodation upon any voyages made under this charter, Owners finding provisions and all requisites as supplied to officers except liquors, Charterers paying at the rate of $25 per day for each representative while on board the Vessel. Charterers and supernumeraries shall sign Owners normal indemnity in the form as provided under Attachment 1 of this Agreement.

11



18. Sub-letting

Charterers may sub-let the Vessel, but shall always remain responsible to Owners for due fulfilment of this charter.

19. Final Voyage

If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for:

    (i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and

    (ii)  bunkers on board at redelivery pursuant to Clause 14.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the Vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. However, no final voyage shall be undertaken unless Charterers can reasonably expect to redeliver the vessel within agreed period.

20. Loss of Vessel

Should the Vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss. Should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the Vessel's underwriters agree that the Vessel is a constructive total loss and should the Vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

21. Off-hire

    (a)   On each and every occasion that there is loss of time (whether by way of interruption in the Vessel's service or, from reduction in the Vessel's performance, or in any other manner):




12

(i)     due to deficiency of persons or stores; repairs; gas-freeing for repairs; time waiting to enter dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the Vessel or her equipment; overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than six (6) consecutive hours (if resulting from interruption in the Vessel's service) or cumulates to more than six (6) hours (if resulting from partial loss of service); or

(ii)    due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than six (6) consecutive hours; or

(iv)    due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)     due to detention of the Vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the Vessel, the Vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); or

(vi)    due to any other circumstances where the Vessel is off-hire under this charter;

then without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the Vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the Vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)     Subject to Clause 25(b), where the Vessel fails to proceed at any guaranteed speed pursuant to Clause 25, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the Vessel shall be off-hire under this Clause 21 shall be the difference between:
        (i)   the time the vessel would have required to perform the relevant service at such guaranteed speed, and
        (ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

13

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 25.

(c)   Further and without prejudice to the foregoing, in the event of the Vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the Vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the Vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire.  If the Vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners.  Should the Vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby unless the Vessel is already off-hire at the time of deviation.

(d)   If the Vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find commercially impracticable to employ the Vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the Vessel shall be off-hire and Owners shall have the right to employ the Vessel on their own account.

(e)   Time during which the vessel is off-hire under this charter shall count as part of the charter Period except where Charterers declare their option to add off-hire under Clause 4(d).

(f)   All references to "time" in this charter shall be references to Nigerian time except where otherwise stated.

(h)   In the event that the Vessel is off-hire for any reason other than in connection with periodical drydocking pursuant to Clause 23 for any period in excess of 20 consecutive days or exceeding 40 days in any period of 90 days, Charterers may request Owners to supply temporary substitute tonnage from Owners controlled fleet (positioning and cost of substituting to be for Owners account)  and if Owners fail to do so within a further 10 days, then Charterers shall have the option to terminate this charter by giving notice in writing with effect from any date stated in such notice provided that the Vessel is free of cargo at the time when such notice becomes effective. This Clause 21(h) is without prejudice to any other rights or obligations of Owners or Charterers under this charter. For the purposes of this Clause 21(h), in the event of partial loss of service, the period of off-hire shall be the total period during which the Vessel is not fully efficient rather than the resulting loss of time.

14

## 22. Ship-Ship Transfer

(a)   It is contemplated under this charter that the discharge of cargo shall be by Ship-Ship (STS) operations. The following provisions shall apply:

   (i)   In the event STS is required by Charterer, it shall be at Charterer's risk, cost and expense and Charterer shall provide a safe and protected area for the conduct of such STS operation where the Vessel can safely and legally proceed to, lie and depart from, always afloat and which shall always be subject to master's approval, Owners affording necessary co-operation and accommodation..

   (ii)  Charterer shall give Owner a firm notice of commencement of such operation and shall ensure that the other vessel(s) involved are approved by the Owner. Such approval by Owner will be determined by the other vessel(s) having at least one of the following:

      □ A satisfactory Owner's inspection within 12 months of STS operation.
      □ A CDI or SIRE report, satisfactory to Owner, less than 12 months old at time of STS operation.

   Charterer may also advise Owners of any Oil Major approvals the ship may have.

   Any delays/costs/expenses resulting from Owner's physical inspection arrangements shall be for Charterers' account

(b)   Any delays as a result of Charterers failure to supply any of the above in a timely manner allowing Owner sufficient time either to appraise inspection reports during their working hours or to arrange, undertake and consider results of any required inspection shall be for Charterer's account.

(c)   As far as possible such operation will be carried out in conformity with the provisions of the SHIP TO SHIP TRANSFER GUIDE (LIQUIFIED GASES) 1995 (hereinafter referred to as The S-T-S Guide), as amended from time to time. Should either master discontinue operations on safety grounds, for which they have full discretion, all time from arrival at rendezvous point until final disconnection of hoses will nevertheless count as time on hire.

(d)   Charterers shall supply adequate fendering, hoses and other lighterage equipment and ensure they are in good condition.

   Charterers shall obtain necessary permissions from relevant authorities to perform STS/lighterage operations and all expenses in this connection, plus any port expenses and additional insurance incurred, shall be for Charterer's account. Owner shall always have the right to both require Charterer to present documentation that such permission has been obtained and also to check with local, national and/or other authorities that the Vessel is authorized to perform lighterage at such place.

15

(e)    Charterers shall indemnify the Owners against all claims, costs, expenses and liability
that Owners may incur which, in any way, may arise from any loss, damage, or misdelivery
of the cargo whilst in the possession of the Owners during storage and STS operation.
Charterers' indemnity under this clause shall however not extend to any claims, costs,
expenses or liabilities that arise from loss, damage, delay or misdelivery of the cargo
caused by the gross negligence of Owners, master, officers or crew of the Vessel.

(f)    Where required by the Owners, an experienced STS superintendent shall be employed by
Owner at its cost and located on Vessel. This STS superintendent will be in overall charge
of the STS transfer operation as per Chapter 1.5.1 of The S-T-S Guide. Irrespective prior
to the vessels manoeuvring together for mooring it is essential that in the absence of such
a STS superintendent that it has been clearly agreed between the two masters involved as
to who will be in overall charge of such STS transfer operation.

## 23. Emergency Drydocking

(a)    If the vessel is required to drydock in case of emergency or Class or Flag requirements
Charterers shall allow the Vessel to proceed to an appropriate port, time and place to be
mutually agreed taking into account Charterers lifting schedule. However, Owners to have
last say on time and place of drydock. The Vessel shall be off hire from the time of
deviation for the port of docking until she is again back in the deviation point or similar
position. However, Charterers shall credit Owners with the time and bunkers at Charter
Party speed and consumption that Charterers have notionally saved resulting from any
improved redelivery position after drydock. All towing, pilotage, fuel and other expenses
incurred whilst proceeding to and from, and while in drydock shall be for Owners' account.

(b)    The time and expense to have Vessel's tanks purged and cooled down ready to load next
cargo is to be for Owners' account provided next cargo is to be of a similar grade to cargo
carried immediately before drydocking, but if requested by Owners with adequate notice
Charterers undertake to provide the purgent and coolant ready and accessible to the
Vessel. The cost of purgent and coolant is for Owners' account, but such amount is not to
exceed the financial loss sustained by Charterers in this respect. If, however, the cargo
nominated following drydocking is of a different nature from that remaining in the ship's
cargo tanks immediately prior to drydocking, then the cost of such purgent and coolant
shall be for Charterers account and any deviation in order to obtain such purgent/coolant
will not be considered off-hire





16

24. Cargo Inspection

Subject to Charterers giving Owners 72 hours written notice Charterers shall have the right at any time during the charter period to make such inspection of the Vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(a) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsbilities to Owners or third parties for the same;

(b) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right;

(c) that any cost incurred by such inspection shall be for Charterers' account

(d) that any inspection carried out by Charterers shall be made without interference with or hindrance to the Vessel's safe and efficient

(e) that any overnight stays shall be subject to Clause 17.

25. Performance Criteria

(a) The Owners guarantee that the service speed of the Vessel is about 15,75 knots average laden and about 16,50 average ballast (assuming 50/50 laden/ballast basis full cargo propane) on about 65 mt HFO laden and about 70 mt HFO ballast plus about 6.0 mt MDO (for auxiliaries depending of operations being performed) per day at sea in moderate weather up to and including Beaufort force 5 wind and wave. Port consumption depends on actual operation being performed but about 2 mt HFO plus 10 mt MDO mt per day excluding manoeuvring and cooling. Gas Oil for inerting for Charterers account as used.

(b) In the event Charterers elect to use the Vessel for prolonged periods of storage or slow discharge and as a result, Vessel's bottom becomes fouled, Charterers shall be responsible for the consequences of such fouling including the costs associated with cleaning the underwater parts of the vessel as deemed necessary by Owners No claim(s) is/are to be made against Owners for a loss of speed/increase in consumption which might thereby occur. Notwithstanding the above cleaning shall not be repeated such that vessels anti-fouling paints are damaged.

17

26. Salvage

Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 26..

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

27. Lien

Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

28. Exceptions

(a)   The Vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 25 hereof shall be unaffected by the foregoing. Further, neither the Vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b)   The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c)   Clause 28(a) shall not apply to or affect any liability of Owners or the Vessel or any other relevant person in respect of:

(i)   loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or

18 

(ii)    any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules, or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules.

(d)    In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire .


## 29. Injurious Cargo

No acids, explosives or cargoes unsuitable or injurious to, or which may contaminate the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account.  No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.


## 30. Grade of Bunkers

(a)    All bunkers supplied shall be fit for the purpose and meet the Marpol regulations with special regard to Annex VI from 19th May 2005 and as may be applied later and to meet the minimum standards of ISO 8217 2005 Grade IFO 380cst RMG 380 for Fuel Oil and ISO 8217 2005 Characteristic DMB distillated clear bright non blended marine diesel or ISO 8217 2005 Marine Gas Oil DMA.

(b)    Vessel will bunker as ordered especially when proceeding to draft restricted places. Charterers accept Owners policy that, when ordered to bunker to full capacity, the vessel normally bunkers to a maximum of 96 percent of permanent bunkers capacity in order to avoid spillage and subsequent claims.  Due to possible deterioration and/or incompatibility of different supplies of fuel oils it may be necessary on occasions to reduce the percentage of capacity to avoid mixing supplies. Therefore if Charterers require the vessel to "bunker to full capacity" the ultimate quantities to be at master / chief engineer's discretion but they will always take due regard to vessels orders and schedule.

(c)    Any dispute as to whether the bunker supplied by Charterers conforms with the specifications of above standard shall be settled by the result of analysis of the sealed sample collected at the vessel's bunker manifold during bunkering. The warranty of performance given by Owners, if any, is conditional upon the bunker supplied meeting the specification of above standard.

19



During the currency of the charter, Owners will be a subscriber to DNV or equivalent fuel testing program or equivalent program and sealed samples will be collected from the vessel's bunkers manifold by method of drip sampling. Owners will provide Charterers and Master by fax or email with copy of report on every occasion of analysis as soon as received. Vessel shall not be obliged to commingle different quality/sourced bunkers within any bunker tank.

## 31. Disbursements

Should the master require advances for ordinary disbursements at any port, Charterers or their agents may make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.

## 32. Requisition

Should the vessel be requisitioned by any government (de facto or de jure) during the period of this charter, the vessel shall be off-hire during the period of such requisition, any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

## 33. Outbreak of War

If war or hostilities break out between two or more countries including the Flag state of the vessel, Norway and/or Nigeria and such war or hostilities materially and adversely affect the trading of the Vessel, Owners and Charterers shall have the right to cancel this charter provided that the party seeking to rely on this Clause 33 has consulted with the other party in good faith.

## 34. Additional War Expenses

If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

20

Any payments by Charterers under this Clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers.

