UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
HARLEY MULLION & CO. LIMITED,                    Case No. 08 CV 5435 (BSJ)
ERNST RUSS (UK) LTD
SCANDINAVIAN SHIPPING

                                    Plaintiffs          **DECLARATION OF**
                                                        **MARK TERENCE O'NEIL IN**
                                                        **RESPONSE TO**
             - against -                                **DEFENDANT'S MOTION**
                                                        **TO VACATE**
CAVERTON MARINE LIMITED                                 **ATTACHMENT AND FOR**
                                                        **ATTORNEY'S FEES**
                                    Defendant,


MARK TERENCE O'NEIL, pursuant to 28 U.S.C. § 1746 hereby declares and states under penalty of perjury:

1.    I am a partner with the law firm Reed Smith LLP, counsel for Plaintiffs, Harley Mullion & Co. Limited, Ernst Russ (UK) Ltd and Scandinavian Shipping ("Brokers"). I am admitted to practice in England by the Law Society of England & Wales and have legal experience in maritime and commercial law in the U.K. I make this declaration in response to the Defendant, Caverton Marine's ("Caverton") Motion to Vacate Attachment and for Attorney's Fees based upon my knowledge and documents provided to me by the Brokers.

2.    In particular I have been asked to respond on the points of English law raised in Andrew Hutcheon's Declaration of 11 July 2008.

3.    It is correct that the Brokers negotiated two charter agreements for Caverton in relation to the Vessel "BW SAGA". Caverton were Charterers under the Head Charter (Bergesen/Caverton) and Disponent Owners under the Sub-Charter (Caverton/NLNG).

4.    As is standard industry practice Caverton as Disponent Owners were responsible for the payment of brokerage commission to the Brokers in future hire/freight payments for fixing the sub-charter. The Brokers' claim relates solely to the brokerage commission in hire/freight payments due under the Sub-Charter.

5.    The Brokers entered into a Brokerage Commission Agreement (the "Agreement") with Caverton by email on 23 January 2007 (Exhibit 1) on the following terms:

      *"2.25% payable by Disponent Owners (Caverton Marine) on freight earned for equal division between Harley Mullion & Co. Limited and Scandinavian Shipping. Harley Mullion/Scandinavian to assist Caverton Marine as their representative agent/brokers with the negotiations of both charters i.e. from Bergesen to Caverton Marine and from Caverton Marine to NLNG".*

6.    These terms were accepted by Caverton in an email on the same day which stated *"ok now that negotiations are over, can we get back to work"* (Exhibit 1).

7.    The Agreement was and/or should have been and/or was intended to be incorporated into the Sub-Charter as it formed part of the fixture negotiations for the Sub-Charter.

8.    In the pending arbitration proceedings in London, pursuant to the Arbitration clause of the Sub-Charter, the Brokers are seeking rectification of the Sub-Charter to expressly incorporate the Agreement.

9.    Pursuant to section 48(5) of the Arbitration Act 1996:

> *The tribunal has the same powers as the court—*
>
> ...
>
> *(c) to order the <u>rectification</u>, setting aside or cancellation of a deed or other document .*(Emphasis added) (Exhibit 2)

10.    Under English law, where a contract does not accurately or expressly reflect what has been agreed, a Court or arbitral Tribunal can rely on its equitable jurisdiction to rectify a written contract where the parties have by mistake failed to express these terms (or express them accurately) in the written contract. (*Joscelyne v Nissen [1970] 2 QB 86.* (Exhibit 3).

11.    Once the Sub-Charter has been rectified by the Tribunal, the Brokers will be entitled to enforce their claim against Caverton by relying on the provisions of the Contracts (Rights of Third Parties) Act 1999 (Exhibit 4), pursuant to Section 1(3) which states that:

> *"The third party must be expressly identified in the contract by name, as a member of a class or as answering a particular description but need not be in existence when the contract is entered into."*

12.    The rectified Sub-Charter incorporating the wording of the Agreement as at paragraph 4 above would expressly identify the Brokers by name.

13.    As a result the Contracts (Rights of Third Parties) Act applies to the rectified Sub-Charter and the Brokers as a third party expressly named in the rectified Sub-Charter can rely on its provisions to exercise their right for brokerage commission against Caverton.

14.    English case law shows that brokers have successfully brought claims in the High Court in London and in arbitration in London for recovery of unpaid brokerage commission where they were a third party to the charterparty, by relying on the provisions of the Contracts (Rights of Third Parties) Act.

15.    I refer in particular to the case of *Nisshin Shipping Co Ltd v Cleaves & Company* [2004] 1 Lloyd's Report 38. (Exhibit 5). In that case it was held that since the scope of the disputes covered by the arbitration agreement was wide enough to embrace a dispute between owners and charterers about payment of the brokers' commissions, the brokers were entitled and indeed obliged to refer those disputes to arbitration and the arbitrators had jurisdiction to determine them.

16.    Under English law, therefore, insofar as a claim for brokerage commission arises under a charterparty, and insofar as that charterparty dispute would constitute a maritime claim, it follows that the commission dispute would also be a maritime claim.

17.     The Court's ruling in this case has been subsequently followed in London arbitration
        proceedings. (Exhibit 6).

I declare under penalty of perjury of the law of the United States that the foregoing is true and
correct and dated London, England July 28, 2008,

..............................................................

MARK TERENCE O'NEIL

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 1

-----Original Message-----
From: Olabode Makanjuola [mailto:bode@cavertonmarine.com]
Sent: 23 January 2007 17:44
To: Harley Mullion
Cc: Scandinavian Shipping
Subject: Re: Nlng / Caverton - Vlgc charter / Comms Agreement

Ok now that negotiations are over can we get back to work


On 23/1/07 18:26, "Harley Mullion" <sandp@harleymullion.co.uk> wrote:

HARLEY MULLION & CO. LIMITED
7th Floor, Duke's House, 32-38 Duke's Place, London EC3A 7LP
Tel: 020 7283 0141 Fax: 020 7626 2858
Email: sandp@harleymullion.co.uk  or tank@harleymullion.co.uk

Bode / Richard

Ref our last and per our subsequent telcon confirm comms agreement as
follows:

2.25% payable by the Disponent Owners (Caverton Marine) on freights earned
for equal division between Harley Mullion & Co. Limited and Scandinavian
Shipping. Harley Mullion / Scandinavian to assist Caverton Marine as their
representative agents / brokers with the negotiations of both charters i.e
from Bergesen to Caverton Marine and from Caverton Marine to Nlng.


Ends

Brgds

25/7/08 11:13 AM

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 2



# Arbitration Act 1996

## 1996 CHAPTER 23

### ARRANGEMENT OF SECTIONS

#### PART I
##### ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Introductory*

| | |
|---|---|
| 1. | General principles. |
| 2. | Scope of application of provisions. |
| 3. | The seat of the arbitration. |
| 4. | Mandatory and non-mandatory provisions. |
| 5. | Agreements to be in writing. |

*The arbitration agreement*

| | |
|---|---|
| 6. | Definition of arbitration agreement. |
| 7. | Separability of arbitration agreement. |
| 8. | Whether agreement discharged by death of a party. |

*Stay of legal proceedings*

| | |
|---|---|
| 9. | Stay of legal proceedings. |
| 10. | Reference of interpleader issue to arbitration. |
| 11. | Retention of security where Admiralty proceedings stayed. |

*Commencement of arbitral proceedings*

| | |
|---|---|
| 12. | Power of court to extend time for beginning arbitral proceedings, &c. |
| 13. | Application of Limitation Acts. |
| 14. | Commencement of arbitral proceedings. |

*The arbitral tribunal*

| | |
|---|---|
| 15. | The arbitral tribunal. |

**48      Remedies**

(1)   The parties are free to agree on the powers exercisable by the arbitral tribunal as regards remedies.

(2)   Unless otherwise agreed by the parties, the tribunal has the following powers.

(3)   The tribunal may make a declaration as to any matter to be determined in the proceedings.

(4)   The tribunal may order the payment of a sum of money, in any currency.

(5)   The tribunal has the same powers as the court—

    (a)   to order a party to do or refrain from doing anything;

    (b)   to order specific performance of a contract (other than a contract relating to land);

    (c)   to order the rectification, setting aside or cancellation of a deed or other document.

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 3

Westlaw.UK

[1970] 2 Q.B. 86                                                                 Page 1
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

*86 Joscelyne v. Nissen and Another
[Plaint No. X 2417]; [1970] 2 W.L.R. 509

Court of Appeal

CA

Russell, Sachs and Phillimore L.JJ.

1969 Dec. 1, 2; 19

Contract--Rectification--Oral agreement--Agreed provision not expressly incorporated in written contract--No prior concluded oral agreement--Whether rectification possible.

The plaintiff, the owner of a car hire business, and his wife shared a house with their daughter, the defendant. In 1963 the plaintiff's wife was taken ill and the plaintiff, being unable to carry on the business, discussed a scheme with the daughter whereby he would make over the business to her in return for which she would pay certain household expenses, including gas, electricity and coal bills. On June 18, 1964, the parties signed an agreement transferring the business, clause 6 of which provided that "[The defendant] shall discharge all expenses in connection with the whole premises ... and shall indemnify [the plaintiff] from and against any claim arising in respect of the same." After signing the agreement, the defendant paid several of the household bills but following a dispute with the plaintiff she stopped paying them, contending that the agreement did not on its true construction provide for payment of the household expenses. The plaintiff brought an action claiming a declaration that she should pay, inter alia, the gas coal and electricity bills and, alternatively, that the agreement should be rectified to include a provision to that effect. The county court judge found that there was no prior concluded contract between the parties but ordered the agreement to be rectified so as specifically to include the costs of the household expenses.

On appeal on the grounds, inter alia, that the

judge had misdirected himself in ordering rectification in view of his finding:-

Held, dismissing the appeal, that it was not necessary to find a concluded contract antecedent to the agreement; that a court had jurisdiction to rectify an agreement if there was a common continuing intention in regard to a particular provision of the agreement, but that an outward expression of accord and convincing proof that the concluded instrument did not represent the parties' common intention were required.

Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662; [1939] 4 All E.R. 68, C.A. applied.

Frederick E. Rose (London) Ltd. v. William H. Pim, Jnr. & Co. Ltd. [1953] 2 Q.B. 450; [1953] 3 W.L.R. 497; [1953] 2 All E.R. 739, C.A. considered.

The following cases are referred to in the judgment:

Craddock Bros. v. Hunt [1923] 2 Ch. 136, C.A..

Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662; [1939] 4 All E.R. 68, C.A..

Earl v. Hector Whaling Ltd. [1961] 1 Lloyd's Rep. 459, C.A..

Faraday v. Tamworth Union (1916) 86 L.J.Ch. 436.

Higgins (W.) Ltd. v. Northampton Corporation [1927] 1 Ch. 128.

*87 London Weekend Television Ltd. v. Paris and Griffith (1969) 113 S.J. 222.

Lovell and Christmas Ltd. v. Wall (1911) 104 L.T. 85, C.A..

McCartney v. Brighton Corporation, The Times, May 20, 1904.

Mackenzie v. Coulson (1869) L.R. 8 Eq. 368.

Morelle v. Wakeling [1955] 2 Q.B. 379; [1955] 2

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86

1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
**(Cite as: [1970] 2 Q.B. 86)**

W.L.R. 672; [1955] 1 All E.R. 708, C.A..

Rose (Frederick E.) (London) Ltd. v. William H.
Pim, Jnr. & Co. Ltd. [1953] 2 Q.B. 450; [1953] 3
W.L.R. 497; [1953] 2 All E.R. 739, C.A..

Schofield v. W. C. Clough & Co. [1913] 2 K.B.
103, C.A..

