CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiffs,
HARLEY MULLION & CO. LIMITED
ERNST RUSS (UK) LTD.
SCANDANAVIAN SHIPPING
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
HARLEY MULLION & CO. LIMITED
ERNST RUSS (UK) LTD.
SCANDANAVIAN SHIPPING,

     Plaintiffs,

             08  CV  5435 (BSJ)

   v.

CAVERTON MARINE LIMITED,

     Defendant.
-----------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE ATTACHMENT PURSUANT TO FED. R. CIV. P. E(4)(f)
AND IN OPPOSITION TO THE CLAIM FOR ATTORNEY'S FEES**

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………...………....…ii

TABLE OF AUTHORITIES …………………………….………………....................iii

PRELIMINARY STATEMENT...…………………...……………….......……………1

STATEMENT OF FACTS…………………………………….........................................1

LEGAL ARGUMENT…………………………………….........................................1

I.      THE GROUNDS FOR VACATUR OF PROCESS OF
        MARITIME ATTACHMENT ARE LIMITED BY AQUA STOLI……...1

II.     PLAINTIFFS ASSERT A VALID *PRIMA FACIE* MARITME
        CLAIM AGAINST THE DEFENDANT CAVERTON…………………….3

III.    UNDER U.S. FEDERAL ADMIRALTY LAW, THE CONTRACT
        AT ISSUE IS MARITIME IN NATURE BECAUSE CHARTER PARTY
        BROKERAGE HAS A SIGNIFICANT IMPACT ON MARITIME
        COMMERCE……………………………………………………………...7

        A)      THE CONTRACT AT ISSUE ……………………………………….7

        B)      THE FEDERAL LAW OF ADMIRALTY AS APPLIED TO
                MARITIME CONTRACTS …………………………………….8

        C)      THE CONTRACT AT ISSUE IN THIS CASE AS APPLIED
                TO THE FEDERAL ADMIRALTY LAW OF CONTRACTS……………...12

IV.     THE PLAINTIFFS HAVE ASSERTED A VALID ADMIRALTY
        CLAIM UNDER ENGLISH LAW, WHICH IS THE SUBTANTIVE
        LAW OF THE CONTRACT…………………………….................................14

VI.     AN AWARD OF ATTORNEY'S FEES IS NOT IN ANY
        WAY JUSTIFIED IN THIS CASE…………………………………...18

CONCLUSION …………………………….......................................................20

## TABLE OF AUTHORITIES

PAGE

CASES

Andolina Shipping, Ltd. v. TBS Eurolines Ltd.,
    84 F. Supp. 2d 527 (S.D.N.Y. 2000)......................................................13

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,
    460 F.3d 434 (2nd Cir. 2006).....................................................2, 3, 4

Dolco Investments, Ltd. v. Moonriver Development, Ltd.,
    486 F. Supp. 2d 261 (S.D.N.Y. 2007)....................................................4

Dolco Inv., LTD. v. Moonriver Dev., LTD.,
    526 F. Supp. 2d 451 (S.D.N.Y. 2007)................................................18

Exxon Corp. v. Central Gulf Lines, Inc.,
    500 U.S. 603, 111 S. Ct. 2071, 114 L. Ed. 2d 649 (1991)..........5, 8, 9, 10, 12, 19

F. H. Bertling Holding KG v. Ranhill Eng'rs & Constructors Sdn. Bhd.,
    2008 U.S. Dist. LEXIS 52085 (S.D.N.Y. July 8, 2008)............................4, 5

Kan Int'l v. Coastal Tankships U.S.A.,
    1997 U.S. App. LEXIS 4800 (9th Cir. Mar. 11, 1997)...............................9

Kossick v. United Fruit Co.,
    365 U.S. 731, 81 S. Ct. 886, 6 L. Ed. 2d 56 (1961)...................................8

Norfolk Southern Railway Co. v. Kirby,
    543 U.S. 14, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004)................5, 8, 9, 10, 19

Padre Shipping, Inc. v. Yong He Shipping,
    2008 U.S. Dist. LEXIS 34428 (S.D.N.Y. Apr. 25, 2008)............................4

Phoenix Bulk Carriers Ltd. v. Oldendorff Carriers GmbH & Co.,
    2002 U.S. Dist. LEXIS 21421 (S.D.N.Y. Nov. 6, 2002)............................13

Sea Transport Contractors, Ltd. v. Industries Chemiques Du Senegal,
    411 F.Supp.2d 386 (S.D.N.Y. 2006)....................................................4, 5

Seatrans Shipping Corp. v. Interamericas Marine Transport, Ltd.,
    1997 U.S. Dist. Lexis 5665 (S.D.N.Y. April 28, 1997)..............................14

Shipping Fin. Servs. Corp. v. Drakos,
    140 F.3d 129 (2d Cir. 1998)........................................................10, 11, 12

Sierra Club v. United States Army Corps of Engineers,
    776 F.2d 383 (2d Cir. 1985)……………………………………………...18

Sirius Ins. Co. (UK) Ltd. v. Collins,
    16 F.3d 34 (2d Cir. 1994)……………………………………………......5

Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd.,
    478 F. Supp. 2d 532 (S.D.N.Y. 2007)………………………....4, 14, 15, 16, 17