## 35. War Risks

(a)   Irrespective of the Vessel's place trading whether coastwise Nigeria or outside Nigeria the master shall not be required or bound to sign bills of lading for any place in his or Owners reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b)   If in the reasonable opinion of the Master or the Owners it becomes, for any reasons set out in Clause 37(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at any place to which the vessel has been ordered pursuant to this charter, (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this Charter (provided such other place is not itself a place of peril). If any place of discharge is or become a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the Master may in their or his discretion select within the trading limits of this Charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned.

(c)   It is understood that although war risk premiums are applicable for the intended trade on the Nigerian coast including storage, such trade is acceptable to Owners provided that the risks and situation do not deteriorate.

(d)   The additional insurance premium shall be based on the vessel's full hull and machinery value (including hull and freight interest) blocking and trapping, mine risk, loss of hire and freight. The total insured value shall be that advised and as may be amended by Owners and payment by Charterers shall be made promptly on Owners invoice supported by Insurance companies' supporting document(s). Owners have the right to refuse orders to enter any such area if any amounts from previous invoices are outstanding. Resulting delays, if any, shall count as on-hire.

Any crew bonus paid by Owners when Vessel is blocked or trapped in pursuant to Charterers instruction shall be promptly refunded to Owners by Charterers on presentation of vouchers provided however that such bonus and the scales thereof have been approved by the applicable flag state or Norwegian authority.

21



(e)   The Vessel shall have the liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in otherwise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority or any such government or local authority or by any committee or person having under the terms of war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. Owners shall inform Charterers of such deviation as soon as possible.

If by reason of or in compliance with any such directions or recommendations the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the Vessel may proceed to any place which the Master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned subject to Charterer's consent, which shall not be unreasonably withheld.

However Charterers shall not order vessel into a war zone, or to a zone where hostilities exists with no declaration of war, without the consent of the Owner.
The insured value of the vessel for the purposes of this clause shall be USD 21,500,000 (United States Dollars twenty one million five hundred thousand)

(f)   Charterers shall procure that all bills of lading issued pursuant to this charter shall contain this clause (or such part of it as is relevant to bills of lading)

## 36. Both to Blame Collision Clause

Charterers shall procure that all bills of lading issued under this charter shall include the following clause:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owner of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

22





37  New Jason Clause

General average contributions shall be payable according to the York-Antwerp Rules, 1994 and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

38. Clause Paramount

Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the following:

"(a)    Subject to sub-clause (b) or (c) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules").  Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(b)    If there is governing legislation which applies the Hague Rules compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules.  Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

23



"(c)    If there is govern...ng ...s...on ...hich applies the United Nations Convention ...n ...e
Carriage of Goods ...... ......h, hereafter the 'Hamburg Rules') compulsorily to this Bill of
Lading, to the exc...s...n ...... Hague-Visby Rules, then this Bill of Lading shall have effe...t
subject to the Ha...b...rg ...les. Nothing therein contained shall be deemed to be eithe... a
surrender by the ...a...e... ...f any of his rights or immunities or an increase of any of his
responsibilities or ...abil... ...under the Hamburg Rules."

"(d)    If any term of this ...ill of ...a...ing is repugnant to the Hague-Visby Rules, or Hague Rules, or
Hamburg Rules, a... app...c...ble, such term shall be void to that extent but no further."

"(e)    Nothing in this Bi... of L...d...ng shall be construed as in any way restricting, excluding or
waiving the right of any ...ele...ant party or person to limit his liability under any available
legislation and/or law..."

### 39. Insurance/ITOPF

(a)    Should any load and/or discharge place or port require any insurance document and/or
bond and/or proof of fina...cial responsibility beyond that normally available from Owners P
& I Club, The Brita...nia ...team Ship Insurance Association Limited, such document, bond
or proof of financial re...consibility for the vessel shall be provided by Charterers at
Charterers risk and expe...se.

(b)    Owners warrant that th... vessel is kept insured by the owners at their expense against
protection and inde...nity ...sks in a recognized first class P & I Club (to be a member of the
International Group of P ...d I Clubs) throughout the entire duration of this charter.
Owners warrant that the... have and will maintain throughout the period of this charter the
standard oil pollution ins...rance cover issued by the vessel's P & I Club, plus any additional
oil pollution insurance co...er which is available or becomes available through the vessel's P
& I Club.

Owners will provide, within a ...asonable time following a request from Charterers to do so,
documented evidence of compli...e with the warranties given in this Clause 39.

### 40. Export Restrictions

The master shall not be required ...r bound to sign any documentation for the carriage of cargo to
any place to which export or su...h cargo is prohibited under the laws, rules or regulations of the
country in which the cargo was p...duced and/or shipped or the flag of the vessel.

Charterers shall procure that all b...s of lading issued under this charter shall contain the following
clause:

"If any laws rules or regulations ...plied by the government of the country in which the cargo was
produced and/or shipped, or any ...ele...ant agency thereof, impose a prohibition on export of the
cargo to the place of discharge d...signated in or ordered under this bill of lading, carriers shall be



24

entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this bill of lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter.

### 41. Business Principles

(a)  No director, employee or agent of the Owners shall give or receive any commission, fee, rebate, gift or entertainment of significant cost or value in connection with the charter or enter into any business arrangement with any director, employee or agent of any of the companies comprising the Charterers or any affiliate of any of the companies comprising the Charterers, other than as a representative of any of the companies comprising the Charterers or their affiliates, or without the prior written consent of the Charterers.

(b)  If any violation of sub-clause (41)(a) is found to have occurred prior to the date of signing this charter and such violation is determined to have resulted directly or indirectly  in  the Charterers's consent to enter into this Charter with the Owners the Charterers may terminate this charter forthwith on completion of the voyage in accordance with Clause 19.

### 42. Drugs and Alcohol

Owners undertake that they have and shall maintain for the duration of this charter a policy on drug and alcohol abuse applicable to the vessel ('The D and A Policy') that meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for The Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time.

Owners shall exercise due diligence to ensure that the D and A policy is understood and complied with on and about the vessel. An actual impairment or any test finding of impairment shall not in and of itself mean that owners have failed to exercise due diligence.



25



43. Pollution and Emergency Response

Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/telex/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies

Notice to Owners' Pollution and Emergency Response Department:

| Qualified Individuals for OPA 90 response | Norwegian Marine Services, Inc. |
| | 2951 Marina Bay Drive, Suite 130-331 |
| | League City, TX 77573 |
| Phone, business: | + (281) 538-2305 (24 hours) |
| Fax: | + (281) 538-4181 |
| E-mail: | nms@att.net |
| Back-up phones: | + (281) 924-7278 Mr. Gunnar Kr. Gangsaas mobile |
| | + (281) 924-7009 Mr. Tom Briggs |
| | + (757) 869-5389 Mr. Hugh D. Williams |

Notice to Charterers' Pollution and Emergency Response Department:

Caverton Marine Agency
Tel +23412705656
Fax +23414618745

Mob +2348023016515 Mr Yemi Adeola
Mob +2348033039571 Mr Ola Wasiu
Mob +2348056017308 Mr Abdullahi Andarai
E mail: agency@cavertonmarine.com
yemi.adeola@caverton marine.com

44. ISPS Code/USMTSA 2002

(a)    (i)    From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request Owners shall provide documentary evidence of compliance with this Clause 44 (a) (i). The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

26



(ii)  Except as otherwise provided in this charter, loss, damage, expense or delay excluding consequential losses caused by failure on the part of Owners or the Company/Owner to comply with the requirements of the ISPS Code/MTSA this Clause shall be for Owners' account.

(b) (i)  Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii)  Except as otherwise provided in this charter, loss, damage, expense or delay excluding consequential losses caused by failure on the part of Charterers to comply with this sub-Clause 44 (b) shall be for Charterers' account.

(c)  Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d)  Notwithstanding any other provision of this charter, the Vessel shall not be off-hire where there is a loss of time caused by Charterers' failure to comply with the ISPS Code/MTSA.

(e)  If either party makes any payment, which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

(f)  Charterers guarantee that the ports to which they direct the vessel comply at all times while the vessel is at the port with all requirements of the ISPS code. Owners are entitled to refuse to proceed to a port not complying with the ISPS Code. All costs and consequences arising from or in connection with calls at ports not complying with the ISPS Code to be for Charterers' account

---

45. Slow Steaming Clause

Charterers shall be entitled to instruct vessel to slow steam for economic or other reasons in which event Charterers shall be liable for delays in cargo deliveries which may arise as a direct result of Charterers instructions to slow steam. The Vessel shall not steam at speeds that could cause damage to the main engine or ancillary equipment.



46. Taxes and Levies

(a)  Where due to Charterers use of the vessel, the Owner, Insurer, Charterer is required to deduct any amount, whether as tax or otherwise, the amount owing to the Owner will be increased so that it actually receives, net of such deduction the amount which it would have received if no such deduction had been required.

(b)  Without prejudice to the generality of the above, the Parties shall comply with any applicable withholding and/or tax retention obligations imposed by the Government of Nigeria.  The Parties understand and agree that the Hire is intended to be the net amount that Owner is to receive after the Charterer has withheld sums (if any) pursuant to applicable withholding and tax retention obligations imposed by the Government of Nigeria. The Owner shall add to its invoices for the Hire all amounts necessary to result in payment of the appropriate Hire after the Charterer has withheld from payment(s) to the Owner in accordance with any applicable withholding and tax retention obligations imposed by the Government of Nigeria. The Charterer shall provide the Owner duly authenticated, original receipts for all amounts withheld issued by the Government within thirty (30) days from the date on which Charterer receives such receipts.

(c)  Further, hires and other payments described in this Contract made by the Charterer to the Owner shall be made exclusive of Nigerian value added tax or other tax of a similar nature or effect chargeable in Nigeria.  The Charterer shall assume full and exclusive liability for payment of all such taxes.

(d)  Without prejudice to the generality of the foregoing, the Charterer shall pay all import and export charges, customs and excise duties imposed in Nigeria (including clearing and brokerage charges) on the Vessel and equipment on behalf of the Owner which are necessary for the performance of the Charter. Owners shall provide Charterers with written documentary evidence with any claim made under this subclause.

(e)  If any tax, due or similar charge is applied in Nigeria to the Master's, Officers, Crew's income then there shall be a corresponding increase in the compensation to Owner, by adjustment of Hires or by lump sum payments, so that the Master, Officers, Crew are in no better or worse financial position. In this sub clause, Master, Officers, Crew and Owner refers to non-Nigerian Master, Officers, Crew and Owner. Owners shall provide Charterers with written documentary evidence with any claim made under this subclause

47. Confidentiality

All terms and conditions of this charter arrangement ("the Confidential Information") shall be kept strictly confidential; provided that a party may disclose Confidential Information in the following cases:

28 

i.  it is already known to the public or becomes available to the public other than through the act or omission of the disclosing party;

ii. it is required to be disclosed under applicable law or by a governmental order, decree, regulation or rule (provided that the disclosing party shall give written notice of such required disclosure to the other party prior to the disclosure);

iii. in filings with a court or arbitral body in proceedings in which the Confidential Information is relevant and in discovery arising out of such proceedings; or

iv. to any of the following persons on a need to know basis:

    a)  a buyer or seller or a potential buyer or seller of LPG shipped or to be shipped on the Vessel or a sub-charterer or potential sub-charterer of the Vessel;

    b)  an associated company;

    c)  employees, officers, directors and agents of the disclosing party or an associated company;

    d)  professional consultants retained by a disclosing party;

    e)  financial institutions advising on, providing or considering the provision of financing to the disclosing party or an associated company.

Provided that the disclosing party shall take all reasonable steps to ensure that no such person shall disclose Confidential Information to any unauthorised person or under unauthorised circumstances.

## 48. Construction

The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

## 49. Non-waiver

No act, omission, course of dealing, forbearance, indulgence or delay by Owners or Charterers in the exercising of their rights hereunder (whether pursuant to any default of the other or otherwise); or in enforcing any of the terms of conditions of this Charter, nor any granting of time shall prejudice or affect or be in derogation of the rights and remedies of such party hereunder and no such matter shall be treated as evidence of or constitute a waiver of any rights of Owners or Charterers.