Shelburne v. Inchiquin (1784) 1 Bro.C.C. 338 .

Shipley Urban District Council v. Bradford Cor-
poration [1936] Ch. 375, C.A..

Slack v. Hancock (1912) 107 L.T. 14.

United States of America v. Motor Trucks Ltd.
[1924] A.C. 196, P.C..

The following additional case was cited in argu-
ment:

Conway v. Rimmer [1967] 1 W.L.R. 1031;
[1967] 2 All E.R. 1260, C.A..

APPEAL from Judge Granville-Smith sitting at
Edmonton County Court.

The plaintiff, Laurence Henry Prince Joscelyne,
and his wife were tenants of a house, "Mar-
tindale," Stanley Road, Enfield, owned by their
daughter, Margaret Ellen Nissen, the defendant.
In 1964, the plaintiff discussed with his daughter
a scheme by which she would take over his car
hire business in return for which she would pay
him a weekly pension and household expenses,
including the gas, electricity and coal bills and
the cost of a home help. On June 18, 1964, the
parties signed an agreement, which provided:
"Whereby it is agreed as follows: (1) Mrs. Nis-
sen [that is, the daughter] shall be deemed to have
taken over from Mr. Joscelyne [that is, the father]
the business of a car hire proprietor hitherto car-
ried on by Mr. Joscelyne under the style of 'Sta-
tion Hire' from 'Martindale' Stanley Road, Enfield
aforesaid under the style of 'Station Cars' as from
May 1, 1963. (2) Mrs. Nissen shall be deemed to
have taken over all the assets and liabilities of the
business of self-drive and chauffeur driven car
hire carried on under the style and from the
premises aforesaid as from May 1, 1963. (3) Mrs.

Nissen shall indemnify Mr. Joscelyne and his es-
tate and effects from any claim or payment made
in respect of the liabilities of the said business in-
cluding all past or future claims in respect of in-
come tax and or surtax arising in respect of the
business. (4) In consideration of the transfer of
the assets of the self-drive and chauffeur driven
portion of the said business Mrs. Nissen shall pay
by way of a pension to Mr. Joscelyne (such pen-
sion to be payable for the life of Mr. Joscelyne or
the duration of the business) the sum of £3 10s.
per week. (5) Mr. Joscelyne shall be permitted to
have the use of any of the cars of the business
when not needed for business work and to carry
out driving work for Mrs. Nissen subject to pay-
ment to him of one fifth of the charge made to
each customer. (6) Mrs. Nissen shall discharge all
expenses in connection with the whole premises
'Martindale,' Stanley Road, Enfield aforesaid and
shall indemnify Mr. Joscelyne from and against
any claim arising in respect of the same. (7) Mrs.
Nissen shall permit Mr. Joscelyne during his life
to have the uncontrolled right to reside at and oc-
cupy *88 the ground floor of 'Martindale,' Stanley
Road, Enfield aforesaid or such other property as
may be agreed upon in writing free of all rent and
outgoings of every kind in any event. (8) Mrs.
Nissen shall be entitled to at least three annual
weeks' holiday in each year. (9) Mr. Joscelyne
shall be entitled to at least three weeks' annual
holiday in each year. (10) Mrs. Nissen hereby
agrees with Mr. Joscelyne that she will not at any
time sell the whole or any part of the said busi-
ness without Mr. Joscelyne receiving one half of
the sale moneys or otherwise deal with the same
or take in a partner without the consent of Mr.
Joscelyne which consent may be arbitrarily with-
held by Mr. Joscelyne without assigning any reas-
on therefor."

At first the defendant paid the household ex-
penses but she subsequently stopped paying them
and the plaintiff brought an action for a declara-
tion that it was an express term of the agreement
that the defendant would discharge all expenses
in connection with "Martindale" or, alternatively,
that it was orally agreed between the parties dur-
ing the negotiations prior to the making of the
agreement that it should contain a provision that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86                                                                  Page 3
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114 S.J. 55
**(Cite as: [1970] 2 Q.B. 86)**

the defendant should pay the plaintiff's household bills and costs, and that the agreement should be rectified so as to contain a provision to that effect. The judge found that although there was no complete concluded antecedent agreement, the agreement should be rectified to provide for the payment of electricity, coal and gas bills and the costs of a home help. The defendant appealed on the grounds, inter alia, that the judge had misdirected himself in ordering rectification of the agreement in view of his finding of fact that there was no complete antecedent agreement.

The facts are more fully stated in the judgment of the court.

*Kenneth Zucker* for the daughter. The judge ought not to have ordered rectification in the light of his finding of fact that there was no previous concluded agreement. There are two conflicting lines of authority, one insisting on a complete prior agreement, the other requiring the concurring intention of the parties at the time of executing the agreement. The first proposition was correct since the second was opposed to two fundamental rules of contract; that there must be a matching of offer and acceptance and that parole evidence is not admissible to vary a written document: Mackenzie v. Coulson (1869) L.R. 8 Eq. 368 and Lovell and Christmas Ltd. v. Wall (1911) 104 L.T. 85. Faraday v. Tamworth Union (1916) 86 L.J. Ch. 436; Craddock Bros. v. Hunt [1923] 2 Ch. 136 ; and United States of America v. Motor Trucks Ltd. [1924] A.C. 196 support the proposition that there must be a prior concluded agreement. The dictum of Clauson J. in Shipley Urban District Council v. Bradford Corporation [1936] Ch. 375, that there was no such requirement was obiter and did not take into consideration Lovell's case which was a decision of the Court of Appeal. The view of Denning L.J. in Rose v. Pim [1953] 2 Q.B. 450 p. 461 supports the proposition that there must be a prior concluded agreement. Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662 did not decide that point. The mere fact that a decision of the Court of Appeal involved upholding the findings of the judge at first instance did *89 not make those findings binding decisions of the Court of Appeal and accordingly the question was

open for the Court of Appeal to decide.

*Rodney Bax Q.C* . and *Derek Wood* for the father. There are two ways of looking at the matter: either to say that a prior concluded agreement is necessary or, as is more likely, that an expressed mutual intention is sufficient. The decision in Lovell's case (1911) 104 L.T. 85, C.A. was obiter as the question did not arise. It is unnecessarily elaborate to lay down a principle that a prior concluded agreement is necessary and then make exceptions.

In Rose v. Pim [1953] 2 Q.B. 450 there was no communication of the parties' intention that they should deal with anything but horsebeans. Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662, was binding on the Court of Appeal since the decision included the whole of the judgment of the court of first instance.

[Reference was made to Conway v. Rimmer [1967] 1 W.L.R. 1031 and Morelle v. Wakeling [1955] 2 Q.B. 379.]

*Cur. adv. vult.*

December 19, 1969. RUSSELL L.J.

The judgment I am about to read is the judgment of the court.

This is an unhappy dispute between father and daughter which has led to an investigation into differing expressions of judicial views upon what is required before a contractual instrument may be rectified by the court.

The father with the mother were living as tenants of a house called "Martindale" in Enfield. He carried on from there and from an office at the nearest railway station a car hire business both self-drive and chauffeur driven, the cars being garaged at "Martindale." In 1960 he was given notice to quit. The daughter and her husband lived in a house belonging to her husband also in Enfield. To help her parents in their difficulty the daughter bought "Martindale" with the help of a mortgage, let her husband's house furnished to pay off the mortgage instalments, and moved to "Martindale." The father and mother lived on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86                                                                    Page 4
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

ground floor the daughter and son-in-law on the first floor. Each floor had its own kitchen and bathroom facilities. The daughter helped with the car hire business to some extent. In 1963 the mother was seriously ill with two strokes, returning from hospital in January, 1964, unable to look after herself. The father, even with the aid of a home help, had to devote much of his time to looking after her, his business was suffering as a result, and he felt that he could not really carry on. Because of this he and the daughter discussed a scheme by which she should take over the business, a scheme that culminated in the signing by them of an agreement on June 18, 1964.

For the present purposes it is sufficient to say that it was found by the county court judge that at an early stage it was made clear between them in conversation that if the business and its assets were, as proposed, made over to the daughter she should in return pay him a weekly pension to supplement his old age pension and in addition pay the expenses in connection with "Martindale " attributable to the parents' part of the house, and that these expenses should include the gas, electricity and coal bills and also the cost of the necessary home help. It is not before this court disputed that *90 it was expressly agreed and intended that these particular items should be paid for by the daughter as such expenses and that they negotiated upon that footing: it is not disputed that father and daughter continued in this expressed accord thereafter and when they signed the agreement still intended that it should provide for such payment.

It is however argued for the daughter that the contract signed did not on its true construction provide for payment of these matters and that since there was no complete concluded contract antecedent to the written agreement then in point of law the remedy of rectification is not available to the father.

The various steps leading to the signing of the agreement need not be detailed, since they do not touch on the particular matters. The agreement signed was in the following form.

[His Lordship read the agreement and continued:]

For a time all went well under the agreement, the daughter paying the gas and coal and electricity bills attributable to the ground floor and also the weekly cost of the home help, in addition to the pension of £3 10s. weekly, but, of course, taking the profits of the business. (There were separate gas meters for the two floors: but the ground floor electricity meter carried the electricity for the garage while we were told the first floor electricity meter carried the current for the ground floor immersion heater). Trouble then arose because of incursions on the ground floor of drivers and customers of the business. It was suggested that the parents move upstairs and the daughter and son-in-law downstairs, in variation of the agreement. The parents refused because of the mother's difficulty in movement. The father went away for a holiday and on his return found that the mother and all their belongings had been moved upstairs behind his back. The fat was in the fire, proceedings started in the county court, and the status quo was restored as a result of interlocutory proceedings. However, the daughter was no doubt then advised that the language of the agreement did not require her to pay for the items that we have mentioned and she stopped doing so. (As indicated, she necessarily continued to pay for the parents' immersion heater: the father necessarily paid for the garage electricity: though who was the gainer by this is not known.)

The father, to meet this new attitude, amended his particulars of claim to raise this point either as a matter of construction or by way of rectification. The county court judge decided against the father on construction but in his favour on rectification. A cross-appeal by the father on the question of construction was not pursued. The relevant facts on the question of rectification we have already stated.

For the daughter it is argued that the law says that the father cannot get rectification of the written instrument save to accord with a complete antecedent concluded oral contract with the daughter, and, as was found by the judge, there was none such here. For the father it is argued that if in the course of negotiation a firm accord has been expressly reached on a particular term of the pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86                                                          Page 5
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

posed contract, and both parties continue minded that the contract should contain appropriate language to embrace that term, it matters not that the accord was not part of a complete antecedent concluded oral contract.

The point of law has a curious judicial history, involving apparently *91 the disappearance from professional sight of the case in the Court of Appeal of Lovell and Christmas Ltd. v. Wall (1911) 104 L.T. 85 until its existence was recognised in the judgment of Denning L.J. in Rose v. Pim [1953] 2 Q.B. 450 apart from a passing reference in Slack v. Hancock (1912) 107 L.T. 14, 16, by Eve J., who had been the trial judge in the Lovell and Christmas Ltd. case.

It is convenient to start with Mackenzie v. Coulson (1869) L.R. 8 Eq. 368, a decision of James V.-C. There a policy of insurance was in terms in accordance with the wishes of the assured and the insurers sought rectification based on an insurance slip which is not a contract: the facts are a little complicated but it would seem that the insurers sought to impute to the assured an intention (and mistake) based on knowledge of a junior clerk of an agent of the assured of the contents of the slip. We should have thought this a difficult proposition to sustain. In deciding against rectification James V.-C. used this language, at p. 375:

"Courts of Equity do not rectify contracts; they may and do rectify instruments purporting to have been made in pursuance of the terms of contracts. But it is always necessary for a plaintiff to show that there was an actual concluded contract antecedent to the instrument which is sought to be rectified; and that such contract is inaccurately represented in the instrument. In this instance there never was any contract other than this policy which the plaintiffs have so signed ... It is impossible for this court to rescind or alter a contract with reference to the terms of the negotiation which preceded it."
This statement of the law supports the daughter's contention.