T&O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.,
    415 F.Supp. 2d 310 (S.D.N.Y. Jan. 20, 2006)………………….....5, 15, 16, 17

Tide Line, Inc. v. Eastrade Commodities, Inc.,
    2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006)……………………...3

U. S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,
    241 F.3d 135 (2d Cir. 2001)…………………………………………….....13

**STATUTES and RULES**

28 *U.S.C.* § 1333(1)………………………………………………….8

*Fed. R. Civ. P.* 8(d)(2)…………………………………………..…………………6

*Fed. R. Civ. P.*, Supplemental Rules for Admiralty or Maritime Claims,
Rule B…………………………………………………………………………..2, 3, 14

*Fed. R. Civ. P.*, Supplemental Rules for Admiralty or Maritime Claims,
Rule E(4)(f)…………………………………………………………………………3

**OTHER AUTHORITIES**

8-XVIII Benedict on Admiralty § 18.03 (2008)…..…………………………………13

## PRELIMINARY STATEMENT

Plaintiffs HARLEY MULLION & CO. LIMITED (hereinafter "HARLEY"), ERNST RUSS (UK) LTD. (hereinafter "ERNST RUSS") and SCANDANAVIAN SHIPPING (hereinafter "SCANDANAVIAN") (hereinafter collectively referred to as "PLAINTIFFS"), submit this Memorandum of Law in Opposition to the Motion to Vacate Attachment and in Opposition to an Award for Attorney's Fees as presented by defendant CAVERTON MARINE LIMITED (hereinafter "CAVERTON").

## STATEMENT OF FACTS

The facts and supporting documents pertaining to the instant Opposition to the Motion to Vacate the Attachment and an Award of Attorney's Fees are more fully set forth in the accompanying Declaration of Owen F. Duffy, in Opposition to Defendant's Motion to Vacate Attachment and an Award of Attorney's Fees, dated July 28, 2008, (hereinafter referred to as the "Duffy Declaration") and, also, the accompanying Declaration of Mark Terence O'Neil in Response to Defendant's Motion to Vacate Attachment and for Attorney's Fees, dated July 28, 2008, (hereinafter referred to as the "O'Neil Declaration").

## LEGAL ARGUMENT

### POINT I

### THE GROUNDS FOR VACATUR OF PROCESS OF MARITIME ATTACHMENT ARE LIMITED BY AQUA STOLI

Any legal analysis undertaken in connection with a Motion to Vacate a Process of Maritime Attachment must begin with the Court of Appeals for the Second Circuit's decision

entitled <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 460 F.3d 434 (2nd Cir. 2006). In

<u>Aqua Stoli</u>, the Court of Appeals rejected the notion that the district courts are to engage in a

broad inquiry into the validity of a maritime attachment on a motion to vacate. 460 F.3d at 446.

The <u>Aqua Stoli</u> case has since been often cited for the Court's holdings that:

> An attachment should issue if the plaintiff shows that: 1) it has a valid
> *prima facie* admiralty claim against the defendant; 2) the defendant cannot
> found within the district; 3) the defendant's property may be found within
> the district; and 4) there is no statutory or maritime law bar to the
> attachment.
>   And,
> A district court must vacate an attachment if the plaintiff fails to sustain
> his burden of showing that he has satisfied the requirements of Rules B
> and E or in other limited circumstances, such as where: 1) the defendant is
> subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could
> obtain *in personam* jurisdiction over the defendant in the district where the
> plaintiff is located; or 3) the plaintiff has already obtained sufficient
> security for the potential judgment, by attachment or otherwise.

460 F.3d at 446.

   In <u>Aqua Stoli</u>, the Court of Appeals noted that the question presented on appeal

was "to what extent the district court may require a showing by the plaintiff beyond the

simple fact that the textual requirements of Rule B have been met." 460 F. 3d at 438.

When it answered that question, the Court of Appeals emphasized that "Rule B specifies

the sum total of what must be shown for a valid maritime attachment." 460 F.3d at 448.

Indeed, the Court of Appeals specifically noted that the maritime attachment rule was to

be construed broadly so that an attachment could be easily obtained with a minimum of

litigation. 460 F. 3d at 443 (The Court of Appeals discussed the policy and purposes of

Maritime Attachment.).

   In the case at hand, the Defendant Caverton seeks to vacate the Attachment on the basis

that the Plaintiffs have not satisfied one of the minimum requirements as set forth by the Court of

Appeals in Aqua Stoli. The specific argument is that the Verified Complaint fails to state a *prima facie* admiralty claim against CAVERTON. *See*, Defendant Caverton's Memorandum of Law in Support of Motion to Vacate Attachment pursuant to F.R.Civ.P. [sic] Rule E(4)(f) and for Attorney's Fees" (hereinafter "Defendant's Memo of Law") at Points I & II.  Defendant Caverton does not argue that it is found within the Southern District of New York, that the Defendant's property was not found within the district or that there is a statutory or maritime law bar to the attachment. Likewise, Defendant Caverton does not argue that is subject to suit in a convenient adjacent jurisdiction, that it is subject to *in personam* jurisdiction in a district where the Plaintiffs are located or that the Plaintiffs have already obtained sufficient security for the potential judgment against Defendant Caverton.