29

50. Assignment

The Owners and Charterers shall be entitled to assign the benefit of any and all of the rights under this Charter provided that the other party consents, such consent not to be unreasonably withheld.

51.     Disputes, Mediation, Arbitration & Experts

Mediation:

If the parties mutually agree, they will attempt to settle any dispute, difference, controversy, proceedings or claim (whether based in contract, tort or any other legal doctrine) between them arising out of or relating to this agreement, or the formation, breach, termination or invalidity thereof (each a "**Dispute**") (which is not referred to expert determination) first through mediation as set forth in this Clause in accordance with the CEDR Model Mediation Procedure. To initiate the mediation, a Party must give notice in writing to the other party requesting the consent of the other Party for mediation (the "Request"). Where the other Party declines the Request for mediation, then parties shall settle the Dispute through arbitration as provided hereunder. The procedure for mediation shall be as follows:

(a)     the mediation shall be conducted by a single mediator who shall be appointed by agreement in writing between the parties or, if the parties are unable to agree on the identity of the mediator within 5 (five) working days from the date of the Request, or if the mediator nominated by the parties for appointment is or becomes unable or unwilling to act, the mediator shall be appointed by the Centre for Effective Dispute Resolution London, England on the application of any party;

(b)     the mediator shall chair and determine the procedure for the mediation;

(c)     the mediation shall be conducted in London, England and in the English language. The Mediation Agreement referred to in the CEDR Model Mediation Procedure shall be governed by, and construed and take effect in accordance with English law;

(d)     save for the purposes of ~~implementing and/or enforcing a written~~ legally binding settlement agreement or as otherwise required by law, the mediation shall be conducted in confidence and without prejudice to the rights of the parties in any future proceedings;

(e)     the courts of England shall have exclusive jurisdiction to settle any claim, dispute or matter of difference which may arise out of, or in connection with any agreement reached during or as a result of the mediation;

(f)     every person involved in the mediation shall keep confidential and not use for any collateral or ulterior purpose all information (whether given orally, in writing or

30



otherwise) arising out of. or in connection with the mediation including the fact of any settlement and its terms and the fact that the mediation is to take place or has taken place. All information (whether oral, in writing or otherwise) arising out of or in connection with the mediation will be without prejudice, privileged and not admissible as evidence or disclosable in any current or subsequent litigation or any other proceedings whatsoever. This does not apply to any information which would in any event have been admissible or disclosable in any such proceedings;

(g)     the costs of the mediation, including the fees and expenses of the mediator (but excluding the parties' own costs and expense, which shall be borne by the party incurring those costs), shall be borne equally by the parties in dispute, unless otherwise agreed in writing;

(h)     if the parties fail to reach agreement through mediation as set forth in this Clause within 45 (forty-five) days of the mediator being appointed, parties shall have no further obligations under this Clause in relation to the Dispute and the parties may proceed directly to arbitration from and after such date;

Arbitration:

Any dispute, controversy or claim arising out of or in connection with this agreement, or the validity, termination, interpretation, performance or non-performance hereof (including the determination of the scope of this agreement to arbitrate) or the relationship between the parties created by this agreement, which cannot be resolved by discussion in good faith between the parties in dispute or by mediation shall be settled by binding arbitration in accordance with this Clause. Such arbitration shall be conducted in accordance with the Rules of the ICC-International Chamber of Commerce in force as at the date of commencement of such arbitration. The number of arbitrators shall be three (3). The parties shall each appoint one (1) arbitrator, and the two (2) appointed arbitrators shall select a third (3rd) arbitrator who shall serve as chairperson of the arbitration panel. In the event the two appointed arbitrators fail to agree on the choice of the third arbitrator, the President of the ICC for the time being shall appoint the third arbitrator, who shall serve as the chairman of the arbitration panel. The arbitral proceedings shall be conducted in the English language and the venue of the arbitration shall be London, England, unless another location is selected by mutual agreement of the Parties.

The decision of the arbitration panel shall be the majority decision and shall include a statement of the reasons for such decision and shall be final and binding on the parties. Judgement upon the award of the arbitrators shall not be subject to appeal, (except in the event of manifest error in law or fact, fraud, miscarriage of justice, failure by any of the arbitrators to disclose any interest in the subject matter of the arbitration and/or in the parties or to the extent that the determination or award is beyond the scope of the claim submitted for the arbitration) and may be entered in any court having jurisdiction over any party concerned. The cost of the arbitration and venue (but excluding the Parties' own costs and expenses, such as cost of legal representation and expert witnesses which shall be borne by the party incurring those costs) shall be borne equally by the Parties, unless otherwise agreed in writing.

This Clause shall survive the termination of this agreement, howsoever caused.

31



Expert:

Disputes of a technical nature shall be referred to an expert rather than to arbitration. The said expert shall be a person with profound knowledge for the determination of the technical matter in dispute. The expert shall be appointed by agreement between the parties or, in default of such an agreement, by the President of the ICC or an officer so designated. The decision of such an expert shall be final and binding on both parties, except in the event of manifest error or fraud on the part of the expert. The language to be used for the determination of the dispute shall be the English Language unless otherwise agreed.

The parties shall furnish the expert with all written or oral information, which he may require for his determination. The cost of the services of the expert, if appointed, shall be shared equally between the parties.

## 52. Governing Law

The proper law of this charter is the law of England and Wales. English law shall be used for the interpretation of this charter and for resolving any dispute, difference, controversy or claim between the parties arising out of or in connection with this charter excluding, however, any rule of English private international law which would refer any dispute to the law of a jurisdiction other than England.

## 53. Whole Agreement

This Charter comprise the full and complete agreement of the parties with respect to the use of the Vessel and supersedes all prior communications, understandings and agreements between the parties, whether written or oral, expressed or implied, with regard to said use.

## 54. Notices

a)    Whenever written notices are required to be given by either party to the other party, such notices shall be sent by telex, fax, registered mail, e-mail or registered airmail to the following addresses:

Notice to Owners:    Bergesen Green Carriers AS
Drammensveien 106
P.O.Box 2800 Solli – 0204
Oslo Norway
Attn                 Mr Armand Staunton
Chartering Manager
Tel: +47 22 120615

32



Fax: +47 85028183
E mail: gaschart@bwgas.com

| | |
|---|---|
| Notice to Charterers: | : Caverton Marine Limited |
| | 1 Prince Kayode Akingbade Close |
| | Victoria Island |
| | Lagos |
| | Nigeria |
| Attn | Mr Olabode Makanjuola |
| | Executive Director |
| | Tel: +234 2705757 |
| | Fax: +2341 4618745 |
| | E mail: bode@cavertonmarine.com |

| | |
|---|---|
| Copy to: | Tolulope Osunsanya tolu@cavertonmarine.com |
| | Caverton Group rmki@cavertonmarine.com |

Notice to Owners' Operations Department:    Mr Arild Julsen
Tel: +47 22120665
Fax +47 22120500
Mob +47 48281740
E mail: operation.chartering@bwgas.com

| | |
|---|---|
| Notice to Charterers' Operations Department: | Caverton Marine Agency |
| | Tel: +23412705656 |
| | Fax +23414618745 |
| | Mob +2348056017308 Mr Abdullahi Ancarai |
| | Mob +2348023016515 Mr Yemi Adeola |
| | Mob +2348033039571 Mr Ola Wasiu |
| | E mail: agency@cavertonmarine.com |
| | yemi.adeola@caverton marine.com |

or to such other addresses as the parties may respectively from time to time designate by
notice in writing. Any failure to transmit a copy of the notice to a party listed as entitled to

33

receive a copy shall not in any way affect the validity of any notice otherwise properly given as provided in this Clause.

b    Any notice required under this charter to be given in writing shall be deemed to be duly received only:

In the case of a telex, at the time of transmission recorded on the message if such time is within normal business hours on a working day at the place of receipt, otherwise at the commencement of normal business hours on the next working day there.

i)    In the case of a letter, whether delivered in course of the post or by hand or by courier, at the date and time of its actual delivery if within normal business hours on a working day at the place of receipt otherwise at the commencement of normal business on the next such working day.

ii)    In the case of a facsimile or e-mail, at the time of transmission recorded on the message if such time is within normal business hours (09:00 - 17:00) in the country of receipt, otherwise at the commencement of normal business hours on the next working day at the place of receipt.

## 55. Charterer's Purchase Option

It is agreed that at the end of each 12 month period of the Charter Charterers have the option to purchase the ship for the prices listed below on the basis of 'As is where is' in Class. Any option to purchase will be declared no later than 9 months after the commencement of the initial period or the first option (if declared for purchase at the end of the second year of the Charter) or the second option (if declared for purchase at the end of the third year of the Charter). Charterers agree that the vessel will be permitted to proceed to another place outside Nigeria for the completion of the sale should in sellers opinion completion in Nigeria be problematic. The terms and conditions of the MOA are to be agreed basis NSF '93. Charterers to put a 10% deposit as per sale form on declaration of their option to purchase with the balance payable on delivery. Owners will deliver the vessel to Buyers within 3 months of declaration to purchase. If the purchase option is declared then the vessel will be delivered within plus or minus 30 days of the appropriate anniversary date of the Charter

Purchase option prices:

USD 20.0 m net of 2.25% commission to Owners for purchase at the end of the 1st 12 months of the Charter

34

USD 15.0 m net of 2.25% commiss on to Owners for purchase at the end of the 2nd 12 months of the Charter

USD 15.0 m net of 2.25% commiss on to Owners for purchase at the end of the 3rd 12 months of the Charter

56. Additional Clauses

Appendix A:                          LPG Form C for the Vessel, as attached, shall be incorporated herein.

Appendix B:                          Safety and Environmental Monthly Reporting Template, as attached, shall be incorporated herein.

SIGNED FOR OWNERS                                    SIGNED FOR CHARTERERS

A. W. STAUNTON                                        OLABODE MAKANJUOLA
FULL NAME                                             FULL NAME

CHARTERING MANAGER                                    MANAGING DIRECTOR
POSITION                                              POSITION

35

36

Attachment 1
FREE PASS AGREEMENT

To the Master of the .......... ...............

In consideration of being allowed to follow your ship from ..... .......to ............on payment of
...... per day to cover meals and berth plus a normal remuneration of ........ on signing of this
agreement the undersigned user of this free passage accept the following conditions:

1.
This agreement is in every respect, including questions of shipowners' liability, to be governed by
Laws of England and Wales, and any dispute(s) is to be decided by the proper English Courts to
the exclusion of any other law and any other jurisdiction.

Should for any reason proceedings be instituted elsewhere whether in rem or in personam relative
to the passage agreed herein, such proceedings are to be stayed pending the decision of the
proper English Courts, whose decision shall be final and binding.

2.
The ... (name of vessel) ... and/or her Owners are not under liability of a carrier to the user of this
free pass. In particular, the user assumes all risk of loss of life and personal injury as well as of loss
of or damage to personal effects or baggage or other property whilst onboard and whilst embarking
or disembarking.
The user expressly agrees that the Owners, Manager, Charterers, Agents, Master, Mariners or
other servants of the ship are not to be under any liability whatsoever, whether statutory or
otherwise, and whether or not there be negligence on the part of any of the aforesaid in respect of
loss of life, personal injury or loss or damage to personal effects, baggage or other property.

3.
The ship is not a passenger ship and there is no warranty that the ship is fit for the carriage of
passengers; any undertaking as to seaworthiness that might otherwise exist being hereby
expressly waived.

4.
No guarantee is given that the vessel will proceed to ports mentioned above or along the proposed
or advertised route or otherwise howsoever, and if required the user of this free pass will
disembark at any port at which the ship may call at his risk and expense.

Any money paid on signing this contract to be considered as earned and not returnable in any
event.

5.
The user warrants compliance with all quarantine, passport and other regulations, and accepts
responsibility for all extra expenses such as harbour dues, tonnage dues, light dues, fines and all
other expenses, which may be incurred by said vessel due to the fact that she is carrying



37

passengers, provided, however, that such responsibility be limited to a share of the ship's total extra expenses proportionate to the number of passengers carried.