We turn next to the lost cause of Lovell and Christmas Ltd. v. Wall 104 L.T. 85 in this court.

A covenant not to be concerned in the business of a provision merchant was held not broken by manufacturing and selling margarine, and it was further held that there was no case for rectification so as to provide that the covenantor should not compete with the business of the covenantee company or its subsidiaries. We do not think that it is necessary to examine closely the facts of the case, save to say that we do not think that the facts demonstrated that such a firm accord on the relevant term had been reached in the course of negotiation as even on the father's argument is required. There is no doubt, however, that general statements of the law as contended for by the daughter were firmly made, albeit obiter, and made in the face of the argument that is now put forward by the father. Sir Herbert Cozens-Hardy M.R. said, at p. 88:

"The essence of rectification is to bring the document which was expressed and intended to be in pursuance of a prior agreement into harmony with that prior agreement. Indeed, it may be regarded as a branch of the doctrine of specific performance. It presupposes a prior contract, and it requires proof that, by common mistake, the final completed instrument as executed fails to give proper effect to the prior contract."
He had in the course of argument said, at p. 88:

"Surely rectification ought to be looked upon as a branch of specific *92 performance subject to an exception in the case of voluntary settlements."
Fletcher Moulton L.J. said, at p. 91:

"Rectification can only come where there is a case of contract. And, as James V.-C. put it so well in the case which has been cited of Mackenzie v. Coulson (1869) L.R. 8 Eq. 368, the law does not make new contracts for parties. All it does is to rectify an incorrect expression in writing of the contract that was made, and to my mind, it is not only clear law, but it is absolutely necessary logic, that there cannot be a rectification unless there has been a pre-existing contract, which has been inaptly expressed. The consequence is that if you have to ascertain whether there was or was not a pre-existing contract, for that purpose you must look at what happened before the contract was entered into. It is a very great mistake to think that that can lightly be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

Page 6

done unless you can prove the existing contract. If the completed contract is badly expressed, all the 'communings beforehand,' whether you have gone into them or not, have to be rejected by the court in deciding the nature of the instrument."
Buckley L.J. expressed himself somewhat differently, at p. 93:

"In ordering rectification the court does not rectify contracts, but what it rectifies is the erroneous expression of contracts in documents. For rectification it is not enough to set about to find out what one or even both of the parties to the contract intended. What you have got to find out is what intention was communicated by one side to the other, and with what common intention and common agreement they made their bargain."

Next to be considered are obiter dicta at first instance of Younger J. and Romer J. in Faraday v. Tamworth Union (1916) 86 L.J.Ch. 436 , the former expressed the provisional opinion that even had there been mutual mistake the contract could not have been rectified since the Union could not contract except under seal. In W. Higgins Ltd. v. Northampton Corporation [1927] 1 Ch. 128 (in which there was on the facts no mutual mistake) the latter, Romer J., said, at p. 136:

"But where, as here, there is no precedent contract between the parties I cannot see that I have any jurisdiction to make a different contract between the parties from the only one which exists, merely because I come to the conclusion that both parties previously to making that contract had intended to make a different one. There is a passage in a judgment of Younger J. which was cited to me which supports the view that I have expressed. It is only a dictum, because in that particular case he was able to set aside a contract entered into under a mistake of one party, inasmuch as the mistake had been contributed to or induced by, although innocently, the acts of the defendants; but he did say in the course of his judgment that, had there been a mutual mistake, he did not see how he could have rectified the contract."

Romer J. then quoted from the judgment of Younger J. with approval and disapproved a decision of Grantham J. in McCartney v. Brighton-

Corporation, The Times, May 20, 1904 *93 , which might have been in the opposite sense. In Schofield v. W. C. Clough & Co. [1913] 2 K.B. 103 Sir Herbert Cozens-Hardy M.R. quoted in argument from the judgment in Mackenzie v. Coulson, L.R. 8 Eq. 368 but did not, curiously enough, mention his own opinion to the same effect in Lovell and Christmas Ltd. v. Wall, 104 L.T. 85. In Craddock Bros. v. Hunt [1923] 2 Ch. 136 we find an obiter dictum of Warrington L.J., at p. 159:

"The jurisdiction of courts of equity in this respect is to bring the written document executed in pursuance of an antecedent agreement into conformity with that agreement. The conditions to its exercise are that there must be an antecedent contract and the common intention of embodying or giving effect to the whole of that contract by the writing, and there must be clear evidence that the document by common mistake failed to embody such contract and either contained provisions not agreed upon or omitted something that was agreed upon, or otherwise departed from its terms."

The same view is indicated, again obiter, by the Judicial Committee in United States of America v. Motor Trucks Ltd. [1924] A.C. 196 where it was said, at p. 200:

"Nor does the rule make any inroad upon another principle, that the plaintiff must show first that there was an actually concluded agreement antecedent to the instrument which is sought to be rectified; and secondly, that such agreement has been inaccurately represented in the instrument."

In the train of this undoubtedly formidable array of judicial opinion comes the judgment of Clauson J. in Shipley Urban District Council v. Bradford Corporation [1936] Ch. 375. This again was obiter, since the case was decided on the construction of the instrument in question: but the case was very fully argued and the arguments very fully considered in a reserved judgment. (This case went to appeal and was argued both on construction and rectification: but this court dismissed the appeal on construction and expressed no opinion on rectification). This was also a case in which the parties could only contract under

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86                                                                                   Page 7
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

seal. The absence of reference to Lovell & Christmas Ltd. v. Wall 104 L.T. 85 suggests that it had found no place in current textbooks, which appear to have been fully combed by counsel, though not the *English and Empire Digest*. Clauson J., after reviewing the authorities, many of which do not appear to have been cited in the Lovell & Christmas case, said, at p. 395:

"Notwithstanding these authorities, counsel for the corporation argued as I understood them, that the jurisdiction of the court to rectify a document is limited to the case where it is possible to prove that before the execution of the document there was in existence a legally enforceable agreement, whether oral or written (or possibly an agreement which would be legally enforceable but for some statutory provision requiring special formalities) in terms which the document was intended to record, but failed by mutual mistake to record. They argued, and in my view correctly, that, in view of the *94 inability, which the plaintiffs admitted, of the council and the corporation to bind themselves to such an agreement as that in dispute otherwise than under seal, it was impossible to predicate that there was any agreement between the council and the corporation except that constituted by the sealed document. They drew the conclusion (which, indeed, appears to me to be, on their premises, inevitable) that the court could not rectify an agreement between two such bodies as the council and the corporation even on the clearest evidence that the document, even by the merest copying slip, failed to record what all parties intended it to record. Even as regards such bodies as the council and the corporation this would seem to be rather startling; but it will be observed - and counsel for the defendants did not shrink from accepting this conclusion - that in the case of ordinary individuals, an instrument, on this theory, cannot be rectified except on proof of a previously existing legally binding document, proof of which, in the case of most written contracts (though not, of course, as a rule in the case of conveyances) is not usually available, simply because negotiation has not, even where intentions have been found to coincide, crystallized into contract, until the moment of executing the written contract. It must be conceded that, whether or not it is difficult to reconcile the

defendants' argument with principle and with the long and ancient line of authorities which I have summarized above, there is some justification to be found in the books for their contention. It is to be remembered that many, perhaps even most, rectification cases deal with the reforming of a final instrument, such as a conveyance or a settlement, so as to accord with a previous instrument, such as a contract for sale or articles for a settlement, and that the high standard of mutual mistake which the court requires - Thurlow L.C. in Shelburne v. Inchiquin, 1 Bro.C.C. 338, 341 even used the phrase 'irrefragable' - makes cases where mutual mistake can be proved, in the absence of any previous written instrument, very rare, and that where, in the absence of any previous instrument, mutual mistake can clearly be proved, the matter may very often be put right out of court without litigation.

"It would thus not be surprising to find that, in cases where the exact point was not material, language may be used in general terms, in relation to cases of rectification by reference to a previous written instrument, which is not strictly accurate in reference to a case where rectification proceeds on proof of mutual mistake in recording the concurrent intention of the parties at the moment of execution of the instrument which it is sought to rectify."

He then referred to the judgment in MacKenzie v. Coulson, L.R. 8 Eq. 368, 375 and continued, at p. 397:

"The language of the Vice-Chancellor was, if I may respectfully say so, perfectly accurate in reference to the cases which he obviously had in mind, where mutual mistake is sought to be established by reference to the terms of a previous contract. His words, however, apart from their context, have, there is no doubt, found their way into works of no little authority in such a form as to suggest, as, *95 indeed, the defendants' counsel argued, that the jurisdiction of the court cannot be exercised, even in cases of clear mutual mistake, in the attempt to embody in the instrument the concurrent intention of the parties existing at the moment of the execution of the instrument, unless a previously existing contract can be proved. It is sufficient for me to say that, had it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114 S.J. 55
(Cite as: [1970] 2 Q.B. 86)

Page 8

been necessary for me to decide the point, I should not have felt justified in accepting this interpretation of the Vice-Chancellor's language as correct."

He then referred to other dicta that we have mentioned indicating that he was unable to accept them as correct.

Next we have Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662 decided by Simonds J. The facts need not be set out. The judge said, at p. 664:

"Before I consider the facts and come to a conclusion whether the defendants are right in their contention, it is necessary to say a few words upon the principles which must guide me in this matter. I am clear that I must follow the decision of Clauson J., as he then was, in Shipley Urban District Council v. Bradford Corpn. [1936] 1 Ch. 375, the point of which is that, in order that this court may exercise its jurisdiction to rectify a written instrument, it is not necessary to find a concluded and binding contract between the parties antecedent to the agreement which it is sought to rectify. The judge held, and I respectfully concur with his reasoning and his conclusion, that it is sufficient to find a common continuing intention in regard to a particular provision or aspect of the agreement. If one finds that, in regard to a particular point, the parties were in agreement up to the moment when they executed their formal instrument, and the formal instrument does not conform with that common agreement, then this court has jurisdiction to rectify, although it may be that there was, until the formal instrument was executed, no concluded and binding contract between the parties. That is what the judge decided, and, as I say, with his reasoning I wholly concur, and I can add nothing to his authority in the matter, except that I would say that, if it were not so, it would be a strange thing, for the result would be that two parties binding themselves by a mistake to which each had equally contributed, by an instrument which did not express their real intention, would yet be bound by it. That is a state of affairs which I hold is not the law, and, until a higher court tells me it is the law, I shall continue to exercise the jurisdiction which Clauson J., as I think rightly, held might be

entertained by this court.

"Secondly, I want to say this upon the principle of the jurisdiction. It is a jurisdiction which is to be exercised only upon convincing proof that the concluded instrument does not represent the common intention of the parties. That is particularly the case where one finds prolonged negotiations between the parties eventually assuming the shape of a formal instrument in which they have been advised by their respective skilled legal advisers. The assumption is very strong in such a case that the instrument does represent their real intention, *96 and it must be only upon proof which Lord Eldon, I think, in a somewhat picturesque phrase described as 'irrefragable' that the court can act. I would rather, I think, say that the court can only act if it is satisfied beyond all reasonable doubt that the instrument does not represent their common intention, and is further satisfied as to what their common intention was. For let it be clear that it is not sufficient to show that the written instrument does not represent their common intention unless positively also one can show what their common intention was. It is in the light of those principles that I must examine the facts of this somewhat complicated case."