For the reasons set forth in the following Points of Argument, Caverton's argument to vacate the Process of Maritime Attachment cannot succeed because the Plaintiffs do assert a a *prima facie* admiralty claim against CAVERTON and the admiralty jurisdiction of this Honorable Court has been properly invoked. Therefore, the motion to vacate the attachment must be denied.

## POINT II

### PLAINTIFFS ASSERT A VALID *PRIMA FACIE* MARITME CLAIM AGAINST THE DEFENDANT CAVERTON

Aqua Stoli requires the district courts to limit their Rule B inquiries to whether the plaintiff has stated a *prima facie* basis for the maritime attachment at issue. Aqua Stoli, 460 F.3d at 445;  *see also*, Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 95870, *12 to 17 (S.D.N.Y. Aug. 15, 2006)(KMW)(discussing the holding and rationale of Aqua Stoli

3

and the *prima facie* standard.). In Dolco Investments, Ltd. v. Moonriver Development, Ltd.,

Judge Sweet, citing cases, noted: "The majority of courts in this district to have considered the

issue have interpreted Aqua Stoli to require the application of the *prima facie* standard when

considering the adequacy of the claim in a maritime vacatur motion." 486 F. Supp. 2d 261, 266-

67 (S.D.N.Y. 2007) (citing cases).  The *prima facie* standard has generally become the more

accepted standard in the Southern District of New York, and the prima facie standard was cited

most recently by Judge Scheindlin in  F. H. Bertling Holding KG v. Ranhill Eng'rs &

Constructors Sdn. Bhd., 2008 U.S. Dist. LEXIS 52085, *10 (S.D.N.Y. July 8, 2008) (citing

Padre Shipping, Inc. v. Yong He Shipping, __ F.Supp. 2d ___, No. 07 Civ. 9682, 2008 U.S.

Dist. LEXIS 34428, 2008 WL 1869212, at *3 (S.D.N.Y. Apr. 25, 2008, *citing* Dolco Invs., Ltd.,

*supra.*

        The case before this Court turns on whether Plaintiffs have satisfied the first requirement

of Aqua Stoli, namely whether the complaint pleads "a valid *prima facie* admiralty claim."

Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y.

2007). If the Court finds that the Plaintiffs present a *prima facie* admiralty claim, then the

attachment cannot be vacated. Aqua Stoli, 460 F.3d at 447. Conversely, if the Verified

Complaint does not state a *prima facie* admiralty claim, the attachment should be vacated. Sea

Transport Contractors, Ltd. v. Industries Chemiques Du Senegal, 411 F.Supp.2d 386, 392

(S.D.N.Y. 2006); *see also*, Dolco Investments, Ltd. v. Moonriver Development, Ltd., 486 F.

Supp. 2d 261, 266-67 (S.D.N.Y. 2007)("To sustain the attachments, Dolco must demonstrate that

it has 'an *in personam* claim against Defendants which is cognizable in admiralty .... In other

words, the plaintiff's must be one which will support a finding of admiralty jurisdiction.'").

4

The jurisdictional grant of the district court extends to contracts "which relate to the navigation, business, or commerce of the sea." Sirius Ins. Co. (UK) Ltd. v. Collins, 16 F.3d 34, 36 (2d Cir. 1994) (citations omitted). As directed by the Supreme Court, district courts are to make a case-by-case judgment of such a contract based upon "the subject matter of the . . . contract" and "the services performed under the contract." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612, 111 S. Ct. 2071, 114 L. Ed. 2d 649 (1991). The ultimate determination turns on "the nature and character of the contract" and whether the contract has "reference to maritime service or maritime transactions." Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 24, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004). Accordingly, the only real issue for this Court to consider is whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it would not implicate any of the concerns underlying admiralty and maritime jurisdiction. Sea Transport, 411 F. Supp.2d at 393.

There is, however, some division within this district as to what law should be applied in examining whether the claim asserted is a *prima facie* admiralty claim. *See*, F. H. Bertling Holding KG v. Ranhill Eng'rs & Constructors Sdn. Bhd., 2008 U.S. Dist. LEXIS 52085, * 9. In that case, Judge Scheindlin observed "some cases within the district have held that the admiralty claim 'must be valid under the substantive law that will govern the underlying action,' while others have held that the plaintiff satisfies the prima facie standard 'if the complaint merely demonstrates that the plaintiff has a claim that is cognizable in admiralty'." 2008 U.S. Dist. LEXIS 52085 * 9, fn. 39; *see also*, T&O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F.Supp. 2d 310, 315-16 (S.D.N.Y. Jan. 20, 2006)("The law of the contract applies to the question of whether a claim has accrued, but federal law governs the determination of whether an attachment is reasonable.").

5

In the case at hand, the Plaintiffs have presented a valid *prima facie* claim that is cognizable in admiralty under the law of the United States and which, in any event, is also a valid admiralty claim under the substantive law that will govern the underlying action. *See*, Fed. R. Civ. P. 8(d)(2)("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient").  The Plaintiffs openly stated both of its theories in the Verified Complaint to support the claim that the Plaintiffs have a valid *prima facie* admiralty claim under U.S. law or the substantive law that governs the underlying action. They were presented to the Court, at paragraphs 8 and 9 of the Verified Complaint, as follows:

> 8.    The contract of January 23, 2007 evidenced by the exchange of emails between the parties is a maritime contract because charter party brokerage has a significant impact on maritime commerce and is hereinafter referred to as the "MARITIME CONTRACT."