------------------------
Name of Passenger

------------------------
Address of Residence

------------------------
Passport Number

38

APPENDIX 4

LPG FORM C - PARTICULARS OF VESSEL

TO be attached

39

APPENDIX B

## Safety and Environmental Monthly Reporting Template

| Safety and Environmental Monthly Reporting Template | Return to: Charterers marked for the attention of: Fax: Phone: Email: |
|---|---|

| Time Chartered Vessel Name | |
|---|---|
| Management Company | |
| Month | |

| OIL SPILL INCIDENTS (Any amount entering the water) Approximate volume in barrels and brief details | |
|---|---|
| ANY OTHER INCIDENTS resulting in or having potential for injury, damage or loss | |

FOR DEFINITIONS OF INCIDENT CLASSIFICATION AND EXPOSURE HOURS PLEASE SEE OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF) BOOKLET "Marine Injury Reporting Guidelines" (February 1997) or any subsequent version, amendment, or variation to them

| A. No. Of crew: | |
|---|---|
| B. Days in month / period: | |
| EXPOSURE HOURS (A x B x 24): | |

| LOST TIME INJURIES (LTI'S) including brief details / any treatments |
|---|
| |

| TOTAL RECORDABLE CASE INJURIES (TRC'S) including brief details / any treatments |
|---|

40 

PLEASE CONFIRM YOUR RETURN CONTACT DETAILS:

| | |
|---|---|
| Name: | |
| Phone: | |
| Fax: | |
| Email: | |

Return for each calendar month – by 10th of following month.

| Safety and Environmental Monthly Reporting Template | Return to:<br>Charterers marked for the attention of:<br>Fax:<br>Phone:<br>Email: |
|---|---|

| | |
|---|---|
| Time Chartered Vessel Name | |
| Management Company | |
| Month | |

Notes :    Please enter zero i.e. "0" where any amount is nil (rather than entering "Nil" or "N/A")
Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter "3".
Cargo loaded for LPG vessels should also be reported as tonnes and not as m³.



| | |
|---|---|
| Monthly Consumption – Fuel Oil mt | |
| Sulphur content of Fuel Oil (percentage weight) | |
| Monthly Consumption – Diesel and/or Gas Oil mt | |
| Monthly Consumption (LPG ships only) – Fuel Gases mt | |

Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter 3".
Cargo loaded for LPG vessels should also be reported as tonnes and not as m3.

| | |
|---|---|
| Monthly Distance Steamed | |
| Monthly Cargo Loaded – mt | |

| | |
|---|---|
| Refrigerant Gas Consumption - Type | |
| Refrigerant Gas Consumption – Quantity (litres) | |

| | |
|---|---|
| Garbage Disposal m3 – At Sea | |
| Garbage Disposal m3 – Incinerated on Board | |

41



| Garbage Disposal in 5 – Sanit. Approx. | | |

| OIL SPILL INCIDENTS | | |
| (Other than those entering the water) Approx. volume & brief details | | |

Return for each calendar month – by 10th



**BW GREEN CARRIERS AS**

Drammensveien 106
P.O. Box 2800 Solli
N-0204 Oslo, Norway
Tel.: +47 22 12 05 05
Fax.: +47 22 12 05 00
Organisation No.: 990 648 883

## POWER OF ATTORNEY

KNOWN ALL MEN BY THESE PRESENT that we, the undersigned, BW Green Carriers AS, hereby give Power-of-Attorney to Mr Armand Staunton, to sign on our behalf and with binding effect for us the Timecharter of the BW Saga fixed to Caverton Marine Limited (copy of which was sent by Mr Richard France to this office on the 5th September 2007) on behalf of BW Green Carriers AS, the disponent Owners.

IN WITNESS WHEREOF BW Green Carriers AS have caused this instrument to be duly executed this 6th day of September 2007.

BW GREEN CARRIERS AS

Mr Jens Ismar
Director

EXHIBIT 2

# TIME CHARTER PARTY AGREEMENT

between

CAVERTON MARINE LIMITED

as Owner

and

NIGERIA LNG LIMITED

as Charterer

DATED

| Clause No. | | Page |
|---|---|---|
| 1. | Description and Condition of Vessel | 3 |
| 2. | Shipboard Personnel and their Duties | 3 |
| 3. | Duty to Maintain | 4 |
| 4. | Period, Trading Limits and Safe Places | 5 |
| 5. | Delivery, Redelivery | 7 |
| 6. | Owners to Provide | 8 |
| 7. | Charterers to Provide | 8 |
| 8. | Rate of Hire | 9 |
| 9. | Payment of Hire | 10 |
| 10. | Space Available to Charterers | 10 |
| 11. | Instructions and Logs | 11 |
| 12. | Bill of Lading | 11 |
| 13. | Conduct of Vessel | 11 |
| 14. | Bunkers at Delivery and Redelivery | 13 |
| 15. | Stevedores, Pilots and Tugs | 13 |
| 16. | Deliberately left blank | 13 |
| 17. | Supernumeraries | 13 |
| 18. | Sub-letting | 14 |
| 19. | Final Voyage | 14 |
| 20. | Loss of Vessel | 14 |
| 21. | Off-hire | 14 |
| 22. | Ship-Ship Transfer | 15 |
| 23. | Emergency Drydocking | 17 |
| 24. | Ship Inspection | 18 |
| 25. | Performance Criteria | 19 |
| 26. | Salvage | 19 |
| 27. | Lien | 20 |
| 28. | Exceptions | 20 |
| 29. | Injurious Cargo | 20 |
| 30. | Grade of Bunkers | 21 |
| 31. | Disbursements | 21 |
| 32. | Requisition | 22 |
| 33. | Outbreak of War | 22 |
| 34. | Additional War Expenses | 22 |
| 35. | War Risks | 23 |
| 36. | Both to Blame Collision Clause | 23 |
| 37. | New Jason Clause | 24 |
| 38. | Clause Paramount | 25 |
| 39. | Insurance/ITOPF | 25 |
| 40. | Export Restrictions | 26 |
| 41. | Business Principles | 27 |
| 42. | Drugs and Alcohol | 27 |
| 43. | Pollution and Emergency Response | 28 |
| 44. | ISPS Code/USMTSA 2002 | 28 |
| 45. | Slow Steaming Clause | 28 |
| 46. | Taxes and Levies. | 30 |
| 47. | Confidentiality | 30 |
| 48. | Construction | 31 |
| 49. | Non-waiver | 31 |
| 50. | Assignment | 32 |
| 51. | Disputes, Mediation, Arbitration & Experts | 32 |
| 52. | Governing Law | 32 |
| 53. | Whole Agreement | 34 |
| 54. | Notices | 34 |
| 55. | Charterer's Purchase Option | 35 |
| 56. | Additional Clauses | 36 |
| | | 37 |
| Attachment 1 | | |
| FREE PASS AGREEMENT | | 39 |
| APPENDIX A - | LPG FORM C - PARTICULARS OF VESSEL | 41 |
| APPENDIX B- | Safety and Environmental Monthly Reporting Template | 42 |

2

**IT IS THIS DAY AGREED** between **Caverton Marine Limited** of 1, Prince Kayode Akingbade Close, Victoria Island, Lagos, Nigeria (hereinafter referred to as "Owners"), being disponent owners of the fully refrigerated LPG vessel called *BW Saga* (hereinafter referred to as "the Vessel") described as per Clause 1 hereof,

AND

**Nigeria LNG Limited** of Plot 1684, Sanusi Fafunwa Street, Victoria Island, Lagos, Nigeria (hereinafter referred to as "Charterers"):

### 1. Description and Condition of Vessel

At the date of delivery of the Vessel under this charter and throughout the charter period:

(a)    she shall be classed by a classification Society, which is a member of the International Association of Classification Societies;

(b)    she shall be in every way fit to load, carry, discharge and measure normal commercial quality and quantity of Liquefied Petroleum Gas (LPG);

(c)    she shall be tight, staunch, strong in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;

(d)    her tanks, valves and pipelines and appurtenances pertaining to the LPG cargo shall be gas-tight and fully functional;

(e)    she shall be in every way fitted for burning at sea – fuel oil with a maximum viscosity of Centistokes at 50 degrees Centigrade/any commercial grade of fuel oil for main propulsion, marine diesel oil for auxiliaries, in port – marine diesel oil for auxiliaries See Clause30;

(f)    she shall have all her cargo measuring equipment and instrumentation calibrated and certified, and this shall be verified (if required by Charterers);

(g)    she shall comply with the regulations in force so as to enable her to pass through the Suez Canal by day and night without delay;

(h)    she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her perform the charter service without delay;

(i)    she shall comply with the description in Form C appended hereto, provided however that if there is any conflict between the provisions of Form C and any other provision, including this Clause 1, of this charter such other provision shall govern.

3

2. Shipboard Personnel and their Duties

(a)     At the date of delivery of the Vessel under this charter and throughout the charter period:

    (i)     she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the Vessel and her equipment competently and safely;

    (ii)     all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state and shall be trained in accordance with the relevant provisions of the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, 1978;

    (iii)     there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently;

    (iv)     the terms of employment of the Vessel's staff and crew will always remain acceptable to The International Transport Worker's Federation (ITF)

    (v)     Owners and/or any person engaged by Owners as managers or operators of the Vessel shall comply with any national or international law or regulation applicable in respect of the management or operation of the Vessel.

(b)     Owners shall exercise due diligence that throughout the charter service the master shall with the Vessel's officers and crew, unless otherwise ordered by Charterers:
    (i)     prosecute all voyages with the utmost despatch;
    (ii)     render all customary assistance; and
    (iii)     load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

(c)     It is agreed that the Owner will employ Nigerian crew as agreed with the relevant Authorities in compliance with the Nigerian Cabotage Act, 2004. The number and seniority level of such Nigerian ratings will be agreed but it is understood that (in the Owners sole discretion) if suitable crew cannot be found then the Owner shall employ such crew as required but will double up with non Nigerian staff until the Nigerian staff are trained and in the reasonable opinion of the master acceptable for the position they are to fill.

All extra costs (including doubling up of ships staff, if any) arising out of employing such Nigerian ship staff including training costs shall be for Owners' account. It is understood

4

that the Owner may not employ such Nigerian staff directly but will use the services of a reputable Nigerian manning agency/or other reputable company. The employment of Nigerian staff will always comply with ITF regulations or agreements acceptable to the ITF

It is also understood and agreed that such Nigerian manning may only be qualified for Nigerian coastwise trade and that should the Owner agree to trade the Vessel outside Nigeria for a limited time on the instruction of Charterer, then any and all extra costs (including but not limited to travel and severance payments if necessary) incurred in changing the Nigerian manning of the vessel to permit such trade shall be for Charterer's account and shall be paid promptly on receipt of Owner's invoice.

Charterers will allow the vessel to deviate to a nearby convenient place outside Nigeria to change crew whilst on hire provided such deviation does not seriously disrupt the discharge programme of the cargo.

(d)     At certain ports it is usual and necessary for ship's crew to connect and disconnect cargo hoses and/or chicksan arm from vessel's manifold and such work to be done free of expenses to the Charterers under the shore terminal's guidance and at the shore terminal's responsibility.

### 3. Duty to Maintain

(a)     Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 28 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the Vessel.

(b)     If at any time whilst the Vessel is on hire under this charter the Vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure.  If and to the extent such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 25.

(c)     If Owners are in breach of their obligation under Clause 3(a) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the Vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d)     Furthermore, at any time while the Vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on

5

which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (d) is without prejudice to any rights of the Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).

(e)   Owners do not give any warranties as to the vessels approvals by all oil company but the ship will be maintained in a condition acceptable to Shell subject to Shell not amending their vetting requirements with regard to the age of the vessel.

Owners shall advise Charterers immediately, in writing, should the Vessel fail an inspection by, but not limited to a governmental and/or port state authority, and/or terminal and/or major charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects, which have caused the failure of such inspection.