It is, we think, probable that the eminent counsel concerned in the case did not really dispute that Clauson J.'s opinion represented the law on the relevant point: it does not appear from the judgment that they did, and very many more cases would have been cited had they done so. Equally in that case in the Court of Appeal: [1939] 4 All E.R. 68. Sir Wilfrid Greene M.R. said, at p. 71:

"Two arguments on behalf of the present appellant were before Simonds J. and these arguments are before us. They were these. First, that upon the facts of the case no case for rectification had been made out: secondly, that the matter in question, namely, the issue between the parties as to whether or not the agreement ought to be rectified was a matter which fell within the terms of the arbitration submission, which could have been raised before the arbitrator, and ought to have been raised before him, and could not be raised after he had issued his award and was functus officio ... Simonds J. in a judgment of conspicuous clarity, rejected the appellant's argument on both points. He found that the facts brought to his

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114 S.J. 55
(Cite as: [1970] 2 Q.B. 86)

Page 9

mind that high degree or conviction which un-questionably is to be insisted upon in rectification cases."

Again, at p. 72:

"The case is no doubt one of importance to the parties and for that reason I have thought proper to put in my own language my reasons for saying that this appeal should be dismissed, but I might have been content to say that the judgment of Simonds J., both on law and on fact, is one with which I am in entire agreement."

Clauson L.J. and Goddard L.J. agreed. In referring particularly to the judge's rejection of the argument on rectification, in our view the Master of the Rolls was referring in fact to his rejection of argument on the facts, not the law. Accordingly we have in Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662; [1939] 4 All E.R. 68, in both courts an acceptance of the law on rectification as not requiring a complete antecedent concluded contract, in a case in which the decision must have been otherwise if such an antecedent contract was essential to rectification. But it seems to us that the contrary was not really argued, and we leave aside for the moment whether in those circumstances the principles of precedent require us to be bound by this case on the relevant point.

Next we refer to the horsebeans case in this court, Frederick E. Rose (London) Ltd. v. William H. Pim Jnr. & Co. Ltd. [1953] 2 Q.B. 450. That *97 was a case in which there was nothing that could be described as an outward expression between the parties of an accord on what was to be involved in a term of a proposed agreement. It turned out that locked separately in the breast of each party was the misapprehension that the word "horsebeans" meant another commodity, but as we understand the case there was no communication between them to the effect that when they should speak of horsebeans that was to be their private label for the other commodity. The decision in our judgment does not assert or reinstate the view that an antecedent complete concluded contract is required for rectification: it only shows that prior accord on a term or the meaning of a phrase to be used must have been outwardly

expressed or communicated between the parties. Denning L.J. said, at p. 461:

"It is not necessary that all the formalities of the contract should have been executed so as to make it enforceable at law (see Shipley Urban District Council v. Bradford Corporation [1936] Ch. 375); but, formalities apart, there must have been a concluded contract. There is a passage in Crane v. Hegeman-Harris Co. Inc. [1939] 1 All E.R. 662, 664, which suggests that a continuing common intention alone will suffice; but I am clearly of opinion that a continuing common intention is not sufficient unless it has found expression in outward agreement. There could be no certainty at all in business transactions if a party who had entered into a firm contract could afterwards turn around and claim to have it rectified on the ground that the parties intended something different. He is allowed to prove, if he can, that they *agreed something different*[Denning L.J.'s italics]: see Lovell & Christmas v. Wall (1911) 104 L.T. 85, *per* Lord Cozens-Hardy M.R., and *per* Buckley L.J. at pp. 88, 93, but not that they intended something different."

In so far as this passage might be taken to suggest that an antecedent complete concluded contract is necessary it would be in conflict with the views of both courts in Crane v. Hegeman-Harris [1939] 1 All E.R. 662; [1939] 4 All E.R. 68, and is not supported by the other judgments. In so far as it speaks of agreement in the more general sense of an outwardly expressed accord of minds it does no more than assent to the argument of Mr. Roche, at p. 457, as to the true width of the views of Simonds J.

We conclude this review of authority with a few other cases to which our attention was drawn. In Earl v. Hector Whaling Ltd. [1961] 1 Lloyd's Rep. 459, Harman L.J. said, at p. 470:

"As to the facts it does not appear to me that there ever was an oral agreement. There was a common intention and that is enough. In spite of Denning L.J.'s observations in Frederick E. Rose (London) Ltd. v. William H. Pim Jnr. & Co. Ltd. [1953] 2 Q.B. 450, 461; I think that Clauson J.'s original decision in Shipley Urban District Council v. Bradford Corporation [1936] Ch. 375 (as followed by Simonds J. in Crane v. Hegeman-Har-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86                                                      Page 10
1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114
S.J. 55
(Cite as: [1970] 2 Q.B. 86)

ris Company Inc. [1939] 1 All E.R. 662, 664) that you do not need a prior contract, but a prior common intention, is right: and here, as it seems to me, both parties always intended that there should be a written agreement, and they came to a common intention as to what that written agreement was to be, or thought they *98 did: and if the evidence satisfied one that that common intention did not appear in the written document, then you would have a case for rectification."
We do not take Pearce L.J. to suggest the contrary view, at p. 468.

Lastly, reference was made to a decision of Megaw J. shortly noted in London Weekend Television Ltd. v. Paris and Griffith (1969) 113 Sol J. 222. He expressed the view that the propositions of Simonds J. in Crane's case [1939] 1 All E.R. 662 were binding as a result of their express approval by this court. He then used this phrase, according to the report, a phrase which if correct covers the present case, at p. 222:

"Where two persons agreed expressly with one another what was the meaning of a particular phrase but did not record their definition in the contract itself, if one of the parties sought to enforce the agreement on the basis of some other meaning, he could be prevented by an action for rectification."

In our judgment the law is as expounded by Simonds J. in Crane's case with the qualification that some outward expression of accord is required. We do not wish to attempt to state in any different phrases that with which we entirely agree, except to say that it is in our view better to use only the phrase "convincing proof" without echoing an old-fashioned word such as "irrefragable " and without importing from the criminal law the phrase "beyond all reasonable doubt." Remembering always the strong burden of proof that lies on the shoulders of those seeking rectification, and that the requisite accord and continuance of accord of intention may be the more difficult to establish if a complete antecedent concluded contract be not shown, it would be a sorry state of affairs if when that burden is discharged a party to a written contract could, on discovery that the written language chosen for the document

did not on its true construction reflect the accord of the parties on a particular point, take advantage of the fact.

The contention in law for the daughter would, we apprehend, involve this proposition, that if all the important terms of an agreement were set out in correspondence with clarity, but expressly "subject to contract," and the contract by a slip of the copyist unnoticed by either party departed from what had been "agreed," there could not be rectification. We have been puzzled by the suggestion of the Master of the Rolls in the Lovell & Christmascase 104 L.T. 85 that rectification should be regarded as a branch of the doctrine of specific performance: we do not see any necessary connection, more particularly since rectification is available in the case of voluntary settlements. In our judgment the view of Simonds J. and this court on the point were correct and on the facts found by the county court judge the father established a claim to rectification. It is not necessary, therefore, to decide whether we were bound in any event by the decision of this court in Crane's case [1939] 1 All E.R. 662, notwithstanding that (in our view) the contrary was not argued, the particular point of law being in fact essential to the dismissal of the appeal. This question of precedent was discussed at some length in this court in Morelle v. Wakeling [1955] 2 Q.B. 379 and as at present advised it would appear *99 to us that it may well not be right to say that the decision in Crane's case was made per incuriam: we refer in particular to the judgment of the full court in Morelle's case at p. 406: though we are not completely content on this point. The court is not omniscient in the law, nor are counsel, however eminent. We work under great pressure from the lists, and whilst not always ready to accept a concession on a point of law from the Bar it is not infrequent to do so, and moreover on a point essential to the decision of the appeal, without further investigation. We are attracted by a suggestion that the conceded point of law should be open to argument in another case, provided it is made plain that that should not be made the basis for the further suggestion that where an argument, though put forward, had been only weakly or inexpertly put forward, the point of law should sim-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1970] 2 Q.B. 86

1969 WL 27843 (CA (Civ Div)), [1970] 2 Q.B. 86, [1970] 1 All E.R. 1213, [1970] 2 W.L.R. 509, (1970) 114 S.J. 55

(Cite as: [1970] 2 Q.B. 86)

ilarly be open: for much uncertainty could thus be undesirably introduced.

We wish to stress that this is a case of rectification based on antecedent expressed accord on a point adhered to in intention by the parties to the subsequent written contract: we were in no way concerned with arguments as to collateral terms of a contract.

The actual order of the county court judge would appear to have rectified the wrong clause in the agreement, and to have omitted the reference in the accepted evidence of the father to payment of expenses being made out of the business. Counsel were able to agree the proper form of order. The order will be accordingly varied so as to provide that in lieu of rectification of clause 7 of the contract thereby ordered, clause 6 shall be rectified so as to read:

"Mrs. Nissen shall until she sells the business and out of the proceeds of the business discharge Mr. Joscelyne's expenses in respect of gas, coal, electricity and home help incurred by him while occupying ' Martindale' ... aforesaid or such property as may be agreed upon in pursuance of clause 7 hereof and shall indemnify Mr. Joscelyne from and against any claim arising in respect of the same."

We would add that we very much hope that the father and daughter will now be able to return to a proper familial relationship after their differences, which will have given them the distinction, if such it be, of being enshrined in the Law Reports. The appeal is dismissed. The cross-appeal was not pursued.

**Representation**

Solicitors: Baylis Pearce, McMillan & Mott; Craigen, Wilders & Sorrell.

Appeal dismissed with costs. (J. W. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 4

ch3199c00a     18-11-99 00:19:14 ____|____ ACT   Unit: pag1     RA Proof 2.11.99

ELIZABETH II     c. 31



# Contracts (Rights of Third Parties) Act 1999

## 1999 CHAPTER 31

An Act to make provision for the enforcement of contractual terms
by third parties.                                    [11th November 1999]

**B**E IT ENACTED by the Queen's most Excellent Majesty, by and with
the advice and consent of the Lords Spiritual and Temporal, and
Commons, in this present Parliament assembled, and by the
authority of the same, as follows:—

1.—(1) Subject to the provisions of this Act, a person who is not a party    *Right of third*
to a contract (a "third party") may in his own right enforce a term of the    *party to enforce*
contract if—    *contractual term.*

    (a) the contract expressly provides that he may, or

    (b) subject to subsection (2), the term purports to confer a benefit
        on him.

(2) Subsection (1)(b) does not apply if on a proper construction of the
contract it appears that the parties did not intend the term to be
enforceable by the third party.

(3) The third party must be expressly identified in the contract by
name, as a member of a class or as answering a particular description but
need not be in existence when the contract is entered into.

(4) This section does not confer a right on a third party to enforce a
term of a contract otherwise than subject to and in accordance with any
other relevant terms of the contract.

(5) For the purpose of exercising his right to enforce a term of the
contract, there shall be available to the third party any remedy that would
have been available to him in an action for breach of contract if he had
been a party to the contract (and the rules relating to damages,
injunctions, specific performance and other relief shall apply
accordingly).

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 5

Westlaw.UK

[2004] 1 Lloyd's Rep. 38                                                                          Page 1
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

*38 Nisshin Shipping Co. Ltd. v. Cleaves &
Company Ltd. and Others
[2003] EWHC 2602

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
July 17; Nov. 7, 2003

Before Mr. Justice Colman

Contract - Contracts (Rights of Third Parties) Act
1999 - Charter-parties provided for commission
payable to shipbrokers - Charter-parties contained
arbitration clauses - Shipbrokers not parties to
charter-parties - Whether shipbrokers entitled to
enforce commission payments as third parties un-
der 1999 Act - Whether shipbrokers entitled to
pursue claims by arbitration.