> 9.    In the alternative, the MARITIME CONTRACT is a maritime contract because it is based upon two maritime charter party contracts which are governed by English law, and, under English law brokers can enforce their rights in admiralty, even though they are not a party to a maritime charter party, by relying on the provisions of the Contracts (Rights of Third Parties) Act because a maritime charter party contract confers a benefit on brokers.

These alternate bases for this Court to exercise its admiralty jurisdiction in this matter are discussed in detail below.  Under either basis, however, this Court's exercise of its admiralty jurisdiction in issuing the Order for Issuance of a Process of Maritime Attachment was valid and there is no ground for vacating the attachment.

## POINT III

### UNDER U.S. FEDERAL ADMIRALTY LAW, THE CONTRACT AT ISSUE IS MARITIME IN NATURE BECAUSE CHARTY PARTY BROKERAGE HAS A SIGNIFICANT IMPACT ON MARITIME COMMERCE

A) The Contract at Issue

The Verified Complaint alleges that the contract at issue in this matter occurred as the result of an exchange of emails on January 23, 2007 wherein Defendant Caverton agreed to pay Plaintiffs a percentage of the freights earned by its vessels in an exchange for Plaintiffs to represent Defendant Caverton as their representative agents/brokers with the negotiations of two charterparties involving the same vessel, *i.e.* the M/V BW SAGA. *See*, Duffy Declaration at ¶ 5, citing Verified Complaint ¶ 6. The Verified Complaint goes on to allege that Plaintiffs successfully assisted the Defendant Caverton with the conclusion of the charterparties thereby entitling the Plaintiffs a portion of the freights earned as they became due as commission. *Id.*, *citing* Verified Complaint at ¶ 10.[1]  Finally, the Verified Complaint alleges that after making the first two monthly payments of a percentage of the freight earnings on the vessel, Defendant Caverton refused to make any further payments thereby breaching the contract with Plaintiffs. *Id.*, *citing* Verified Complaint at ¶ 14.

The Defendant Caverton has not contested the underlying allegations of the Verified Complaint in this matter. *See*, Duffy Declaration at ¶ 19. Indeed, Caverton concedes that there is a dispute "between the Plaintiffs and Caverton regarding the calculation and payment of [brokerage] commissions." *See*, Defendant's Memo of Law at Statement of Facts at page 3. Instead, Defendant Caverton takes the position that a contract for the provision of ship brokerage

---

[1] The fact that the Plaintiffs earnings under the contract were tied to the freight payments demonstrates a continuing interest of the Plaintiffs in the successful continuation of the charterparty and earning of freight thereon.

services does not give rise to a maritime cause of action and, therefore, maritime jurisdiction is lacking in this matter. However, and contrary to the position taken by Defendant Caverton, under U.S. federal admiralty law, the contract is maritime in nature because charter party brokerage agreement has as its principal objective maritime commerce, *i.e.* the employment of the M/V BW SAGA to carry cargo across the oceans.

B) The Federal Law of Admiralty as Applied to Maritime Contracts

The federal courts have original jurisdiction over "any civil case of admiralty or maritime jurisdiction...." *28 U.S.C. § 1333(1)*. "The boundaries of admiralty jurisdiction over contracts--as opposed to torts or crimes--being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S. Ct. 886, 6 L. Ed. 2d 56 (1961). With its argument that the underlying contract between Plaintiffs and Defendant Caverton does not give rise to maritime jurisdiction, Defendant Caverton seeks to rely on principles of dubious validity and which ignore the sea change as to how the district courts should examine contracts to determine if maritime jurisdiction exists.

As the Supreme Court recently held, the modern rule is that courts should look to "the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions," because "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." Norfolk Southern Ry. Co. v. Kirby, 543 U.S. 14, 24-25, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004) (internal citations, quotation marks and alteration omitted, emphasis in original). Thus, in determining whether a contractual dispute gives rise to maritime jurisdiction, many of the older artificial boundaries no longer have any place in the analysis because the only real inquiry is whether "the principal objective of a

contract is maritime commerce." *Id.* at 25; see also, <u>Exxon Corp. v. Central Gulf Lines, Inc.</u> 500 U.S. 603, 613, 611 (1991)(In rejecting the rule that excluded all agency contracts from the realm of admiralty, the Supreme Court emphasized that the "nature and subject-matter" of the contract at issue should be the crucial consideration in assessing admiralty jurisdiction.)

As plead in the Verified Complaint, the contract between the Plaintiffs and the Defendant Caverton had as its fundamental purpose the charter of the BW SAGA was to have the vessel carry LNG cargoes from Nigeria for one calendar year. The purpose of the contract was to effectuate maritime commerce and, conceptually, the brokerage contract was a maritime contract. No matter how artfully argued, its character as a maritime contract is not defeated simply because of artificial limitations that no longer have a place in modern jurisprudence.