(f)   Where Owners fail to remedy the defect under Clause 3(e) above within a period of 10 (ten) days and such failure prevents normal commercial operations then Charterers have the option to place the Vessel off-hire from the date and time that the Vessel fails such inspection and becomes commercially inoperable, until the date and time that the Vessel passes a re-inspection by the same organisation, or becomes commercially operable, which shall be in a position no less favourable to Charterers than at which she went off-hire.

(g)   i)   During the currency of this Charter, the Owners shall procure that both the vessel and the "Company" (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter, loss, damages, expense or delay caused by failure on the part of the Owners or the "Company" to comply with the ISM Code and/or failure to respond (or delay in responding) to Charterers' request for the foregoing documents and certificates shall be for the Owners' account. Owners undertake that the vessel will have on board a certificate valid for the full duration of this Charter, warranting that the company operating the vessel and the vessel comply with the ISM Code.

ii)   Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements in the format reasonably agreed and appended hereto as Appendix B;

iii)   Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners;

6

4. Period, Trading Limits and Safe Places

(a)    Owners agree to let and Charterers agree to hire the vessel for a period of One year, commencing from the date of delivery of the Vessel. Charterers have the option to extend for a second year and a third year. The final declared period shall be plus or minus 30 days at Charterers' option. Charterer's option to extend for the second and third year is to be declared no later than 9 months after the commencement of the initial period or the first option if declared.

(b)    The Vessel shall be used for the purpose of carrying all lawful merchandise (subject always to Clause 29) including in particular 1 or 2 grades fully refrigerated normal commercial quality Liquefied Petroleum Gas (LPG) and if 2 grades, always within Vessel's natural segregations for trading between safe ports or places within Nigerian waters of offshore Nigeria as Charterers shall direct. Vessel not to carry incompatible products at the same time.

(c)    The Vessel will trade Nigerian coastwise but, in exceptional circumstances Charterers may request Owners to trade the vessel outside the agreed limitations. The Vessel shall not be used in any trade that could result in detention/arrest or restraint by any or authorities (governmental or otherwise). Charterers agree that should Owners incur any delays, costs or expenses as a result of Charterers request to trade outside Nigeria including but not limited to changing or dismissing any officers or crew, the cost of obtaining COFR for USA trading, then such costs and expenses shall be for Charterers account and delays to the Vessel, if any shall be on-hire. However Owners shall endeavour to minimise such delays and costs.

(d)    The Vessel will not be ordered to areas where there is danger from ice.

(e)    Charterers shall use due diligence to ensure that the Vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the Vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid.  Subject as above, the Vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform with Clause 22.



7



5. Delivery, Redelivery

(a)     The Vessel shall be delivered by Owners on arrival off Bonny River, Nigeria at Owners'
        option and redelivered to Owners dropping outbound pilot at, or off a port or at a safe
        anchorage, Nigeria at Charterers' option.

(b)     The Vessel shall not be delivered to Charterers before 15 August 2007 and Charterers
        shall have the option of cancelling this charter if the Vessel is not ready and at their
        disposal on or before 31st August 2007.

(c)     On delivery and redelivery the Vessel to present under vapours and heel normal
        commercial quality LPG, with last 3 cargoes LPG.

6. Owners to Provide

(a)     Owners undertake to provide and to pay for all provisions, wages and shipping and
        discharging fees and all other expenses of the master, officers and crew; also, for all
        insurance on the vessel, for all deck, cabin and engine-room stores, for all drydocking,
        overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat
        certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or
        import duties arising at any time during the performance of this charter in relation to the
        personal effects of the master, officers and crew, and relation to the stores, provisions and
        other matters aforesaid which Owners are to provide and pay for and Owners shall refund to
        Charterers any sums Charterers or their agents may have paid or been compelled to pay in
        respect of any such liability.  Any amounts allowable in general average for wages and
        provisions and stores shall be credited to Charterers insofar as such amounts are in respect
        of a period when the vessel is on-hire.

(b)     Overtime pay of the master, officers and crew in accordance with ship's articles shall be for
        Owners' account when incurred, as a result of complying with the request of Charterers or
        their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning.

(c)     The Vessel shall be used off the Nigerian coast and as such shall require an exemption from
        the Nigerian Authorities. Owners shall arrange any and all exemptions (at their cost and
        time) to permit the Vessel to trade on the Nigerian coast. Owners shall provide Charterers
        with written documentary evidence that all exemptions have been obtained.

(d)     Owners shall arrange for the provision of suitable and sufficient Nigerian Navy guards on
        board the Vessel as the master requires.

(e)     Owners confirm that they will ensure that the Vessel is acceptable to national, regional and
        local and governmental authorities and other Nigerian bodies having authority over the trade,



8

manning and operation of the Vessel and further Charterers will ensure that the Vessel will be physically acceptable to the terminals and loading places utilized by the Vessel.

(f)  All permits required to enable the Vessel to trade and serve as a floating storage unit in Nigeria throughout the period of the Charter, including importation and exportation of the Vessel her equipment and spare parts, will be arranged by the Owners for Charterers' account.

(g)  Owners will ensure that the vessel, master, officers, crew, and support staff in Nigeria and entering Nigeria will receive all permits in connection with the Vessel and its manning. The cost of these permits shall be for the Owner's account.

7. Charterers to Provide

(a)  Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay all agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 23); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

(b)  It is agreed that Charterers shall promptly re-imburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably paid for by the Owners as a consequence of the Vessel's trade.

(c)  Due to the unclear safety situation in Nigeria should the master be concerned about the safety of the Vessel, officers and crew he shall, in his sole discretion and upon informing the Charterers, be permitted to move the Vessel off shore, further to sea or other safe place until in the master's opinion it is safe to return. Such movement, bunkers consumed shall be on hire and any additional substantiated (original vouchers and invoices) reasonable costs incurred shall be for Charterers account.

(d)  Charterers shall provide and pay for all potable water required by the vessel as and when requested by the master.

(e)  Charterers shall provide and pay for the provision of facilities to remove all waste, garbage and sludge from the vessel as and when requested by the master.

(f)  If after the date on which this charter is agreed there are changes in the laws and regulations of Nigeria making the use of the Vessel as floating storage more expensive then Charterers shall re-imburse Owners promptly for any corresponding extra costs incurred by Owners by increasing the hire rate of by lump sum payments, so that the Owner is in no worse financial position than if such a change had not occurred.

9

(g)     The Charterers agree that their agents will undertake without charges normal ship's husbandry as Owners agents. This shall not include any extraordinary business such as but not limited to crew member deserting or being left in hospital, when Owners shall appoint their own agents or pay Charterers agents in accordance with locally recognised tariff.

## 8. Rate of Hire

Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of U.S $ 1,000,000 (one million United States Dollars) and pro rata per calendar month, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners.

## 9. Payment of Hire

Subject to Clause 3(c) and 3(f), payment of hire shall be made in immediately available funds to *Caverton Marines US$ account at*

CORRESPONDENT BANK: ANZ LONDON
SWIFT CODE:ANZBGB2L
SORT CODE: 20 32 53
FOR CREDIT OF: GUARANTY TRUST BANK PLC, LAGOS NIGERIA
SWIFT CODE: GTBINGLA
ACCOUNT NUMBER: 664276 –USD-001
IBAN NUMBER:GB 56 ANZB 203253 00664276
FOR FINAL CREDIT OF: CAVERTON MARINE LIMITED
BENEFICIARY'S ACCOUNT NO: 214/775510/210
REFERENCE: HIRE PAYMENT FOR BW SAGA:

per calendar month in advance, less:

( )     any hire paid which Charterers reasonable estimate to relate to off-hire periods, and;

(ii)    any amounts disbursed on Owners' behalf, any advances and commissions thereon, and charges which are for Owners' account pursuant to any provision hereof, and;

(iii)   any amounts due or reasonably estimated to become due to Charterers under this charter,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained.  Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.



10

In default of such proper and timely payment:

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at the rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

## 10. Space Available to Charterers

The whole reach, burthen and decks of the Vessel and any passenger accommodation shall be at Charterers' disposal, reserving only proper and sufficient space for the Vessel's master, officers, crew, extra personnel, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 500 tonnes at any time during the charter period.

## 11. Instructions and Logs

All oral and written instructions between Charterers and the master of the Vessel shall be in English Language. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

## 12. Bill of Lading

(a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the Vessel, agency and other arrangements, and



11

subject to Clause 12(c) below shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise:

(i) from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 12(b)) from the master otherwise complying with Charterers' or their agents' orders;

(ii) from any irregularities in papers supplied by Charterers or their agents.

(b)     Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo:

   (i) at any place other than that shown on the bill of lading and/or

   (ii) without presentation of an original bill of lading,

unless they have received from both written confirmation of such orders and an indemnity(ies) in a form acceptable to Owners

(c)     For cargo destined for domestic Nigerian waters trading the Vessel shall not produce valid bills of lading but will issue 'Mates receipts' for all cargo loaded and discharged. Should it be agreed that the Vessel trades outside Nigeria then the Vessel will produce bills of lading for the cargo on board prior to sailing from Nigeria. If bills of lading are produced and should Charterers require the Vessel to discharge without presenting original bill(s) of lading at the discharge port and/or wish discharge at a port different to that named on the bill of lading(s) then Owners may discharge cargo as requested provided Charterers arrange for an indemnity, in a form acceptable to Owners, to be provided to the Owners and master. Such indemnity shall be countersigned by a first class bank or a company acceptable to Owners and the indemnity and countersignature to be provided to Owners at their Oslo office in sufficient time not to delay vessel.

(d)     The master of the Vessel will, if requested by cargo owners, and approved by Charterers draft bills of lading (in originals and copies as specifically instructed by cargo owners) for the transhipment vessel for each cargo loaded off the Vessel. Such Bills of Lading shall be issued by and for and on behalf of the transhipment vessel. Save for wilful neglect on the part of the master, Charterers and cargo owners hereby indemnify Owners against consequences and or liabilities that may arise:

   (i) from drafting such bills of lading according to Charterers directions;

   (ii) from irregularities in papers supplied to transhipment vessel in compliance with Charterers directions.



   (iii) from the handling of the Bills of lading once issued by the transhipment vessel on behalf of Cargo Owners;

12

13. Conduct of Vessel

If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall discuss the results of their investigations with Charterer and if so required by Charterer, make a change in the appointments as soon as possible.

14. Bunkers at Delivery and Redelivery

The Vessel will deliver with full bunkers less that used to ballast the Vessel to the delivery position. With regard to the trade Owners will utilise Fuel Oil Bunker tank(s) for Gas Oil thus reducing the fuel oil capacity. On redelivery the vessel should have sufficient bunkers with bunkers of each grade for 8 sea days full speed steaming with normal safety reserves. Bunker prices shall be as per last paid prior delivery and redelivery respectively. However, bunkering for delivery and redelivery shall be done after consultation with the other party with regard to their trading intentions. Bunkering for delivery and redelivery shall not be done for the purposes of making a profit.

15. Stevedores, Pilots and Tugs

Stevedores and or cargo surveyors when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboats personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that:

(i)     the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and;

(ii)    Charterers shall be liable for any damage to the Vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

16. Deliberately left blank

13

17. Supernumeraries

Charterers may send representatives in the Vessel's available accommodation upon any voyages made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of $25 per day for each representative while on board the Vessel. Charterers and supernumeraries shall sign Owners normal indemnity in the form as provided under Attachment 1 of this Agreement.

18. Sub-letting

Charterers may sub-let the Vessel, but shall always remain responsible to Owners for due fulfillment of this charter.

19. Final Voyage

If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for:

    (i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and

    (ii)  bunkers on board at redelivery pursuant to Clause 14.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the Vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. However, no final voyage shall be undertaken unless Charterers can reasonably expect to redeliver the vessel within agreed period.