The respondent shipbrokers (Cleaves) negotiated
nine time charters on behalf of the applicant
(Nisshin). Each charter-party provided for the
payment of commission to Cleaves, and con-
tained an arbitration clause. The wording of the
commission clauses in four of the charter-parties
was as follows:
    A commission of two per cent. for equal divi-
sion is payable by the vessel and owners to
Messrs Ifchor S.A. Lausanne and Messrs Cleaves
and Company Ltd., London on hire earned and
paid under this Charter . . .

Cleaves sought payment of their commission but
Nisshin challenged Cleaves's entitlement to com-
mission on the ground that Cleaves were in repu-
diatory breach of the agency relationship because
their principal and controlling interest became a
shareholder and member of the senior manage-
ment team of a competitor of Nisshin.

Each arbitration clause contained wording refer-
ring to disputes between the "parties" to the
charter-party or between owners and charterers.
However, the wording was in each case in terms
wide enough to cover a claim by the charterers
against the owners for failure by the owners to

perform their promise to pay commission to
Cleaves.

The issue of entitlement to commission was re-
ferred by Cleaves to arbitration notwithstanding
that it was not a party to any of the nine arbitra-
tion agreements. The issue as to the arbitrators'
jurisdiction was raised before the arbitrators. In
an interim final award the arbitrators concluded
that the effect of ss. 1 and 9 of the Contracts
(Rights of Third Parties) Act, 1999 was that they
did have jurisdiction.

There were four other charter-parties which were
not covered by the 1999 Act. Cleaves had com-
menced proceedings in the Commercial Court
claiming commission in relation to all 13 charter-
parties. Nisshin wished all the claims to proceed
in one set of proceed- ings before the court and
issued an application under s. 67 of the Arbitra-
tion Act, 1996 for a declaration that the arbitrat-
ors had no jurisdiction to determine Cleaves's
claims for commission.

The relevant sections of the 1999 Act were as fol-
lows:
    Section 1:
    (1) Subject to the provisions of this Act, a per-
son who is not party to a contract (a "third party")
may in his own right enforce a term of the con-
tract
    if -
    (a) the contract expressly provides that he may,
or
    (b) subject to subsection (2), the term purports
to confer a benefit on him.
    (2) Subsection (1)(b) does not apply if on a
proper construction of the contract it appears that
the parties did not intend the term to be enforce-
able by the third party.
    (3) The third party must be expressly identi-
fied in the contract by name, as a member of a
class or as answering a particular description but
need not be in existence when the contract is
entered into.
    (4) This section does not confer a right on a
third party to enforce a term of a contract other-
wise than subject to and in accordance with any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                                Page 2
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)
other relevant terms of the contract.

. . .

   Section 8
   (1) Where -
   (a) a right under section 1 to enforce a term
("the substantive term") is subject to a term
providing for the submission of disputes to arbit-
ration ("the arbitration agreement"), and
   (b) the arbitration agreement is an agreement in
writing for the purposes of Part 1 of the Arbitra-
tion Act 1996
   the third party shall be treated for the purposes
of that Act as a party to the arbitration agreement
as regards disputes between himself and the
promisor relating to the enforcement of the sub-
stantive term by the third party.

. . .

The issues for determination were (1) whether
Cleaves fell within s. 1 of the 1999 Act on the
basis that the charter-parties purported to confer a
benefit on Cleaves within s. 1(1)(b) and (2)
whether the enforcement of Cleaves's rights was
subject to the arbitration agreements in the
charter-parties.

On the first issue, Nisshin argued (a) that the four
charter-parties which provided for commission of
two per cent for equal division to Ifchor S.A. and
Cleaves did not purport to confer a benefit on
Cleaves alone, and (b) that on the proper con-
struction of the charter-parties the parties did not
intend the commission clause to be enforceable
by Cleaves and accordingly s. 1(1)(b) was disap-
plied by s. 1(2). On the second issue, Nisshin ar-
gued that in determining the question whether, on
the true construction of the charter-parties, the
brokers' *39 right was "subject to . . . a[n] arbitra-
tion agreement" under s. 8(1)(a) of the 1999 Act,
(i) the conditional benefit principle applied, (ii)
there was no presumption that the arbitration
agreement applied; and (iii) having regard to the
need to construe s. 8 in accordance with Human
Rights principles, in particular Art. 6(1), it would
be wrong to construe it so as to shut out the
parties from the courts unless there were clear
words to that effect

Held, by Q.B. (Com. Ct.) (COLMAN, J.), that

(1) in relation to the first issue, the provisions
in the four charter-parties that "A commission of
two per cent for equal division is payable by the
vessel and owners to Messrs Ifchor S.A.
Lausanne and Messrs Cleaves and Company
Ltd." left no doubt as to the identity of the broker
to whom payment was to be made and as to the
amount to be paid; the wording was in substance
exactly the same as if the clause had provided
that there was to be a commission of two per cent
of which one per cent. was to be paid to Ifchor
and one per cent. to Cleaves; there was nothing in
that clause to suggest that the total two per cent.
commission was to be paid to Ifchor and that If-
chor would then pay half of that to Cleaves; the
words "for division" did not bear that connotation
in the absence of any indication as to the broker
to whom payment was first to be made; nor did
the words support the submission that the obliga-
tion to pay commission could only be enforced
jointly by both the firms of brokers; there was no
conceivable commercial purpose in a construction
which created a joint and indivisible right of en-
forcement; accordingly, the effect of the clause
was to confer a benefit to the extent of one per
cent commission on Cleaves alone (see pars. 13
and 14);

(2) the charter-parties were neutral in that they
did not express any intention contrary to the enti-
tlement of the brokers to enforce the commission
term (see par. 24);

(3) it followed that Cleaves were entitled to en-
force the commission clauses in their own right
by reason of s. 1 of the 1999 Act (see par. 33);

(4) in relation to the second issue, having re-
gard (i) to the Lord Chancellor's Explanatory
Notes, which referred to the approach of s. 8(1)
being analogous to that applied to assignees who
might be prevented from unconscionably taking a
substantive benefit free of its procedural burden,
and (ii) to authority on the Third Parties (Rights
against Insurers) Act, 1930, in view of the fact
that the third party had in effect become a stat-
utory assignee of the promisee's right of action
against the promisor, and because, by reason of
the underlying policy of the 1999 Act expressed
in s. 1(4), he was confined to the means of en-
forcement provided by the contract to the prom-
isee, namely arbitration, he was to be treated as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                    Page 3
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R. (Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

standing in the shoes of that promisee for the pur-
pose only of the enforcement of the substantive
term (see pars. 38, 41 and 42);

(5) since the scope of the disputes covered by
all nine arbitration agreements was wide enough
to embrace a dispute between owners and charter-
ers about payment of the brokers' commission,
Cleaves were entitled and, indeed, obliged to
refer those disputes to arbitration, and the arbit-
rators had jurisdiction to determine them (see par.
44);

(6) having regard to the fact that ss. 1 and 8 of
the 1999 Act provided to a third party a remedy
which would otherwise have been denied to him,
the fact that the third party was required to arbit-
rate a claim to enforce a promise which, had the
promisee wished to pursue it, he would have had
to refer to arbitration, did not infringe the third
party's rights under Art. 6(1) of the European
Convention on Human Rights (see pars. 52 and 53).

The following cases were referred to in the judg-
ment:

Jay Bola, The (C.A.) [1997] 2 Lloyd's Rep. 279;

Jordan Nicolov, The [1990] 2 Lloyd's Rep. 11;

Les Affreteurs Reunis S.A. v. Leopold Walford
(London) Ltd., (H.L.) [1919] A.C. 801;

Mahkutai, The (P.C.) [1996] 2 Lloyd's Rep. 1;
[1996] A.C. 650;

Padre Island, The (No. 1) [1984] 2 Lloyd's Rep.
408;

Robertson v. Wait, (1853) 8 Ex 299;

T.W. Thomas & Co. Ltd. v. Portsea Steamship.
Co. Ltd., The Portsmouth, (H.L.) [1912] A.C. 1.

This was an application by the owners, Nisshin
Shipping Co. Ltd., under s. 67 of the Arbitration
Act, 1996, for a declaration that arbitrators had
no jurisdiction to determine claims for commis-
sion said to be due to the respondent chartering
brokers, Cleaves & Co. Ltd. and Ors.

**Representation**

Mr. Michael Ashcroft (instructed by Messrs.
Jackson Parton) for the owners; Miss Philippa
Hopkins (instructed by Messrs. Ince & Co.) for
the brokers.

The further facts are stated in the judgment of Mr.
Justice Colman.

Judgment was reserved.

Friday, Nov. 7, 2003

**JUDGMENT**

Mr. Justice COLMAN:

*Introduction*

1. In 1999, following an admirable report by the
Law Commission, Parliament dealt a long over-
due *40 body blow to the doctrine of privity of
contract. It enacted the Contracts (Rights of Third
Parties) Act, 1999. That broadly had the purpose
of enabling a third party to a contract under
which one party had promised to confer a benefit
on that third party to enforce that promise direct
against the promisor. That facility is of particular
importance to chartering brokers, like the re-
spondents to this application, and to others who
create contracts under which one party promises
to pay them commission.

2. This case is, I understand, the first time that the
1999 Act has been before the Courts. It raises
questions highly relevant to the shipping industry
as to how a third party may enforce a promise of
a benefit for him where there is an arbitration
clause in the underlying contract.

3. This is an application under s. 67 of the Arbit-
ration Act, 1996 for the court to declare that ar-
bitrators have no jurisdiction to determine claims
for commission said to be due to the respondent
chartering brokers ("Cleaves"), payment of such
commission having been sought from the applic-
ant owners/guarantors.

4. There were nine relevant time charters negoti-
ated by Cleaves on behalf of the applicant, Nissh-
in. Each charter-party contained an arbitration
clause. The applicant challenges the entitlement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                   Page 4
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

of Cleaves to commission on the principal ground that Cleaves were in repudiatory breach of the agency relationship because their principal and controlling interest became a shareholder and member of the senior management team of a competitor of the applicant. It is said that this breach was accepted by Nisshin as terminating the agency relationship.

5. Each charter-party provided for the payment of commission to Cleaves. Each arbitration clause contained wording referring to disputes between the "parties" to the charter-party or between owners and charterers. However, the wording was in each case in terms wide enough to cover a claim by the charterers against the owners for failure by the owners to perform their promise to pay commission to Cleaves.

6. The issue of entitlement to commission was referred by Cleaves to arbitration notwithstanding it was not a party to any of the nine arbitration agreements.

7. The issue as to the arbitrators' jurisdiction was raised and argued on paper before a tribunal consisting of Mr. Timothy Young, Q.C. and Mr. Timothy Rayment. Both are extremely experienced in the field of maritime law and arbitration. In an interim final arbitration award dated Jan. 24, 2003 they concluded that the effect of ss. 1 and 8 of the 1999 Act was that they did have jurisdiction.

8. There are four other charter-parties involved which are not covered by the 1999 Act. The respondents, Cleaves, have commenced proceedings in this court claiming commission in relation to all 13 charter-parties. The applicant wishes all the claims to proceed in one set of proceedings before the court.