Indeed, and even before the Supreme Court's decision in <u>Norfolk Southern Ry. Co. v. Kirby</u>, there was judicial precedent to support the position taken by the Plaintiffs in this case. In this regard, the Defendant Caverton states in its Memorandum of Law in Support of the Motion to Vacate that "we are unaware of any reported case in which a United States Court has extended admiralty jurisdiction in such circumstances." *See*, Defendant's Memo of Law at page 5. However, it is well known in maritime circles that over ten years ago, the Ninth Circuit, in an unreported case held that the Plaintiff's action was governed by federal admiralty law "because charterparty brokerage has a significant impact on 'maritime commerce.'" <u>Kan Int'l v. Coastal Tankships U.S.A.</u>, 1997 U.S. App. LEXIS 4800, *3 (9th Cir. Mar. 11, 1997). In that case, the issue was over prejudgment interest, but the Court of Appeals took it as a self-evident point that a charter party brokerage agreement was governed by federal admiralty law pursuant to the Supreme Court's holding in <u>Exxon Corp. v. Central Gulf Lines, Inc.</u>, 500 U.S. 603, 612 (1991).

9

1997 U.S. App. LEXIS 4800, *3, because the contract to broker a charter party certainly involved maritime commerce.

Seeking to avoid the obvious, and common sense, evaluation of the contract at issue, the Defendant Caverton relies heavily on the Preliminary Contracts Doctrine and the Second Circuit's holding in Shipping Fin. Servs. Corp. v. Drakos. Such reliance, however, is misplaced and, only serves to cloud the issue with irrelevant arguments that the preliminary nature of a brokerage agreement should absolutely foreclose an exercise of admiralty jurisdiction.

It is true that many older cases[2], state that acting as a chartering broker is a preliminary matter and that preliminary matters used to be excluded from a federal court's admiralty jurisdiction. Furthermore, it is true that while Exxon Corp. v. Central Gulf Lines, Inc. overturned the *per se* exclusion of agency contracts from admiralty jurisdiction, the Supreme Court did not rule on the validity of the preliminary contract doctrine. 500 U.S. 603, 613, n.7 (1991). However, the full statement given by the U.S. Supreme Court on the matter was:

> "This Court has never ruled on the validity of the preliminary contract doctrine, nor do we reach that question here. However, we emphasize that Minturn has been overruled and that courts should focus on the nature of the services performed by the agent in determining whether an agency contract is a maritime contract."
> *Id.*

Mindful of the fact that the preliminary contract doctrine's viability as a *per se* exclusion to admiralty jurisdiction was doubtful, the Court of Appeals for the Second Circuit has refrained from using the doctrine as basis for excluding brokerage contracts from admiralty jurisdiction. Shipping Fin. Servs. v. Drakos, 140 F.3d 129, 133 (2d Cir. 1998). The Court of Appeals, in Drakos, noted that it was passing on the opportunity of either reaching or deciding the issue of

---

[2]  As cited by the Defendant Caverton, some of which go back as far as 1881and some through 1989, which were all decided pre Exxon Corp. v. Central Gulf Lines, Inc..

whether Exxon precludes application of the preliminary contract doctrine. Under the circumstances, the Defendant Caverton can point to no modern authority in support of its argument that a preliminary service contract for navigation does not give rise to maritime jurisdiction and, therefore, the Defendant Caverton's entire reliance on the preliminary contract doctrine should be ignored.

Indeed, the Defendant Caverton's additional reliance on the Second Circuit's holding in Shipping Fin. Servs. v. Drakos as "compelling precedent" for its argument against admiralty jurisdiction should also be ignored. While the Second Circuit did analyze the plaintiff Shipping Financial Services's claim under the modern "nature and subject matter analysis" and it concluded that the contract was not maritime in nature, see 40 F.3d at 134, the Court of Appeals' reasoning is difficult to defend and, more to the point, the facts of Drakos do not mirror the allegations presently before this court. On the contrary, Drakos is distinguishable in several key respects.

Preliminarily, it is difficult to understand the Second Circuit's reasoning that shipbrokering activities are not "sufficiently maritime in nature." Shipbroking facilitates the employment or hiring of a vessel to carry cargo through the negotiation and maintenance of a charter party, and it is difficult to see how the Court of Appeals could not conclude that such activity did not fall within "maritime subject matter" as required by the Exxon court. A shipbroker not only facilitates the negotiations, but facilitates communications and handles issues "post fixture," and will usually prepare and/or pass invoices to the parties and provide continuing advice to its client on particular commercial matters that arise during the currency of the charter. Most certainly, it is difficult to see that any such a ruling would survive post Norfolk Southern Ry. Co. v. Kirby.

Secondarily, the contract at issue in <u>Drakos</u> related to the subchartering of the vessel M/V
RICH DUKE, but one key fact is that the plaintiff, Shipping Financial Services never actually
brokered a deal for the employment of the M/V RICH DUKE in maritime commerce. 140 F.3d at
131. The plaintiff Shipping Financial Services was authorized by defendants William Drakos and
Duke Petroleum Transport Corporation, co-owners of the vessel, to investigate the possibility of
entering into a subcharter. *Id.* To that end, Shipping Financial Services contacted defendant OMI
Petrolink Corporation ("OMI"), a ship operator, but OMI initially declined to subcharter the
vessel. *Id.* While Plaintiff continued to explore other subchartering options, OMI subsequently
entered into a charter with the co-owners of the M/V RICH DUKE through OMI's own
broker. *Id.* As it were, Shipping Financial Services never actually performed any services toward
the firm employment of the M/V RICH DUKE in maritime commerce because it was cut out of
the deal. Indeed, when ruling that Shipping Financial Services failed to establish maritime
jurisdiction under either the <u>Exxon</u> "nature and subject" matter test or the "preliminary contract"
doctrine, the Court of Appeals was careful to "reiterate the fact-specific nature of our decision."
140 F.3d at 134. Accordingly, the Court of Appeals was cautioning that its ruling should not be
considered as binding precedent on all brokerage agreements.