20. Loss of Vessel

Should the Vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss. Should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the Vessel's underwriters agree that the Vessel is a constructive total loss and should the Vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of.  Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the



14

estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

## 21. Off-hire

(a)    On each and every occasion that there is loss of time (whether by way of interruption in the Vessel's service or, from reduction in the Vessel's performance, or in any other manner):

(i)    due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the Vessel or her equipment; overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than six (6) consecutive hours (if resulting from interruption in the Vessel's service) or cumulates to more than six (6) hours (if resulting from partial loss of service); or

(ii)    due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)    for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than six (6) consecutive hours; or

(iv)    due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)    due to detention of the Vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the Vessel, the Vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); or

(v)    ~~due to any other circumstances where the Vessel is off-hire under this charter;~~

then without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the Vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the Vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

15

(b)     Subject to Clause 25(b), where the Vessel fails to proceed at any guaranteed speed pursuant to Clause 25, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the Vessel shall be off-hire under this Clause 21 shall be the difference between:

    (i)   the time the vessel would have required to perform the relevant service at such guaranteed speed, and

    (ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 25.

(c)     Further and without prejudice to the foregoing, in the event of the Vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the Vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the Vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the Vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the Vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby unless the Vessel is already off-hire at the time of deviation.

(d)     If the Vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find commercially impracticable to employ the Vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the Vessel shall be off-hire and Owners shall have the right to employ the Vessel on their own account.

(e)     Time during which the vessel is off-hire under this charter shall count as part of the charter Period except where Charterers declare its option to add off-hire under Clause 4(d).

(f)     All references to "time" in this charter shall be references to Nigerian time except where otherwise stated.

(g)     In the event that the Vessel is off-hire for any reason other than in connection with periodical drydocking pursuant to Clause 23 for any period in excess of 20 consecutive days or exceeding 40 days in any period of 90 days, Charterers may request Owners to supply temporary substitute tonnage from Owners controlled fleet (positioning and cost of substituting to be for Owners account) and if Owners fail to do so within a further 10 days, then Charterers shall have the option to terminate this charter by giving notice in writing with effect from any date stated in such notice provided that the Vessel is free of cargo at the time

16

when such notice becomes effective. This Clause 21(h) is without prejudice to any other
rights or obligations of Owners or Charterers under this charter. For the purposes of this
Clause 21(h), in the event of partial loss of service, the period of off-hire shall be the total
period during which the Vessel is not fully efficient rather than the resulting loss of time.

22. Ship-Ship Transfer

(a)    It is contemplated under this charter that the discharge of cargo shall be by Ship-Ship
       (STS) operations. The following provisions shall apply:

       (i)    In the event STS is required by Charterer, it shall be at Charterer's risk, cost and
              expense and Charterer shall provide a safe and protected area for the conduct of
              such STS operation where the Vessel can safely and legally proceed to, lie and
              depart from, always afloat and which shall always be subject to master's approval,
              Owners affording necessary co-operation and accommodation..

       (ii)   Charterer shall give Owner a firm notice of commencement of such operation and
              shall ensure that the other vessel(s) involved are approved by the Owner. Such
              approval by Owner will be determined by the other vessel(s) having at least one of
              the following:

              ▫ A satisfactory Owner's inspection within 12 months of STS operation.
              ▫ A CDI or SIRE report, satisfactory to Owner, less than 12 months old at time of
              STS operation.

       Charterer may also advise Owners of any Oil Major approvals the ship may have.

       Any delays/costs/expenses resulting from Owner's physical inspection arrangements shall
       be for Charterers' account

(b)    Any delays as a result of Charterers failure to supply any of the above in a timely manner
       allowing Owner sufficient time either to appraise inspection reports during their working
       hours or to arrange, undertake and consider results of any required inspection shall be for
       Charterer's account.

(c)    As far as possible such operation will be carried out in conformity with the provisions of the
       SHIP TO SHIP TRANSFER GUIDE (LIQUIFIED GASES) 1995 (hereinafter referred to as
       The S-T-S Guide), as amended from time to time. Should either master discontinue
       operations on safety grounds, for which they have full discretion, all time from arrival at
       rendezvous point until final disconnection of hoses will nevertheless count as time on hire.



17

(d)    Charterers shall supply adequate fendering, hoses and other lighterage equipment and ensure they are in good condition.

Charterers shall obtain necessary permissions from relevant authorities to perform STS/lighterage operations and all expenses in this connection, plus any port expenses and additional insurance incurred, shall be for Charterer's account. Owner shall always have the right to both require Charterer to present documentation that such permission has been obtained and also to check with local, national and/or other authorities that the Vessel is authorized to perform lighterage at such place.

(e)    Charterers shall indemnify the Owners against all claims, costs, expenses and liabilities that Owners may incur which, in any way, may arise from any loss, damage, or misdelivery of the cargo whilst in the possession of the Owners during storage and STS operations. Charterers' indemnity under this clause shall however not extend to any claims, costs, expenses or liabilities that arise from loss, damage, delay or misdelivery of the cargo caused by the gross negligence of Owners, master, officers or crew of the Vessel.

(f)    Where required by the Owners, an experienced STS superintendent shall be employed by Owner at its cost and located on Vessel. This STS superintendent will be in overall charge of the STS transfer operation as per Chapter 1.5.1 of The S-T-S Guide. Irrespective, prior to the vessels manoeuvring together for mooring it is essential that in the absence of such a STS superintendent that it has been clearly agreed between the two masters involved as to who will be in overall charge of such STS transfer operation.

## 23. Emergency Drydocking

(a)    If the vessel is required to drydock in case of emergency or Class or Flag requirements Charterers shall allow the Vessel to proceed to an appropriate port, time and place to be mutually agreed taking into account Charterers lifting schedule. However, Owners to have last say on time and place of drydock. The Vessel shall be off hire from the time of deviation for the port of docking until she is again back in the deviation point or similar position. However, Charterers shall credit Owners with the time and bunkers at Charter Party speed and consumption that Charterers have notionally saved resulting from an improved redelivery position after drydock. All towing, pilotage, fuel and other expenses incurred whilst proceeding to and from, and while in drydock shall be for Owners' account.

(b)    The time and expense to have Vessel's tanks purged and cooled down ready to load next cargo is to be for Owners' account provided next cargo is to be of a similar grade to cargo carried immediately before drydocking, but if requested by Owners with adequate notice. Charterers undertake to provide the purgent and coolant ready and accessible to the Vessel. The cost of purgent and coolant is for Owners' account, but such amount is not to exceed the financial loss sustained by Charterers in this respect. If, however, the cargo nominated following drydocking is of a different nature from that remaining in the ship's cargo tanks immediately prior to drydocking, then the cost of such purgent and coolant





18

shall be for Charterers account and any deviation in order to obtain such purgent/coolant will not be considered off-hire

### 24. Ship Inspection

Subject to Charterers giving Owners 72 hours written notice Charterers shall have the right at any time during the charter period to make such inspection of the Vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(a)     that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsbilities to Owners or third parties for the same;

(b)     that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right;

(c)     that any cost incurred by such inspection shall be for Charterers' account

(d)     that any inspection carried out by Charterers shall be made without interference with or hindrance to the Vessel's safe and efficient

(e)     that any overnight stays shall be subject to Clause 17.

### 25. Performance Criteria

(a)     The Owners guarantee that the service speed of the Vessel is about 15,75 knots average laden and about 16,50 average ballast (assuming 50/50 laden/ballast basis full cargo propane) on about 65 mt HFO laden and about 70 mt HFO ballast plus about 6.0 mt MDO (for auxiliaries depending of operations being performed) per day at sea in moderate weather up to and including Beaufort force 5 wind and wave. Port consumption depends on actual operation being performed but about 2 mt HFO plus 10 mt MDO mt per day excluding manoeuvring and cooling. Gas-Oil for inerting for Charterers account as used.

(b)     In the event Charterers elect to use the Vessel for prolonged periods of storage or slow discharge and as a result, Vessel's bottom becomes fouled, Charterers shall be



19

responsible for the consequences of such fouling including the costs associated with cleaning the underwater parts of the vessel as deemed necessary by Owners No claim(s) is/are to be made against Owners for a loss of speed/increase in consumption which might thereby occur. Notwithstanding the above cleaning shall not be repeated such that vessels anti-fouling paints are damaged.

### 26. Salvage

Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 26..

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

### 27. Lien

Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

### 28. Exceptions

(a)     The Vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 25 hereof shall be unaffected by the foregoing. Further, neither the Vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.





20

(b)     The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c)     Clause 28(a) shall not apply to or affect any liability of Owners or the Vessel or any other relevant person in respect of:

  (i)     loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or

  (ii)    any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo.  All such claims shall be subject to the Hague-Visby Rules, or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules.

(d)     In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire .


## 29. Injurious Cargo

No acids, explosives or cargoes unsuitable or injurious to, or which may contaminate the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account.  No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.


## 30. Grade of Bunkers

(a)     All bunkers supplied shall be fit for the purpose and meet the Marpol regulations with special regard to Annex VI from 19th May 2005 and as may be applied later and to meet the minimum standards of ISO 8217 2005 Grade IFO 380cst RMG 380 for Fuel Oil and ISO 8217 2005 Characteristic DMB distillated clear bright non blended marine diesel or ISO 8217 2005 Marine Gas Oil DMA.

(b)     Vessel will bunker as ordered especially when proceeding to draft restricted places. Charterers accept Owners policy that, when ordered to bunker to full capacity, the vessel normally bunkers to a maximum of 96 percent of permanent bunkers capacity in order to avoid spillage and subsequent claims.  Due to possible deterioration and/or incompatibility of different supplies of fuel oils it may be necessary on occasions to reduce the percentage



21

of capacity to avoid mixing supplies. Therefore if Charterers require the vessel to "bunker to full capacity" the ultimate quantities to be at master / chief engineer's discretion but they will always take due regard to vessels orders and schedule.

(c)    Any dispute as to whether the bunker supplied by Charterers conforms with the specifications of above standard shall be settled by the result of analysis of the sealed sample collected at the vessel's bunker manifold during bunkering. The warranty of performance given by Owners, if any, is conditional upon the bunker supplied meeting the specification of above standard.

During the currency of the charter, Owners will be a subscriber to DNV or equivalent fuel testing program or equivalent program and sealed samples will be collected from the vessel's bunkers manifold by method of drip sampling. Owners will provide Charterers and Master by fax or email with copy of report on every occasion of analysis as soon as received. Vessel shall not be obliged to commingle different quality/sourced bunkers within any bunker tank.

### 31. Disbursements

Should the master require advances for ordinary disbursements at any port, Charterers or their agents may make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.

### 32. Requisition

Should the vessel be requisitioned by any government (de facto or de jure) during the period of this charter, the vessel shall be off-hire during the period of such requisition, any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

### 33. Outbreak of War

If war or hostilities break out between two or more countries including the Flag state of the vessel, Norway and/or Nigeria and such war or hostilities materially and adversely affect the trading of the Vessel, Owners and Charterers shall have the right to cancel this charter provided that the party seeking to rely on this Clause 33 has consulted with the other party in good faith.



### 34. Additional War Expenses

If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders,  provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

Any payments by Charterers under this Clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers

### 35. War Risks

(a)     Irrespective of the Vessel's place trading whether coastwise Nigeria or outside Nigeria the master shall not be required or bound to sign bills of lading for any place in his or Owners reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b)     If in the reasonable opinion of the Master or the Owners it becomes, for any reasons set out in Clause 37(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at any place to which the vessel has been ordered pursuant to this charter, (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this Charter (provided such other place is not itself a place of peril). If any place of discharge is or become a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the Master may in their or his discretion select within the trading limits of this Charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned.

(c)     It is understood that although war risk premiums are applicable for the intended trade on the Nigerian coast including storage, such trade is acceptable to Owners provided that the risks and situation do not deteriorate.

(d)     The additional insurance premium shall be based on the vessel's full hull and machinery value (including hull and freight interest) blocking and trapping, mine risk, loss of hire and freight. The total insured value shall be that advised and as may be amended by Owners and payment by Charterers shall be made promptly on Owners invoice supported by

23

Insurance companies' supporting document(s). Owners have the right to refuse orders to enter any such area if any amounts from previous invoices are outstanding. Resulting delays, if any, shall count as on-hire.