9. The relevant sections of the 1999 Act are as follows:
    Section 1:
    (1) Subject to the provisions of this Act, a person who is not party to a contract (a "third party") may in his own right enforce a term of the contract if -
    (a) the contract expressly provides that he may,

or
    (b) subject to subsection (2), the term purports to confer a benefit on him.
    (2) Subsection (1)(b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party.
    (3) The third party must be expressly identified in the contract by name, as a member of a class or as answering a particular description but need not be in existence when the contract is entered into.
    (4) This section does not confer a right on a third party to enforce a term of a contract otherwise than subject to and in accordance with any other relevant terms of the contract.
    . . .
    Section 8
    (1) Where -
    (a) a right under section 1 to enforce a term ("the substantive term") is subject to a term providing for the submission of disputes to arbitration ("the arbitration agreement"), and
    (b) the arbitration agreement is an agreement in writing for the purposes of Part 1 of the Arbitration Act, 1996
    the third party shall be treated for the purposes of that Act as a party to the arbitration agreement as regards disputes between himself and the promisor relating to the enforcement of the substantive term by the third party.
    . . .

*Do Cleaves fall within s. 1 of the 1999 Act?*

10. It is accepted on behalf of Cleaves that in none of the charters did the commission clauses expressly provide that Cleaves could enforce such clauses directly against the owners. However the real issues are (i) whether those clauses purported *41 to confer a benefit on Cleaves within sub-s. (1)(b) of s. 1 and (ii) whether sub-s. 1(b) is disapplied by sub-s. (2) because "on a proper construction of the contact it appears that the parties did not intend the term to be enforceable by the third party".

11. It is argued by Mr. Michael Ashcroft, on behalf of Nisshin, that under four of the charter-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                    Page 5
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

parties - those numbered (ii), (iii), (iv) and (v) in the arbitration award - the commission clauses did not purport to confer a benefit on Cleaves alone. Although there was an issue before the arbitrators as to whether certain words had been deleted from numbers (iv) and (v) before or after the contract was entered into, it is common ground that, for the purposes of this application only, I should disregard deletions of part of these clauses which were made at some stage. The relevant wording for all four charter-parties is thus as follows:

A commission of two per cent for equal division is payable by the vessel and owners to Messrs Ifchor S.A. Lausanne and Messrs Cleaves and Company Ltd., London on hire earned and paid under this Charter, and also upon any continuation or extension of this charter.

12. It is argued that the phraseology is such that the benefit conferred by the clause is to be subsequently divided between the two firms as distinct from a provision which specifies that a particular percentage should be paid to a particular broker.

13. I cannot accept this argument. These provisions leave no doubt as to the identity of the broker to whom payment is to be made and as to the amount to be paid. It is in substance exactly the same as if the clause had provided that there was to be a commission of two per cent. of which one per cent. was to be paid to Ifchor and one per cent. to Cleaves. There is nothing in this clause to suggest that the total two per cent commission is to be paid to Ifchor and that Ifchor will then pay half of that to Cleaves. The words "for division" do not, in my judgment, bear that connotation in the absence of any indication as to the broker to whom payment is first to be made. Nor do the words support the submission that the obligation to pay commission can only be enforced jointly by both the firms of brokers. There is no conceivable commercial purpose in a construction which creates a joint and indivisible right of enforcement. Absent of much clearer wording than this, I do not consider that the clause should be thus construed.

14. Accordingly, I hold that the effect of the clause was to confer a benefit to the extent of one per cent commission on Cleaves alone.

15. It is then further argued by Mr. Ashcroft, on behalf of Nisshin, that on the proper construction of the charter-parties the parties to them did not intend the commission clause to be enforceable by Cleaves and accordingly s. 1(1)(b) of the 1999 Act is disapplied by s. 1(2).

16. In support of this argument Nisshin relies on three distinct points.

17. First, it is argued that the arbitration clauses in all of the charter-parties do not make express provision for enforcement by a broker of a claim for commission. All except those numbered (viii) and (ix) include substantially the standard New York Produce Exchange arbitration clause:

Should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London, one to be appointed by each of the parties hereto, and the third by the two so chosen.

18. Those charter-parties numbered (viii) and (ix) which substantially incorporated the Shelltime 4 standard claims provided as follows:

41(a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England. (b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree. See also LMAA Arbitration Clause. See additional Clause 48. (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or reenactment thereof for the time being in force.

19. The relevant part of the LMAA arbitration clause provided:

48. LMAA Arbitration Clause. All disputes or differences arising out of this contract which can-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R. (Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

not be amicably resolved shall be referred to arbitration in London. Unless the parties agree upon a sole arbitrator, one arbitrator to be appointed by each party. . .This contract is governed and construed by English law both in regards to substance and procedure, and there shall apply to all proceedings under this Clause the terms of the London [Maritime] Arbitrators Association current at the time when the arbitration proceedings were commenced . . .

20. The references to "owners" and "charterers" and to two arbitrators to be appointed by "the parties hereto" in the NYPE form are thus expressly inconsistent with the brokers being obliged to utilize that arbitration agreement in order to enforce their rights to commission: the only parties being obliged or entitled to arbitrate are the owners and charterers; similarly the reference in the *42 Shelltime 4 clause to "either party" is a reasonably clear indication that its application is confined to disputes between owners and charterers.

21. It is accepted by Miss Philippa Hopkins, on behalf of Cleaves, that the brokers were not parties to the arbitration agreements as a matter of construction of those clauses. Her case is that the effect of s. 8 of the 1999 Act is to impose the arbitration clauses on the owners and the brokers as the means of enforcement of the commission benefit conferred by the commission clause. I shall have to consider this submission more fully when I come to discuss the effect of s. 8. However, for the purposes of the submission in relation to absence of intention to confer a benefit, the wording of the arbitration clauses is, in my judgment, of little or no materiality. First, although the parties to the charter-parties clearly expressed their mutual intention that *their* disputes should be arbitrated, that mutual intention is entirely consistent with a mutual intention that the brokers should be obliged to recover their commission by court action rather than by arbitration. Secondly, if, on the proper construction of the 1999 Act, the third party is obliged to enforce the commission benefit by arbitration, even where the agreement does not on its proper construction provide for any participants in an arbitration other

than the parties to the main contract, identification of the intention to be imputed to the parties as to enforceability of the third party commission benefit clearly has to take this into account. That is to say, if, as a matter of law, it makes no difference to the broker's ability to enforce his right to commission benefit that no express provision is made for this in the arbitration agreement, the strength of any inference derived from the absence of such express provision could be little more than negligible.

22. Secondly, it is argued by Mr. Ashcroft on behalf of Nisshin that there is no positive indication in the charter-parties that the parties did intend the brokers to have enforceable rights. There is no suggestion in those contracts that the owners and charterers were mutually in agreement that the brokers should be entitled to claim against the owners as if they were parties to the contract.

23. It is to be noted that s. 1(2) of the 1999 Act does not provide that sub-s. 1(b) is disapplied unless on a proper construction of the contract it appears that the parties intended that the benefit term should be enforceable by the third party. Rather it provides that sub-s. 1(b) is disapplied if, on a proper construction, it appears that the parties did not intend third party enforcement. In other words, if the contract is neutral on this question, sub-s. (2) does not disapply sub-s. 1(b). Whether the contract does express a mutual intention that the third party should not be entitled to enforce the benefit conferred on him or is merely neutral is a matter of construction having regard to all relevant circumstances. The purpose and background of the Law Commission's recommendations in relation to sub-s. (2) are explained in a paper by Professor Andrew Burrows who, as a member of the Law Commission, made a major contribution to the drafting of the bill as enacted. He wrote at [2000] L.M.C.L.Q. 540 at p. 544:

The second test therefore uses a rebuttable presumption of intention. In doing so, it copies the New Zealand Contracts (Privity) Act, 1982, s. 4, which has used the same approach. It is this rebuttable presumption that provides the essential balance between sufficient certainty for contracting parties and the flexibility required for the re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                           Page 7
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

form to deal fairly with a huge range of different situations. The presumption is based on the idea that, if you ask yourself, "When is it that parties are likely to have intended to confer rights on a third party to enforce a term, albeit that they have not expressly conferred that right", the answer will be: "Where the term purports to confer a benefit on an expressly identified third party". That then sets up the presumption. But the presumption can be rebutted if, as a matter of ordinary contractual interpretation, there is something else indicating that the parties did not intend such a right to be given.

24. In the present case, apart from Mr. Ashcroft's third point, the charter-parties are indeed neutral in the sense that they do not express any intention contrary to the entitlement of the brokers to enforce the commission term.

25. Thirdly, Mr. Ashcroft submits that the parties' mutual intention on the proper construction of the contracts was to create a trust of a promise in favour of the brokers - a trust enforceable against the owners at the suit of the charterers as trustees. That being the proper construction of the contracts by reference to the state of the law at the time when the 1999 Act came into force, the very same contract wording did not, subsequently to that, evidence a different mutual intention. Accordingly, the mutual intention evidenced by the contracts was that the enforcement of the promise to pay commission would be at the suit of the charterers who must be joined by the brokers as co-claimants.

26. The starting point for consideration of this point is Les Affreteurs Reunis S.A. v. Leopold Walford (London) Ltd., [1919] A.C. 801. The House of Lords in that case confirmed the decision in Robertson v. Wait, (1853) 8 Ex. 299. In relation to that authority Lord Birkenhead, L.C. said this at pp. 806- 807:

My Lords, so far as I am aware, that case has not before engaged the attention of this House, and I think it right to say plainly that I agree with *43 that decision and I agree with the reasoning, shortly as it is expressed, upon which the decision was founded. In this connection I would refer to the well-known case of In re Empress Engineering Company. In the judgment of Sir George Jessel M.R. the principle is examined which, in my view, underlies and is the explanation of the decision in Robertson v. Wait. The Master of the Rolls uses this language: "So, again, it is quite possible that one of the parties to the agreement may be the nominee or trustee of the third person. As Lord Justice James suggested to me in the course of the argument, a married woman may nominate somebody to contract on her behalf, but then the person makes the contract really as trustee for somebody else, and it is because he contracts in that character that the cestui que trust can take the benefit of the contract."

It appears to me plain that for convenience, and under long established practice, the broker in such cases, in effect, nominates the charterer to contract on his behalf, influenced probably by the circumstances that there is always a contract between charterer and owner in which this stipulation, which is to enure to the benefit of the broker, may very conveniently be inserted. In these cases the broker, on ultimate analysis, appoints the charterer to contract on his behalf. I agree therefore with the conclusion arrived at by all the learned judges in Robertson v. Wait, that in such cases charterers can sue as trustees on behalf of the broker.

27. Viscount Finlay and Lords Atkinson and Wrenbury adopted identical reasoning.

28. Accordingly, the position in 1853 and 1919 was that when a charter-party was entered into and incorporated a term that the owners would pay commission to the brokers, the only means of enforcement of that promise was an action by the charterers and the brokers as co-plaintiff because, the charterer having contracted for commission on behalf of the broker, once the contract had been signed, the charterer became trustee of the broker's right to recover that commission, the broker being unable to enforce the promise direct and without the charterer's intervention because he was not a party to the contract and therefore had no cause of action available to him against the owner. With regard to this trustee relationship it could then be said that when the charter-party

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                    Page 8
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R. (Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

was entered into neither owners nor charterers contemplated that the brokers could sue the owners direct.

29. What is the position arising from the contract itself following the coming into force of the 1999 Act? As a matter of analysis of the underlying relationship between the parties, it must be precisely the same. Thus, the charterer is no less the trustee of the owners' promise to pay the commission, having regard to the fact that the charterer contracts for payment of the commission on behalf of a non-contracting party. Indeed, the only thing that has changed is the coming into force of the 1999 Act and the introduction of the statutory facility of a direct right of action for a non-contracting party on whom a contract purports to confer a benefit.

30. Accordingly, the argument advanced by the owners can only succeed if it is to be inferred from the existence of the underlying trustee relationship that it was the mutual intention of owners and charterers that the broker beneficiary should not be entitled to avail himself of the facility of direct action by the 1999 Act.