In the case at hand, by contrast with the specific facts of <u>Drakos</u>, the Plaintiffs allege, and
the Defendant does not dispute, that: a) the Defendant Caverton did in fact engage the Plaintiffs
to broker a charter party between BW Green Carriers AS and Caverton Marine so that Caverton
could use the M/V BW SAGA and, also, another contract for the subsequent employment of the
vessel, M/V BW SAGA, in maritime commerce so that Caverton could earn freight payments
while the vessel carried cargo from Nigeria; b) the Plaintiffs did find, and brokered, a deal for the
Defendant to use the M/V BW SAGA and, also, to employ the M/V BW SAGA to carry cargoes

12

of LNG from Nigeria in maritime commerce; and, c) as consideration for their efforts, the Plaintiffs were receiving portions of the freight payments that were earned by the vessel as she performed in maritime commerce. *See*, Duffy Declaration at ¶ 5, citing Verified Complaint ¶s 6 to 14. As such, and completely different from the specific facts of Drakos, the case at hand does not involve the breach of an agreement to obtain a prospective charter party, but it involves the actual negotiation of a chartered lease of an ocean-going vessel, the employment of the vessel in maritime commerce and the breach of the agreement that a portion of the freight payments made each month during the continuation of the charter would be paid to the Plaintiffs as commission for its services in brokering the vessel's employment and for its "post fixture" duties.

In sum, what is clear is that the Supreme Court stated in Exxon that "courts should focus on the nature of the services performed by the agent in determining whether an agency contract is a maritime contract" and, later, in Kirby, the Court held that the focus for maritime jurisdiction should be "on whether the principal objective of a contract is maritime commerce." Any logical or common sense analysis of understanding of Plaintiff's claim in accordance with the principles enunciated by Exxon and Kirby demonstrates that Plaintiff's claim passes both the "nature and subject matter" test, as well as the "principal objective" test, for maritime jurisdiction and, therefore, the admiralty jurisdiction of this court was properly invoked.

C) The Contract at Issue in this Case as Applied to the Federal Admiralty Law of Contracts

The contract at issue in this matter is a charter party brokerage contract. As described by a leading maritime treatise, of the three general types of charterparties, two, time and voyage charters, are usually "fixed" by chartering brokers. *See*, 8-XVIII Benedict on Admiralty § 18.03 (2008). The process is described by Benedict's as:

The two principal chartering markets are New York and London.

In London, brokers deal with each other on the floor of the Baltic Exchange, which functions somewhat like a stock exchange. In New York, there is no exchange; the brokers conduct their business by telephone, fax, e-mail, or personal encounters. A cargo owner will make known in the market the availability of a cargo for carriage. Alternatively, a shipowner expecting to have a ship available at a given time and place will make that fact known to one or more brokers. In the latter case, the brokers, in turn, will notify brokers representing cargo interests who may require a vessel of that type and size, and in that geographical position.

In due course, brokers representing the shipowner and the cargo interests will bargain concerning terms, particularly freight rates (if the parties want a voyage charter or a contract of affreightment), or hire (if the parties want a time charter). Naturally, the shipowner will want to charter his vessel at the highest rate possible, while the cargo interests will try to get the vessel at the lowest rate. The brokers keep in touch with their respective principals, and if a meeting of minds is finally reached, the vessel is considered "fixed."[3] A formal written charter will eventually be signed, but as stated earlier in this chapter, by then performance of the charter may have already begun, or have even been completed.

Id.

What is made clear from Benedict's treatise is that charter party brokerage is a crucial element of maritime commerce. The focus of a broker is a "maritime transaction," *i.e.* a charterparty, which is beyond all doubt a maritime contract, being a contract for the employment an ocean-going vessel to carry cargo over the ocean between various ports in the world Furthermore, this Court would be engaging in the "protection of maritime commerce" by

---

[3] Regarding the "fixture" process, *see* U. S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 138-43 (2d Cir. 2001); Phoenix Bulk Carriers Ltd. v. Oldendorff Carriers GmbH & Co., 2002 U.S. Dist. LEXIS 21421, 2003 A.M.C. 51, 52 (S.D.N.Y. 2002); Andolina Shipping, Ltd. v. TBS Eurolines Ltd., 84 F. Supp. 2d 527, 528-29 (S.D.N.Y. 2000).

allowing the Plaintiffs to seek redress for the Defendant Caverton's breach of the brokerage

contract because brokerage contracts are an essential part of how the majority of charterparties

are made.  As such, this Court should be guided by the modern U.S. Supreme Court tests for

admiralty jurisdiction and find admiralty jurisdiction is present in the case at hand.