Any crew bonus paid by Owners when Vessel is blocked or trapped in pursuant to Charterers instruction shall be promptly refunded to Owners by Charterers on presentation of vouchers provided however that such bonus and the scales thereof have been approved by the applicable flag state or Norwegian authority.

(e)   The Vessel shall have the liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in otherwise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government of local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority or any such government or local authority or by any committee or person having under the terms of war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. Owners shall inform Charterers of such deviation as soon as possible.

If by reason of or in compliance with any such directions or recommendations the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the Vessel may proceed to any place which the Master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned subject to Charterer's consent, which shall not be unreasonably withheld.

However Charterers shall not order vessel into a war zone, or to a zone where hostilities exists with no declaration of war, without the consent of the Owner.
The insured value of the vessel for the purposes of this clause shall be USD 21,500,000 (United States Dollars twenty one million five hundred thousand)

(f)   Charterers shall procure that all bills of lading issued pursuant to this charter shall contain this clause (or such part of it as is relevant to bills of lading)

36. Both to Blame Collision Clause

Charterers shall procure that all bills of lading issued under this charter shall include the following clause:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or de-fault of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners



24

insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owner of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

### 37. New Jason Clause

General average contributions shall be payable according to the York/Antwerp Rules, 1994 and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

### 38. Clause Paramount

Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the following:

"(a)    Subject to sub-clause (b) or (c) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be



25

either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(b)    If there is governing legislation which applies the Hague Rules compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(c)    If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg Rules") compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(d)    If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules, or Hamburg Rules, as applicable, such term shall be void to that extent but no further."

"(e)    Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

### 39. Insurance/ITOPF

(a)    Should any load and/or discharge place or port require any insurance document and/or bond and/or proof of financial responsibility beyond that normally available from Owners P & I Club, The Britannia Steam Ship Insurance Association Limited, such document, bond or proof of financial responsibility for the vessel shall be provided by Charterers at Charterers risk and expense.

(b)    Owners warrant that the vessel is kept insured by the owners at their expense against protection and indemnity risks in a recognized first class P & I Club (to be a member of the International Group of P and I Clubs) throughout the entire duration of this charter.
Owners warrant that they have and will maintain throughout the period of this charter the standard oil pollution insurance cover issued by the vessel's P & I Club, plus any additional oil pollution insurance cover which is available or becomes available through the vessel's P & I Club.

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39.




## 40. Export Restrictions

The master shall not be required or bound to sign any documentation for the carriage of cargo to any place to which export or such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped or the flag of the vessel.

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this bill of lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter.

## 41. Business Principles

(a)     No director, employee or agent of the Owners shall give or receive any commission, fee, rebate, gift or entertainment of significant cost or value in connection with the charter or enter into any business arrangement with any director, employee or agent of any of the companies comprising the Charterers or any affiliate of any of the companies comprising the Charterers, other than as a representative of any of the companies comprising the Charterers or their affiliates, or without the prior written consent of the Charterers.

(b)     If any violation of sub-clause (41)(a) is found to have occurred prior to the date of signing this charter and such violation is determined to have resulted directly or indirectly   in   the Charterers's consent to enter into this Charter with the Owners the Charterers may terminate this charter forthwith on completion of the voyage in accordance with Clause 19.



27

42. Drugs and Alcohol

Owners undertake that they have and shall maintain for the duration of this charter a policy on drug and alcohol abuse applicable to the vessel ('The D and A Policy') that meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for The Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time.

Owners shall exercise due diligence to ensure that the D and A policy is understood and complied with on and about the vessel. An actual impairment or any test finding of impairment shall not in and of itself mean that owners have failed to exercise due diligence.

43. Pollution and Emergency Response

Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies.

Notice to Owners' Pollution and Emergency Response Department:

| | |
|---|---|
| Qualified Individuals for OPA 90 response | **Norwegian Marine Services, Inc.** |
| | 2951 Marina Bay Drive, Suite 130-331 |
| | League City, TX 77573 |
| Phone, business: | + 1 (281) 538-2305 (24 hours) |
| Fax: | + 1 (281) 538-4181 |
| E-mail: | nms@att.net |
| Back-up phones: | + 1 (281) 924-7278 Mr. Gunnar Kr. Gangsaas mobile |
| | + 1 (281) 924-7009 Mr. Tom Briggs |
| | + 1 (757) 869-5389 Mr. Hugh D. Williams |

Notice to Charterers' Pollution and Emergency Response Department:

dlpgoperations@nlng.com
Tel:    +234 1 7752847
Tel:    +234 8039603024

44. ISPS Code/USMTSA 2002

(a)    (i)    From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS

28

(ISPS Code) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request Owners shall provide documentary evidence of compliance with this Clause 44 (a) (i). The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

    (ii)    Except as otherwise provided in this charter, loss, damage, expense or delay, excluding consequential losses caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account.

(b)    (i)    Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision:

           "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

    (ii)    Except as otherwise provided in this charter, loss, damage, expense or delay, excluding consequential losses caused by failure on the part of Charterers to comply with this sub-Clause 44 (b) shall be for Charterers' account.

(c)    Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d)    Notwithstanding any other provision of this charter, the Vessel shall not be off-hire where there is a loss of time caused by Charterers' failure to comply with the ISPS Code/MTSA.

(e)    If either party makes any payment, which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

(f)    Charterers guarantee that the ports to which they direct the vessel comply at all times while the vessel is at the port with all requirements of the ISPS code. Owners are entitled to refuse to proceed to a port not complying with the ISPS Code. All costs and consequences arising from or in connection with calls at ports not complying with the ISPS Code to be for Charterers' account



29

45. Slow Steaming Clause

Charterers shall be entitled to instruct vessel to slow steam for economic or other reasons in which event Charterers shall be liable for delays in cargo deliveries which may arise as a direct result of Charterers instructions to slow steam. The Vessel shall not steam at speeds that could cause damage to the main engine or ancillary equipment.

46. Taxes and Levies.

(a)   Where, due to Charterers use of the vessel, the Owners incur or, Charterers are required to deduct, any amount, whether as tax or otherwise, the amount owing to the Owners will be increased so that it actually receives, net of such deduction, the amount which it would have received if no such deduction had been required.

(b)   Without prejudice to the generality of the above, the Parties shall comply with any applicable withholding and/or tax retention obligations imposed by the Government of Nigeria.  The Parties understand and agree that the Hire is intended to be the net amount that Owners are to receive after the Charterers have withheld sums (if any) pursuant to applicable withholding and tax retention obligations imposed by the Government of Nigeria.  The Owners shall add to its invoices for the Hire all amounts necessary to result in payment of the appropriate Hire after the Charterers has withheld from payment(s) to the Owners in accordance with any applicable withholding and tax retention obligations imposed by the Government of Nigeria. The Charterers shall provide the Owners duly authenticated, original receipts for all amounts withheld issued by the Government within thirty (30) days from the date on which Charterers receive such receipts.

(c)   Further, hires and other payments described in this charter made by the Charterers to the Owners shall be made exclusive of Nigerian value added tax or other tax of a similar nature or effect chargeable in Nigeria. The Charterers shall assume full and exclusive liability for payment of all such taxes.

(d)   Without prejudice to the generality of the foregoing, the Charterers shall pay all import and export charges, customs and excise duties imposed in Nigeria (including clearing and brokerage charges) on the Vessel and equipment on behalf of the Owners which are necessary for the performance of the Charter. The Owners shall provide the Charterers with written documentary evidence with any claim made under this clause.

(e)   If any tax, due or similar charge is applied in Nigeria to the Master's, Officers, Crew's income then there shall be a corresponding increase in the compensation to Owner, by adjustment of Hires or by lump sum payments, so that the Master, Officers, Crew are in no better or worse financial position. In this sub clause, Master, Officers, Crew and Owner refer to non-Nigerian Master, Officers, Crew and Owner. Owners shall provide Charterers with written documentary evidence with any claim made under this subclause.

30

47. Confidentiality

All terms and conditions of this charter arrangement ("the Confidential Information") shall be kept strictly confidential; provided that a party may disclose Confidential Information in the following cases:

i.      it is already known to the public or becomes available to the public other than through the act or omission of the disclosing party;

ii.     it is required to be disclosed under applicable law or by a governmental order, decree, regulation or rule (provided that the disclosing party shall give written notice of such required disclosure to the other party prior to the disclosure);

iii.    in filings with a  court or arbitral body in proceedings in which the Confidential Information is relevant and in discovery arising out of such proceedings; or

iv.     to any of the following persons on a need to know basis:

    a)      a buyer or seller or a potential buyer or seller of LPG shipped or to be shipped on the Vessel or a sub-charterer or potential sub-charterer of the Vessel;

    b)      an associated company;

    c)      employees, officers, directors and agents of the disclosing party or an associated company;

    d)      professional consultants retained by a disclosing party;

    e)      financial institutions advising on, providing or considering the provision of financing to the disclosing party or an associated company.

Provided that the disclosing party shall take all reasonable steps to ensure that no such person shall disclose Confidential Information to any unauthorised person or under unauthorised circumstances.

48. Construction

The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.



31

49. Non-waiver

No act, omission, course of dealing, forbearance, indulgence or delay by Owners or Charterers in the exercising of their rights hereunder (whether pursuant to any default of the other or otherwise), or in enforcing any of the terms of conditions of this Charter, nor any granting of time shall prejudice or affect or be in derogation of the rights and remedies of such party hereunder and no such matter shall be treated as evidence of or constitute a waiver of any rights of Owners or Charterers.

50. Assignment

The Owners and Charterers shall be entitled to assign the benefit of any and all of their rights under this Charter provided that the other party consents, such consent not to be unreasonably withheld.

51.    Disputes, Mediation, Arbitration & Experts

Mediation:

If the parties mutually agree, they will attempt to settle any dispute, difference, controversy, proceedings or claim (whether based in contract, tort or any other legal doctrine) between them arising out of or relating to this agreement, or the formation, breach, termination or invalidity thereof (each a "<ins>Dispute</ins>") (which is not referred to expert determination) first through mediation as set forth in this Clause in accordance with the CEDR Model Mediation Procedure. To initiate the mediation, a Party must give notice in writing to the other party requesting the consent of the other Party for mediation (the "Request"). Where the other Party declines the Request for mediation, then parties shall settle the Dispute through arbitration as provided hereunder. The procedure for mediation shall be as follows:

(a)    the mediation shall be conducted by a single mediator who shall be appointed by agreement in writing between the parties or, if the parties are unable to agree on the identity of the mediator within 5 (five) working days from the date of the Request, or if the mediator nominated by the parties for appointment is or becomes unable or unwilling to act, the mediator shall be appointed by the Centre for Effective Dispute Resolution London, England on the application of any party;

(b)    the mediator shall chair and determine the procedure for the mediation;

(c)    the mediation shall be conducted in London, England and in the English language. The Mediation Agreement referred to in the CEDR Model Mediation Procedure shall be governed by, and construed and take effect in accordance with English law;

32

(d)    save for the purposes of implementing and/or enforcing a written legally binding settlement agreement or as otherwise required by law, the mediation shall be conducted in confidence and without prejudice to the rights of the parties in any future proceedings;

(e)    the courts of England shall have exclusive jurisdiction to settle any claim, dispute or matter of difference which may arise out of, or in connection with any agreement reached during or as a result of the mediation;

(f)    every person involved in the mediation shall keep confidential and not use for any collateral or ulterior purpose all information (whether given orally, in writing or otherwise) arising out of, or in connection with, the mediation including the fact of any settlement and its terms and the fact that the mediation is to take place or has taken place. All information (whether oral, in writing or otherwise) arising out of or in connection with the mediation will be without prejudice, privileged and not admissible as evidence or disclosable in any current or subsequent litigation or any other proceedings whatsoever. This does not apply to any information which would in any event have been admissible or disclosable in any such proceedings;

(g)    the costs of the mediation, including the fees and expenses of the mediator (but excluding the parties' own costs and expense, which shall be borne by the party incurring those costs), shall be borne equally by the parties in dispute, unless otherwise agreed in writing;

(h)    if the parties fail to reach agreement through mediation as set forth in this Clause within 45 (forty-five) days of the mediator being appointed, parties shall have no further obligations under this Clause in relation to the Dispute and the parties may proceed directly to arbitration from and after such date;

**Arbitration:**

Any dispute, controversy or claim arising out of or in connection with this agreement, or the validity, termination, interpretation, performance or non-performance hereof (including the determination of the scope of this agreement to arbitrate) or the relationship between the parties created by this agreement, which cannot be resolved by discussion in good faith between the parties in dispute or by mediation shall be settled by binding arbitration in accordance with this Clause. Such arbitration shall be conducted in accordance with the Rules of the ICC-International Chamber of Commerce in force as at the date of commencement of such arbitration. The number of arbitrators shall be three (3). The parties shall each appoint one (1) arbitrator, and the two (2) appointed arbitrators shall select a third (3rd) arbitrator who shall serve as chairperson of the arbitration panel. In the event the two appointed arbitrators fail to agree on the choice of the third arbitrator, the President of the ICC for the time being shall appoint the third arbitrator, who shall serve as the chairman of the arbitration panel. The arbitral proceedings shall be conducted in the English language and the venue of the arbitration shall be London, England, unless another location is selected by mutual agreement of the Parties.