31. This proposition is, in my judgment, entirely unsustainable. The fact that prior to the 1999 Act it would be the mutual intention that the only available facility for enforcement would be deployed by the broker does not lead to the conclusion that, once an additional statutory facility for enforcement had been introduced, the broker would not be entitled to use it, but would instead be confined to the use of the pre-existing procedure. Indeed, quite apart from the complete lack of any logical basis for such an inference, the very cumbersome and inconvenient nature of the procedure based on the trustee relationship (described by Lord Wright as a "cumbrous fiction") would point naturally to the preferred use by the broker of the right to sue directly provided by the 1999 Act. Not only would that original procedure be inconvenient, but it might involve risk that the broker would be prevented from recovering his commission, for example, in a case where the charterer had been dissolved in its place of incorporation or where, in the absence of

co-operation by the charterer, proceedings had to be served on it outside the jurisdiction and service could not be effected. There are therefore very strong grounds pointing against any mutual intention to confine the brokers to the old procedure and to deny them the right to rely on the 1999 Act.

32. I therefore reject the third ground relied upon by Nisshin. In so doing I reach the same conclusion as the arbitrators.

33. It follows that Cleaves are entitled to enforce the commission clauses in their own right by reason of s. 1 of the 1999 Act.

*Is the enforcement of those rights subject to the arbitration agreements in the charter-parties?*

34. It is conceded by Ms. Hopkins that, given that the arbitration agreements are between and only between owners and charterers, they do not confer rights or impose obligations on the brokers unless the effect of s. 8 of the 1999 Act is to deem *44 the brokers to be bound by and entitled to the benefit of the arbitration clauses for the specific purpose of enforcement against the owners of their entitlement to commission.

35. It is submitted on behalf of the owners that the question whether under s. 8 a third party's right is subject to an arbitration agreement is to be determined by the proper construction of the contract as to whether third parties intended an arbitration agreement contained in it to apply to any dispute relating to the third party's rights. In particular, s. 8 is to be construed by reference to the conditional benefit principle adopted in the Law Commission's Report No. 242, pars. 10.24 to 10.32 and which is reflected in s. 1(4) of the 1999 Act. In this connection, there can be no presumption that the arbitration agreement applies. Having regard to the need to construe s. 8 in accordance with Human Rights principles in particular art. 6(1) it would be wrong in principle so to construe it as to shut out the parties from the courts unless there were clear words to that effect. The imposition of the arbitration agreements would involve shutting out the use by the third party of his local Court and his exposure to liability for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R. (Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

the fees of the arbitrator were he to lose. Further, s. 8 should be interpreted consistently with the principles of party autonomy in as much as a party should not be required to arbitrate unless it had clearly been agreed by the parties to the underlying contract and the arbitration agreement that the broker must arbitrate in order to enforce his rights to commission. Applying this approach, it is submitted that in view of the proper construction of the arbitration clauses the brokers' rights to commission were not "subject to . . . the arbitration agreement[s]".

36. Section 8 of the Act has an unusual legislative history. Although the text of the bill originally recommended by the Law Commission included s. 1(4) and so reflected the principle of conditional benefit, there was no provision dealing expressly with arbitration. The report excluded its application to arbitration agreements. When the bill was first introduced before the House of Lords it contained no specific provision as to arbitration. The background to the addition of s. 8 is described by Professor Burrows in his most helpful article on the Act at Law Maritime and Commercial Law Quarterly, [2000] p. 540. Eventually, s. 8 was introduced by way of Government amendment at the Report stage in the House of Commons. The Lord Chancellor's Department issued Explanatory Notes which were made available to members of Parliament and peers before the debates. In respect of s. 8 those Notes contained the following advice:

33. Section 8 e nsures that, where appropriate, the provisions of the Arbitration Act 1996 apply in relation to third party rights under this Act. Without this section, the main provisions of the Arbitration Act 1996 would not apply because a third party is not a party to the arbitration agreement between the promisor and the promisee.

34. Subsection (1) deals with what is likely to be the most common situation. The third party's substantive right (for example, to payment by the promisor) is conferred subject to disputes being referred to arbitration (see s. 1(4)). This section is based on a "conditional benefit" approach. It ensures that a third party who wishes to take action to enforce his substantive right is not only able to enforce effectively his right to arbitrate, but is

also "bound" to enforce his right by arbitration (so that, for example, a stay of proceedings can be ordered against him under s. 9 of the Arbitration Act 1996). This approach is analogous to that applied to assignees who may be prevented from unconscionably taking a substantive benefit free of its procedural burden (see, for example, DVA v. Voest Alpine, The Jay Bola, [1997] 2 Lloyd's Rep. 279). "Disputes . . . relating to the enforcement of the substantive term by the third party" is intended to have a wide ambit and to include disputes between the third party (who wishes to enforce the term) and the promisor as to the validity, interpretation, existence or performance of the term; the third party's entitlement to enforce the term; the jurisdiction of the arbitral tribunal; or the recognition and enforcement of an arbitration award. But to avoid imposing a "pure" burden on the third party, it does not cover, for example, a separate dispute in relation to a tort claim by the promisor against the third party for damages.

35. Subsection (2) is likely to be of rarer application. It deals with situations where the third party is given a right to arbitrate under s. 1 but the "conditional benefit" approach underpinning subs. (1) is inapplicable. For example, where the contracting parties give the third party a unilateral right to arbitrate or a right to arbitrate a dispute other than one concerning a right conferred on the third party under s. (1). To avoid imposing a pure burden on the third party (in a situation where, for example, the contracting parties give the third party a right to arbitrate a tort claim made by the promisor against the third party) the subsection requires the third party to have chosen to exercise the right. The timing point at the end of the subsection is designed to ensure that a third party who chooses to exercise his right to go to arbitration by, for example, applying for a stay of proceedings under s. 9 of the Arbitration Act, 1996, can do so. Under s. 9 of the Arbitration Act, 1996, the right to apply *45 for a stay of proceedings can only be exercised by someone who is already a party to the arbitration agreement.

37. Although these Notes clearly do not have the force of law, they occupy a position in relation to the Act similar to that of the statement by a min-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                                    Page 10
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

ister introducing a bill. The Courts are entitled to construe the wording of the Act on the assumption that, if the precise meaning of the words used is in doubt, when Parliament enacted those words it did so with some regard to the ministerial explanation.

38. The reference in the Explanatory Notes to the decision of the Court of Appeal in The Jay Bola, [1997] 2 Lloyd's Rep. 279 and to the approach of s. 8(1) being "analogous to that applied to assignees who may be prevented from unconscionably taking a substantive benefit free of its procedural burden" is of some importance. It is quite clearly directed to the meaning to be given to the words "a right under section 1. . . is *subject to* an arbitration agreement" (emphasis added).

39. The introduction into these Notes of the assignment analogy directs attention to the concept that under the contract the promisee could not enforce the substantive term unless· he had resort to arbitration if the scope of the agreement to arbitrate were wide enough to cover the dispute about such enforcement. Once the latter condition is satisfied an assignee from the promisee stands in the shoes of the promisee as regards enforcement of that term. Although the Court of Appeal was concerned in The Jay Bola, sup., with the right of insurers of cargo to recover damages by reason of their status as a party subrogated to the cargo owners' rights of action, the approach adopted was based on the established principles applicable to the position of an assignee under s. 136of the Law of Property Act, 1925. Lord Justice Hobhouse with whose judgment Sir Richard Scott, V.-C. and Lord Justice Morritt agreed, cited the following passage from his judgment in The Jordan Nicholev, [1990] 2 Lloyd's Rep. 11 at p.
Where the assignment is the assignment of the cause of action, it will, in the absence of some agreement to the contrary include as stated in s. 136 all the remedies in respect of that cause of action. The relevant remedy is the right to arbitrate and obtain an arbitration award in respect of the cause of action. The assignee is bound by the arbitration clause in the sense that it cannot assert the assigned right without also accepting the ob-

ligation to arbitrate. Accordingly, it is clear both from the statute and from a consideration of the position of the assignee that the assignee has the benefit of the arbitration clause as well as of other provisions of the contract.

40. The promise under these charter-parties to pay commission to the brokers was clearly a promise made to and enforceable by the charterers. Failure to perform *that* obligation would clearly fall within the scope of all the arbitration clauses. If the charterers had assigned their cause of action for failure to pay commission to the brokers by a statutory assignment the latter could only have enforced that promise if they resorted to arbitration against the owners. Had they done so, it would not have been open to the owners to challenge the arbitrators' jurisdiction on the grounds that the only parties to the arbitration agreement who were identified by it were the owners and the charterers. That would be because such identification would be completely irrelevant to the entitlement of the brokers to utilize the arbitration agreement. The transference by assignment of the substantive chose in action necessarily involved the transference of the procedural means of enforcement of it.

41. There is also authority which suggests that under the Third Parties (Rights against Insurers) Act, 1930, which effects a statutory assignment of rights of action in a case where the assured has become bankrupt or been wound up, the party to whom the benefit of a right of action under the liability insurance contract has been transferred is obliged to pursue that right in accordance with an arbitration agreement in the contract of insurance even if that agreement is expressed to refer only to the parties to the contract of insurance and not in terms wide enough to cover a statutory assignee: see The Padre Island, [1984] 2 Lloyd's Rep. 408.

42. It is against this background that one must consider the words in sub-s. (1) ". . . the third party shall be treated for the purposes of that Act as a party to the arbitration agreement . . .". In my judgment these words clearly reflect and are entirely consistent with the assignment analogy.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                                Page 11
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

The third party never was expressed to be a party to the arbitration agreement but, in view of the fact that he has in effect become a statutory assignee of the promisee's right of action against the promisor and because, by reason of the underlying policy of the 1999 Act expressed in s. 1(4) he is confined to the means of enforcement provided by the contract to the promisee, namely arbitration, he is to be treated as standing in the shoes of that promisee for the purpose only of the enforcement of the substantive term. Thus although the wording of sub-s. (1)(a) - "is subject to a term" - is capable of having a range of possible meanings, one of those meanings is that which I have described and, having regard to the further words of the sub-section, entirely reflects the assignment analogy referred to in the Explanatory Notes.

43. Much weight was placed by Mr. Ashcroft on the proposition that whether the third party must *46 proceed, by arbitration depends on the mutual intention of the parties to the arbitration agreement as to the availability of that agreement to a third party for enforcement of his rights. I accept Miss Hopkins's submission that this proposition is true only to the limited extent that it is necessary that the scope of the arbitration agreement is wide enough to cover a dispute between the promisor and the promisee as to the performance of the substantive term. For the reasons which I have given, whether they did or did not express a mutual intention that the third party should be entitled to avail himself of the arbitration agreement for the purpose of enforcing his rights under the substantive term in relation to which the 1999 Act has transferred to him a right of action is not relevant.

44. Since, as I have held, the scope of the disputes covered by all nine arbitration agreements is wide enough to embrace a dispute between owners and charterers about payment of the brokers' commission, I conclude that in the present case Cleaves were entitled and, indeed, obliged to refer those disputes to arbitration and that the arbitrators had jurisdiction to determine them.

45. The arbitrators reached the same conclusion in pars. 27 and 28 of their interim final award. The conceptual basis for that conclusion is, I believe, closely similar to, if not identical with, that which underlies this judgment.

46. Before concluding this judgment it is right that I should comment on two matters considered by the arbitrators which have been raised in the course of argument before me.