**POINT IV**

**THE PLAINTIFFS HAVE ASSERTED A VALID ADMIRALTY CLAIM
UNDER ENGLISH LAW, WHICH IS THE SUBSTANTIVE LAW OF THE CONTRACT**

Separate and apart from the above arguments, it must further be pointed out that a

rule developed by the district courts is that the existence *vel non* of a valid maritime claim

for purposes of a Rule B attachment turns on the applicable substantive law when

assessing whether a maritime plaintiff has pled a *prima facie* case to justify the

attachment. Sonito Shipping Company Ltd. v. Sun United Maritime Ltd., 478  F.Supp. 2d

532, 536 (S.D.N.Y. Mar. 19, 2007). This rule has developed because, in the majority of

cases, the purpose of initiating a Rule B action in New York is to obtain security for a

maritime claim, the substantive merits of which will be addressed in another forum. *See*,

Seatrans Shipping Corp. v. Interamericas Marine Transport, Ltd., 1997 U.S. Dist. Lexis

5665 * 2 (S.D.N.Y. April 28, 1997)(" Rule B contains no venue limitation. It may be

used for the sole purpose of obtaining security.")

In Sonito Shipping, the district court, Charles S. Haight, Sr. D.J., held that the plaintiff

did not have a valid *prima facie* claim for indemnity under an Inter-Club agreement pursuant to

the governing law of the contract, therefore, the attachment was vacated. 478 F. Supp. 2d at 544.

Judge Haight held that Sonito's claim against Sun had not yet accrued under English law and,

therefore, the Plaintiff Sonito had not carried its burden of showing that it had a valid maritime claim under English law *Id.*; *see also,* T&O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F.Supp. 2d 310, 315-16 (S.D.N.Y. Jan. 20, 2006)(The district court, Shira A. Scheindlin, D.J., held that Rule B is procedural in nature, and when a party brings a Rule B attachment in this district, questions about its validity are governed by federal law, but English law governed the question of whether T&O had made a *prima facie* showing that it had a maritime claim against Lydia Mar.).

The principles articulated in Sonito Shipping and T&O Shipping can be applied to the case at hand by reason of the fact that the dispute between the Plaintiffs and Defendant Caverton will be subject to English law and arbitration in London as the brokerage agreement arises from the Charter Party for the M/V BW SAGA, which explicitly states that it is subject to English law and London arbitration. There are, however, some significant differences between the case now before the court and Sonito and T&O. In both Sonito and T&O, the plaintiffs obtained Process of Attachment for claims that alleged breach of charter party whereby the parties to the disputes agreed to be bound by English law and the question of law in both cases was whether an indemnity claim had yet accrued. In the case at hand, by contrast, Plaintiffs' claim against Defendant Caverton, is not for breach of a charter party, but for the breach of a brokerage contract to negotiate the underlying charter party. In the case at hand there is no question of ripeness with respect to Plaintiffs' claim against Defendant Caverton as Defendant Caverton refused to make payments when they became due. *See,* Duffy Declaration at ¶ 5, citing to Verified Complaint at ¶'s 13 and 14. Plaintiffs' claim has accrued. Nevertheless, Plaintiffs have pled that they will prosecute the underlying claims against Defendant Caverton in London arbitration pursuant to English law. *See,* Verified Complaint at ¶ 19.

The suit in this Court was initiated to obtain security for the London arbitration. Applying the rationale of <u>Sonito Shipping</u> and <u>T&O Shipping</u> to determine whether the Plaintiffs have a valid *prima facie* maritime claim, the question becomes whether Plaintiffs are able to demonstrate that they have a valid *prima facie* maritime claim against Defendant Caverton that is recognized by the Law of England. Plaintiffs maintain that they do have such a maritime claim. In support of their position, the Plaintiffs present the accompanying declaration of an English solicitor, Mark Terence O'Neil, to demonstrate that they do have a valid *prima facie* maritime claim under English law.

In its Motion to Vacate the Attachment, the Defendant Caverton relies on the Declaration of Hutcheon as a *fait accompli*, that since the underlying charterparties do not name the Plaintiffs, the Plaintiffs are excluded from the language of the English law of Contracts (Rights of Third Parties) Act 1999 and, therefore, there is no maritime jurisdiction under English law. However, the Declaration of O'Neil demonstrates that the exclusion of the Plaintiffs from the charterparties is not fatal. As Mr. O'Neil points out, section 48(5) of the Arbitration Act of 1996 allows for the rectification of a contract. *See*, O'Neil Declaration at ¶'s 9 – 11. Therefore it is clear that under English law, the Plaintiffs have a valid *prima facie* claim that is a "maritime" claim.