33

The decision of the arbitration panel shall be the majority decision and shall include a statement of the reasons for such decision and shall be final and binding on the parties. Judgement upon the award of the arbitrators shall not be subject to appeal, (except in the event of manifest error in law or fact, fraud, miscarriage of justice, failure by any of the arbitrators to disclose any interest in the subject matter of the arbitration and/or in the parties or to the extent that the determination or award is beyond the scope of the claim submitted for the arbitration) and may be entered in any court having jurisdiction over any party concerned. The cost of the arbitration and venue (but excluding the Parties' own costs and expenses, such as cost of legal representation and expert witnesses which shall be borne by the party incurring those costs) shall be borne equally by the Parties, unless otherwise agreed in writing.

This Clause shall survive the termination of this agreement, howsoever caused.

**Expert:**
Disputes of a technical nature shall be referred to an expert rather than to arbitration. The said expert shall be a person with profound knowledge for the determination of the technical matter in dispute. The expert shall be appointed by agreement between the parties or, in default of such an agreement, by the President of the ICC or an officer so designated. The decision of such an expert shall be final and binding on both parties, except in the event of manifest error or fraud on the part of the expert. The language to be used for the determination of the dispute shall be the English Language unless otherwise agreed.

The parties shall furnish the expert with all written or oral information, which he may require for his determination. The cost of the services of the expert, if appointed, shall be shared equally between the parties.

## 52. Governing Law

The proper law of this charter is the law of England and Wales. English law shall be used for the interpretation of this charter and for resolving any dispute, difference, controversy or claim between the parties arising out of or in connection with this charter excluding, however, any rule of English private international law which would refer any dispute to the law of a jurisdiction other than England.

## 53. Whole Agreement

This Charter comprise the full and complete agreement of the parties with respect to the use of the Vessel and supersedes all prior communications, understandings and agreements between the parties, whether written or oral, expressed or implied, with regard to said use.



34

54. Notices

a)   Whenever written notices are required to be given by either party to the other party, such
     notices shall be sent by telex, fax, registered mail, e-mail or registered airmail to the
     following addresses:

| | |
|---|---|
| Notice to Owners: | Caverton Marine Limited |
| | 1 Prince Kayode Akingbade Close |
| | Victoria Island |
| | Lagos |
| | Nigeria |
| Attn | Mr Olabode Makanjuola |
| | Executive Director |
| | Tel: +234 2705757 |
| | Fax: +2341 4618745 |
| | E mail: bode@cavertonmarine.com |

| | |
|---|---|
| Notice to Charterers: | Nigeria LNG LTD |
| | Tel:    +234 1 7752847 |
| | Mob:   +234 8039603024 |
| | Fax:   +234 1 2611275 |
| | E-mail: dlpgoperations@nlng.com |

| | |
|---|---|
| Copy to: | shippingoperations@nlng.com |
| | Lateef.biobaku@nlng.com |
| | Lucy.okpo-ene@nlng.com |

| | |
|---|---|
| Notice to Owners' Operations Department: | Caverton Marine Agency |
| | Tel: +23412705656 |
| | Fax +23414618745 |
| | Mob +2348023016515 Mr Yemi Adeola |
| | Mob +2348033039571 Mr Ola Wasiu |
| | E mail: agency@cavertonmarine.com |
| | yemi.adeola@caverton marine.com |

Notice to Charterers' Operations Department:    Nigeria LNG LTD



35

Tel:    +234 1 7752847
Mob:    +234 8039603024
Fax:    +234 1 2611275
E-mail: dlpgoperations@nlng.com

Copy to:        shippingoperations@nlng.com
                Lateef.biobaku@nlng.com
                Lucy.okpo-ene@nlng.com

or to such other addresses as the parties may respectively from time to time designate by notice in writing. Any failure to transmit a copy of the notice to a party listed as entitled to receive a copy shall not in any way affect the validity of any notice otherwise properly given as provided in this Clause.

b)      Any notice required under this charter to be given in writing shall be deemed to be duly received only:

In the case of a telex, at the time of transmission recorded on the message if such time is within normal business hours on a working day at the place of receipt, otherwise at the commencement of normal business hours on the next working day there.

i)      In the case of a letter, whether delivered in course of the post or by hand or by courier, at the date and time of its actual delivery if within normal business hours on a working day at the place of receipt otherwise at the commence-ment of normal business on the next such working day.

ii)     In the case of a facsimile or e-mail, at the time of transmission recorded on the message if such time is within normal business hours (09:00 - 17:00) in the country of receipt, otherwise at the commencement of normal business hours on the next working day at the place of receipt.

---

55. Charterer's Purchase Option

Clause deleted

36

56. Additional Clauses

Appendix A:                    LPG Form C for the Vessel, as attached, shall be
                               incorporated herein.

Appendix B:                    Safety and Environmental Monthly Reporting Template,
                               as attached, shall be incorporated herein.

 

37

SIGNED FOR OWNERS

SIGNED FOR CHARTERERS

07/09/07

MR A. M MAKANJUOLA

FULL NAME

FULL NAME *SHETU LADAN*

CHAIRMAN. CHEVRON MARINE LTD

POSITION

POSITION DEPUTY MANAGING
DIRECTOR, NLNG.

38

Attachment 1
FREE PASS AGREEMENT

To the Master of the ..........................

In consideration of being allowed to follow your ship from ..............to ............on payment of
........ per day to cover meals and berth plus a normal remuneration of ......... on signing of this
agreement the undersigned user of this free passage accepts the following conditions:

1.
This agreement is in every respect, including questions of shipowners' liability, to be governed by
Laws of England and Wales, and any dispute(s) is to be decided by the proper English Courts to
the exclusion of any other law and any other jurisdiction.

Should for any reason proceedings be instituted elsewhere whether in rem or in personam relative
to the passage agreed herein, such proceedings are to be stayed pending the decision of the
proper English Courts, whose decision shall be final and binding.

2.
The ... (name of vessel) ... and/or her Owners are not under liability of a carrier to the user of this
free pass. In particular, the user assumes all risk of loss of life and personal injury as well as of loss
of or damage to personal effects or baggage or other property whilst onboard and whilst embarking
or disembarking.
The user expressly agrees that the Owners, Manager, Charterers, Agents, Master, Mariners or
other servants of the ship are not to be under any liability whatsoever, whether statutory or
otherwise, and whether or not there be negligence on the part of any of the aforesaid in respect of
loss of life, personal injury or loss or damage to personal effects, baggage or other property.

3.
The ship is not a passenger ship and there is no warranty that the ship is fit for the carriage of
passengers; any undertaking as to seaworthiness that might otherwise exist being hereby
expressly waived.

4.
No guarantee is given that the vessel will proceed to ports mentioned above or along the proposed
or advertised route or otherwise howsoever, and if required the user of this free pass will
disembark at any port at which the ship may call at his risk and expense.

Any money paid on signing this contract to be considered as earned and not returnable in any
event.

5.
The user warrants compliance with all quarantine, passport and other regulations, and accepts
responsibility for all extra expenses such as harbour dues, tonnage dues, light dues, fines and all
other expenses, which may be incurred by said vessel due to the fact that she is carrying

39

passengers, provided, however, that such responsibility be limited to a share of the ship's total extra expenses proportionate to the number of passengers carried.

--------------------------
Name of Passenger

--------------------------
Address of Residence

--------------------------
Passport Number

40



APPENDIX A

## LPG FORM C - PARTICULARS OF VESSEL

TO be attached



41



APPENDIX B

Safety and Environmental Monthly Reporting Template

| Safety and Environmental Monthly Reporting Template | Return to: Nigeria LNG LTD<br>Charterers marked for the attention of: Michael Edeke<br>Fax:    +234 1 2611275<br>Phone: +234 1 7752847<br>Email:  michael.edeke@nlng.com |
| --- | --- |

| Time Chartered Vessel Name | |
| --- | --- |
| Management Company | |
| Month | |

| OIL SPILL INCIDENTS<br>(Any amount entering the water)<br>Approximate volume in barrels and brief details | |
| --- | --- |
| ANY OTHER INCIDENTS<br>resulting in or having potential for injury, damage or loss | |

FOR DEFINITIONS OF INCIDENT CLASSIFICATION AND EXPOSURE HOURS PLEASE SEE OIL COMPANIES
INTERNATIONAL MARINE FORUM (OCIMF) BOOKLET "Marine Injury Reporting Guidelines" (February 1997)                                                                                         or
any subsequent version, amendment, or variation to them

| A. No. Of crew: | |
| --- | --- |
| B. Days in month / period: | |
| EXPOSURE HOURS  (A x B x 24): | |

| LOST TIME INJURIES (LTI'S) including brief details / any treatments |
| --- |
| |

| TOTAL RECORDABLE CASE INJURIES (TRC'S) including brief details / any treatments |
| --- |



42

PLEASE CONFIRM YOUR RETURN CONTACT DETAILS:

| | |
|---|---|
| Name: | |
| Phone: | |
| Fax: | |
| Email: | |

Return for each calendar month – by 10th of following month.

| Safety and Environmental Monthly Reporting Template | Return to: Charterers marked for the attention of: Fax: Phone: Email: |
|---|---|

| Time Chartered Vessel Name | |
|---|---|
| Management Company | |
| Month | |

Notes :    Please enter zero i.e. "0" where any amount is nil (rather than entering "Nil" or "N/A")
Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter "3".
Cargo loaded for LPG vessels should also be reported as tonnes and not as m³.

| Monthly Consumption – Fuel Oil mt | |
|---|---|
| Sulphur content of Fuel Oil (percentage weight) | |
| Monthly Consumption – Diesel and/or Gas Oil mt | |
| Monthly Consumption (LPG ships only) – Fuel Gases mt | |

Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter 3".
Cargo loaded for LPG vessels should also be reported as tonnes and not as m3.

| Monthly Distance Steamed | |
|---|---|
| Monthly Cargo Loaded - mt | |

| Refrigerant Gas Consumption - Type | |
|---|---|
| Refrigerant Gas Consumption – Quantity (litres) | |

| Garbage Disposal m3 – At Sea | |
|---|---|
| Garbage Disposal m3 – Incinerated on Board | |

43

| Garbage Disposal m3 – Sent Ashore | |
|---|---|

| OIL SPILL INCIDENTS<br><br>(Other than those entering the water)<br>Approx. volume & brief details | |
|---|---|

Return for each calendar month – by 10th



44