47. Firstly, the arbitrators refer at pars. 21-28 to an article by Clare Ambrose entitled "When can a Third Party Enforce an Arbitration Clause?", [2001] J.B.L. 415. In that interesting contribution to the widespread debate amongst commentators on the proper construction of s. 8 Miss Ambrose starts from the proposition that whether a third party right under s. 1 is "subject to" an arbitration agreement under s. 8(1) depends on "whether it was the parties' intention to enable a third party to enforce the arbitration clause". She then goes on quite logically to suggest that s. 8(1) should be construed so that it can only be invoked by (or against) third parties, if on its true construction disputes relating to a third party's enforcement of his rights under s. 1 are agreed to be referred to arbitration. This, it is argued, is an important consideration because giving effect to the intentions of the parties to the contract was "the sole justification for adopting legislation binding third parties to arbitrate". This was essentially the argument advanced by Mr. Ashcroft on behalf of the owners.

48. However, the problem with this approach is that it ignores the assignment analogy which I have already explained. The effect of s. 1 being analogous to a statutory assignment to the third party by operation of law, the function of s. 8 is to reflect the conditional benefit approach by attaching to the right of action thus transferred the means of enforcement of that right agreed between the parties. Their agreement is effected by limiting the third party to the means of enforcement available to the promisee. That is why their agreement is sufficiently reflected if the dispute would have fallen within the scope of the agreement to arbitrate, if the promisee were seek-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                                                      Page 12
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

ing to enforce the promise. And that is why it is necessary that s. 8(1) should expressly provide that the third party should "be *treated* for the purpose of that Act as a party to the arbitration agreement" (emphasis added) which, but for that provision, he would not be. I have no doubt that in this sense s. 8 does indeed fulfil the purpose of giving effect to the mutual intention of the parties to the contract as to how their obligations are to be enforced and the purpose of rendering conditional the benefit which by virtue of s. 1 has been transferred to the third party.

49. Secondly, I am not persuaded that the reasoning of the Privy Council in The Mahkutai, [1996] A.C. 650 expressed by Lord Goff at p. 666 assists in any way in the construction of s. 8. That which makes the benefit of a Himalaya Clause available to a third party is the mutual intention of the parties to the underlying contract as expressed in the words of the clause. It is in that context that the approach to the incorporation of arbitration clauses and jurisdiction clauses from one contract into another such as a bill of lading, as discussed in T. W. Thomas & Co. Ltd. v. Portsea Steamship Co. Ltd., [1912] A.C. 1, may have to be considered. But Himalaya clauses transfer the benefit of substantive contract terms to a sub-contractor by operation of the agreement between the parties of the contract of carriage and the law of agency stemming from the relationship between the sub-contractor as principal and the contracting party as agent. This is a fundamentally different scene from that arising from the operation of s. 1 of the 1999 Act. There is, above all, nothing analogous to a statutory assignment of a right of action effected subject to the principle of conditional benefit.

50. For these reasons I have no doubt that the arbitrators correctly declined to give to s. 8 the construction advanced in Miss Ambrose's article and in the submissions advanced on behalf of the owners in this application.

51. As to the arguments advanced on behalf of the owners that to construe s. 8 as did the arbitrators would invade Human Rights principles, I have the following brief comments.

*47 52. The effect of ss. 1 and 8 of the 1999 Act as analysed in this judgment is to provide to a third party a remedy which would otherwise have been denied to him. Where a contract included an agreement to arbitrate, a provision whereby a benefit was to be conferred on a third party could neither be directly enforced by the third party nor, if the third party were a broker claiming his commission, could it be enforced by means of the enforcement of a trust because the third party was not a party to the underlying contract or the arbitration agreement. This was a grave defect in the law which could give rise to considerable injustice. The enactment of the 1999 Act has removed that injustice by putting the third party in the position of the promisee to the extent of enforcement of the promise for his benefit and has thereby enabled him to bring proceedings direct against the promisor either by a direct claim in court or by commencing proceedings by arbitration where the arbitration agreement covered the claim. He no longer has to rely on the co-operation of the promisee to proceed as co-claimant where there can be a claim by means of Court action and he is not deprived of all remedy because he was not a party to the arbitration agreement or the underlying contract. It is against this change in the law that one is bound to ask whether by requiring him to arbitrate a claim to enforce a promise which, had the promisee wished to pursue it, he would have had to refer to arbitration, the Act has infringed the third party's right under art. 6(1) of the European Convention on Human Rights.

53. The question has only to be postulated to demonstrate the absurdity of the underlying proposition. That proposition involves the third party's right to access to the courts being infringed unless the law provides him with an enforcement facility which neither he nor the promisee party to the contract ever previously had. Thus stated the argument fails in limine. If it were correct every provision for statutory arbitration would be unlawful.

54. Finally, I should like to acknowledge the great assistance which I have derived from the several articles and commentaries on the 1999

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2004] 1 Lloyd's Rep. 38                                              Page 13
2003 WL 22477399 (QBD (Comm Ct)), [2003] 2 C.L.C. 1097, [2004] 1 Lloyd's Rep. 38, [2004] 1 All E.R.
(Comm)
481, (2003) 153 N.L.J. 1705, [2003] EWHC 2602
(Cite as: [2004] 1 Lloyd's Rep. 38)

Act written by Prof. Burrows and Prof. Merkin,
as well as His Honour Anthony Diamond, Q.C.
The fact that I have not cited all the relevant pas-
sages from them does not indicate that they have
not provided stimulating expositions of ap-
proaches to construction which have been most
helpful.

(c) Lloyds of London Press Lim- ited

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 6

Lloyds Maritime Law Newsletter



Home | Help                                                          Log Out

### Article

Archive > 2006 > LMLN 688: 27 March

**Contract (Rights of Third Parties) Act 1999 - Charterparty providing for shipowners to pay commission to brokers - Charterers getting into financial difficulties and failing to pay hire - Shipowners concluding new agreement with charterers and cargo interests whereby cargo interests agreed to pay "hire" at same rate as charterparty - Whether brokers entitled to commission on hire paid under new agreement - Whether shipowners released from obligation to pay commission**

**London Arbitration 7/06**

(2006) 688 LMLN 1(2)

On 13 April the vessel was chartered on the New York Produce Exchange form as amended for a time charter trip. Clause 4 of the charter provided that hire was payable at the rate of US$37,000 per day. Clause 28 provided that a commission of 2.5% was payable to named brokers on the hire earned and paid under the charter, deductible from hire.

In the event, the charterers got into financial difficulties, and hire was only paid up to and including 18 July. Up to that time the owners had paid commission to the brokers in accordance with clause 28. Because of the charterers' failure to pay hire after 18 July the owners refused to allow the vessel to enter the discharge port. To avoid potentially serious losses, an agreement in writing ("the Agreement") was concluded on 25 August between the owners, the charterers, and certain of the cargo interests whereby such cargo interests agreed "to take over and perform all the obligations of [the charterers] hereafter accruing under the charterparty". Clause 2.4 of the Agreement provided:

"[The relevant cargo interests] undertake to pay the owners for the use of the vessel at the rate of US$37,000 per day ("Hire") from and including 19 July ..."

Clause 3.1 read inter alia:

"[The charterers] further release owners ... from further performance under this charterparty and from any and all claims and liabilities under the charterparty for or in connection with (i) any alleged failure to comply with any order given hereunder as to employment of the vessel (ii) return of any sums paid owners [sic] by way of hire, or for damages equivalent to such sums (iii) bunkers consumed at any time



when the vessel was alleged by [the charterers] to be off-hire. In particular, and without prejudice to the generality of the foregoing, [the charterers] acknowledge owners' entitlement to retain the sum paid by [the charterers] for the period from 3 July to 19 July."

There was no provision in the Agreement for the payment of brokerage to the brokers named under clause 28 of the original charter.

The brokers sought brokerage on sums received by the owners under the Agreement. They claimed commission on hire received by the owners at the charterparty rate of US$37,000 daily from 19 July until 24 August, and from 25 August (the date of the Agreement) until the vessel was re-delivered to the owners, namely 65 days at 2.5% - US$60,125.00. The brokers submitted that they were entitled to bring a claim for their commission against the owners under The Contracts (Rights of Third Parties) Act 1999 ("the Act"), and relied on *Nisshin Shipping Co Ltd v Cleaves & Co Ltd* [2004] 1 Lloyd's Rep 38.

The brokers' primary case was that the charterparty effectively continued (at least for the brokers' purposes) albeit with the relevant cargo interests as charterers, that the owners had earned and been paid "Hire", and that commission was accordingly payable. Their alternative case was that if the charterparty had been terminated by the Agreement, they could recover their commission by reason of section 2 of the Act, which provided that where a third party had a right under section 1 of the Act to enforce a term of the contract, the parties to the contract could not rescind or vary the contract in such a way as to extinguish or alter the third party's entitlement, without his consent.

The owners contended that hire was payable pursuant to the Agreement, and not clause 4 of the charterparty. Alternatively, by reason of clause 3.1 of the Agreement, the charterers released the owners from further performance under the charterparty, and thus from their obligation to pay commission. Further, as no hire after 18 July had actually been paid as at the date of the Agreement (25 August), no commission was due: the payments made pursuant to the Agreement, whilst covering a period prior to 25 August, were not in respect of hire under the charterparty. As to section 2 of the Act, whilst that might preclude rescission of clause 28 - which was the only provision in the charterparty which the brokers had a right to enforce - it could not prevent rescission of the other terms of the charterparty. Accordingly, such rescission would "deprive clause 28 of any scope of operation". There was no implied term in the charterparty to the effect that the owners would do nothing to prevent a broker from earning his commission. The purpose of the Agreement was not to avoid payment of commission.

Held, that the brokers' primary case was correct. The charterparty and the Agreement should and could be read sensibly together to record the parties' intentions. The Agreement essentially substituted the relevant cargo interests for the original charterers to "take over and perform all of the obligations of [the charterers] under the charterparty". That



involved paying hire to the owners and did not remove or reduce the owners' obligations under the same charterparty, one of which was to pay commission to the brokers.

The essentials of the Agreement were that, in return for delivering the cargo, the owners would be safeguarded by payment of hire in arrears and for future operations, also against possible arrest. For their part, the owners were obliged to comply with the terms and provisions of the charterparty in its entirety.

In the event, the owners received hire for the period from 19 July through to 25 August and thereafter until re-delivery of the vessel, in accordance with the charterparty. In return, they were obliged to perform the charterparty as contracted. The owners' attempts to divorce the provisions of clause 28 of the charter from all that were artificial, indeed flawed. There was no basis for cherry picking those terms of the charterparty with which the owners felt comfortable whilst disregarding others which came with responsibilities. Given the lengths to which all parties to the Agreement had gone in order to maintain the fabric of the charterparty, the tribunal could see no logic or reason why the owners should not be obliged to continue to honour their original commitments in return for hire received.

It followed that the tribunal did not need to consider the arguments concerning section 2 of the Act. However, it seemed to the tribunal that provided the parties had not deliberately sought to deprive a broker of his commission, it had to be open to the owners and charterers to cancel or vary their arrangements by agreement. If that resulted in increased or reduced commission, so be it: a broker's lot was not always a happy one. The tribunal would agree with Wilford et al: Time Charters (5th edition) paragraph 36.9:

"The question then arises whether, if no term is normally to be implied in favour of the brokers, Section 2 of the 1999 Act has any real effect. It is submitted that it should not have any effect, because the owners' defence to any claim to damages, following an agreed rescission or variation would be that the brokers are only entitled under the express terms of the charter to commission earned on hire earned and paid and there has been no breach of any other term express or implied."

The brokers would be awarded US$60,125.00 together with interest and costs.

---

About Informa Law | Help | Register | Subscribe | Contact Us | Terms & Conditions
Privacy Statement | Copyright | Advertise

© 2005 T&F Informa UK Limited The content of this web site is copyright by informa Publishing Group Limited. Reproduction, retrieval, copying or transmission of the content of this site is not permitted without the publisher's prior consent.
Lloyd's and the Lloyd's Crest are registered trademarks of the Society Incorporated by the Lloyd's Act 1871 by the name of Lloyd's.