It should also be emphasized that the Declaration of Hutcheon includes a statement of English case law that is hard to square with the Declaration of Mr. O'Neil. Mr. Hutcheon states that "My review of applicable English case law has revealed no reported decision in which admiralty jurisdiction was extended to a claim for a charter party brokerage commission." *See*, Declaration of Hutcheon at ¶ 6. However, in his Declaration Mr. O'Neil attaches as an exhibit the case of *Nisshin Shipping Co Ltd v Cleaves & Company* [2004] 1 Lloyd's Report 38, wherein

an English Court held that since the scope of the disputes covered by an arbitration agreement was wide enough to embrace a dispute between owners and charterers about payment of the brokers' commissions, the brokers were entitled and indeed obliged to refer those disputes to arbitration and the arbitrators had jurisdiction to determine them. *See*, Declaration of O'Neil at ¶ 15. Mr. O'Neil goes on to state that under English law it is, therefore, clear that a dispute arising in relation to unpaid brokerage commission is a maritime dispute and the brokers are obliged to rely on the law and jurisdiction clause of the relevant charterparty. *See, id.* at ¶ 16; *see also*, Shipbrokers' Claims for Commission Revisited, 30 TULANE MARITIME LAW JOURNAL 163 (To the extent that there was any doubt under English Law with respect to whether or not a shipbroker's claim for a commission would fall within the Court's admiralty jurisdiction, *Nisshan* should provide an answer in the affirmative.").

Mr. O'Neil is more than qualified to present an opinion as to whether or not Plaintiffs have set forth a valid *prima facie* maritime claim that can be prosecuted in England. See, Declaration of O'Neil at ¶ 1. Further Mr. O'Neil's legal opinion is based on his review of the facts and, also, his analysis of the legal position under English law. Finally, Mr. O'Neil provides documentary support for his contentions, which documentary support is in direct contradiction to the unsupported Declaration of Hutcheon.

Under the rationale of Sonito Shipping and T&O Shipping, Plaintiffs have, therefore, demonstrated that they have a *prima facie* maritime claim against Defendant Caverton under the substantive law of the jurisdiction where it will pursue its claim against Defendant Caverton.

To conclude on this point, the Plaintiffs have pled a more than sufficient *prima facie* maritime case against Defendant Caverton, its pleadings are supported by more than sufficient factual allegations and, therefore, Plaintiffs' maritime claim against Defendant Caverton is

18

sufficient under any applicable law be it U.S. federal admiralty law or English law. The

jurisdictional prerequisite for a maritime attachment has been met, and the Plaintiffs have

satisfied the textual requirements of Rule B. Accordingly, the motion to vacate must be denied.


## POINT V

### AN AWARD OF ATTORNEY'S FEES
### IS NOT IN ANY WAY JUSTIFIED IN THIS CASE

Defendant Caverton argues that Plaintiffs have acted in bad faith. "Under the bad faith

standard, neither meritlessness nor improper motive is individually sufficient; a party seeking

attorneys' fees and costs must prove both prongs of the test by clear evidence." *See*, Dolco Inv.,

LTD. v. Moonriver Dev., LTD., 526 F. Supp. 2d 451, 453 (S.D.N.Y. 2007) *citing to* Sierra Club

v. United States Army Corps of Engineers, 776 F.2d 383, 390 (2d Cir. 1985).

First, Defendant Caverton's supposed evidence of meritlessness is, in and of itself,

meritless. Defendant states that "There is 'clear evidence' that the challenged attachment was

made without color, as there is compelling, on-point precedent that a simple breach of claim for

lost brokerage commissions does not confer maritime jurisdiction."[4] See, Defendant's Memo of

Law at page 9. However, Defendant Caverton itself missed precedent from the Ninth Circuit

holding that the same exact type of contract as the one at issue in the case at hand falls under a

federal court's admiralty jurisdiction. Furthermore, Defendant Caverton's numerous citations to

case law prior to Exxon and Kirby for the questionable continuity of the preliminary contracts

doctrine and a *per se* exclusion of brokerage agreements from admiralty jurisdiction do not

---

[4] Plaintiff's claim is misstated by the Defendants as it is a claim for breach of a contract to pay
the Plaintiffs to broker a charterparty maritime agreement.

provide evidence that the Plaintiffs' allegations in this matter have no merit and have no possibility of falling under this Court's admiralty jurisdiction.

Second, rather than provide "clear evidence" of improper motive as it is required to do, Defendant Caverton simply states that the fact that attachment of funds pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure was "harassing is self-evident." *See*, Defendant's Memo of Law at page 10. This is not the type of "clear evidence" required by the case law on the awarding of attorney's fees.

Finally, Defendant Caverton confuses what makes a claim colorable. Defendant states, "Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of 'whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established.'" *See*, Defendant's Memo of Law at page 9 (citation omitted). In the case at hand, Defendant does not dispute Plaintiffs' allegation that it breached the brokerage contract by refusing to continue to remit monthly payments due under the contract after making the first two payments. The issue that Defendant argues instead is that admiralty jurisdiction is lacking in this matter, a point of law, not fact. This Court should find, under the U.S. Supreme Court precedents of Exxon and Kirby, that the charterparty brokerage contract in this matter is a maritime contract entered into for the purpose of furthering maritime commerce.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs have satisfied the requirements for a valid maritime attachment. Thus, the Motion of Defendant Caverton to vacate the attachment and for the awarding of attorneys' fees and costs, must be denied.

Dated: Port Washington, New York
       July 28, 2008

                              Respectfully submitted,
                              CHALOS, O'CONNOR & DUFFY
                              Attorneys for Plaintiffs,

              By:             _____
                              Owen F. Duffy (OD-3144)
                              366 Main Street
                              Port Washington, New York 11050
                              Tel:    516-767-3600
                              Fax:    516-767-3925